## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| AARON RANDALL, derivatively on behalf of MAMMOTH ENERGY SERVICES, INC., | |
| Plaintiff, | **C.A. No. _____** |
| v. | |
| ARTY STRAEHLA, MARK LAYTON, ARTHUR AMRON, PAUL V. HEERWAGEN IV, MARC MCCARTHY, JIM PALM, MATTHEW ROSS, ARTHUR SMITH, GULFPORT ENERGY CORPORATION, and WEXFORD CAPITAL LP | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| MAMMOTH ENERGY SERVICES, INC. | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Aaron Randall ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Mammoth Energy Services, Inc. ("Mammoth Energy" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Arty Straehla, Mark Layton, Arthur Amron, Paul V. Heerwagen IV, Marc McCarthy, Jim Palm, Matthew Ross, and Arthur Smith (collectively, the "Individual Defendants"), Gulfport Energy Corporation, and Wexford Capital LP (the "Selling Controlling Shareholders") (collectively, the "Defendants") for breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of Mammoth Energy, unjust enrichment,

1

waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mammoth Energy, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Mammoth Energy's directors, officers, and controlling shareholders, from October 19, 2017 through the present (the "Relevant Period").

2.      Mammoth Energy traditionally operated in the oil and gas industry. Recently, the Company has expanded its business into infrastructure. The Company primarily provides three types of energy services: pressure pumping, natural sand proppant,[1] and infrastructure.

3.      Mammoth Energy has two primary shareholders: Wexford Capital LP ("Wexford") and Gulfport Energy Corporation ("Gulfport"). As of April 1, 2019, Wexford is a controlling shareholder, owning 49% of the Company's common stock. As of the same date, Gulfport owns 21.9% of Mammoth Energy's common stock. Gulfport was also the Company's

---

[1] This refers to the process of pumping round-grained sand into fractures in oil-bearing rock, a critical step in hydraulic fracturing, or "fracking."

top customer in the fiscal years ended December 31, 2017 and 2016, respectively, and contributed the second-highest revenue in fiscal 2018[2] (behind Mammoth Energy's Puerto Rico operations).[3]

4.      In 2017, Mammoth Energy formed its subsidiary, Cobra Acquisitions, Ltd. ("Cobra"), through which it began its first foray into the infrastructure sector. Cobra has almost exclusively operated in Puerto Rico pursuant to two contracts with the Puerto Rico Electric Power Authority ("PREPA") to work on restoring electricity to the island after its devastation by Hurricane Maria in September 2017. Mammoth Energy announced the first of these contracts (the "First Cobra Contract") in a press release issued on October 19, 2017, less than a month after the hurricane.

5.      Mammoth Energy's stock price rose over 19% during the day after the announcement, from a close of $14.49 on October 19, 2017 to close at $17.26 on October 20, 2017.

6.      On January 29, 2018, the Company issued another press release, wherein it disclosed that the First Cobra Contract had more than doubled to $445.4 million.

7.      The First Cobra Contract was again amended on February 27, 2018 to more than twice the new amended amount, for a new total value of $945.4 million.

8.      On May 29, 2018, Mammoth Energy announced that Cobra had entered into a second, additional contract with PREPA (the "Second Cobra Contract") worth $900 million. Both the First and Second Cobra Contracts (the "Cobra Contracts") involved the same infrastructure restoration services.

---

[2] References to the Company's fiscal year refer to the respective year ended December 31.
[3] Mammoth Energy Services, Inc., Annual Report (Form 10-K) (Mar. 18, 2019).

9.      On July 29, 2018, shortly after the Company announced the Second Cobra Contract, when the Company's shares were trading at an all-time high, the Selling Controlling Shareholders[4] executed an underwritten secondary public offering (the "Underwritten Secondary Offering") of 4,000,000 shares of Company stock at a price to the Selling Controlling Shareholders of $38.01 per share. Altogether, the Selling Controlling Shareholders sold over $166 million worth of Company stock at artificially inflated prices during the Underwritten Secondary Offering.

10.     Near the end of the trading day on May 24, 2019, the *Wall Street Journal* published an article reporting that Ahsha Tribble, the Federal Emergency Management Agency ("FEMA") Administrator who had assigned the Cobra Contracts, had been accused of improperly directing work to Cobra. The article also stated that Tribble and Cobra were under investigation for these claims as well as Cobra's suspiciously high rates for its energy services by the Department of Homeland Security's Office of the Inspector General.

11.     On this news, the Company's stock price fell $1.36 (over 11%) over the next two trading days, from opening at $12.35 on May 24, 2019 to close at $10.99 on May 29, 2019.

12.     Just before the close of trading on June 5, 2019, after the Company's stock price had begun to recover, the *Wall Street Journal* published another article about the inquiry into the Cobra Contracts, this time divulging that the FBI had begun its own investigation into the matter.

13.     On this news, the price per share of Mammoth Energy stock dropped over 45% ($5.09) over the next two trading days, from a close of $11.20 on June 4, 2019, to close at $6.11 on June 6, 2019.

---

[4] Including Wexford's controlled entity, MEH Sub LLC ("MEH").

14.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company's subsidiary, Cobra, had obtained the two Cobra Contracts worth over $1.8 billion through improper means; (2) specifically, Cobra had been unfairly steered into its contracts with PREPA, rather than securing them through an impartial Request for Proposal ("RFP") procedure; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

15.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

16.     Moreover, during the Relevant Period, three of the Individual Defendants breached their fiduciary duties by engaging in insider sales, netting proceeds of over $1.7 million. Defendants also breached their fiduciary duties by conspiring with the Selling Controlling Shareholders in the sale of 4.38 million shares of Mammoth Energy common stock by the Selling Controlling Shareholders in a secondary public offering at artificially inflated prices.

17.     In light of the Individual Defendants' misconduct, which has subjected Mammoth Energy, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO"), to being named as defendants in two federal securities fraud class action lawsuits pending in the United

States District Court for the Western District of Oklahoma (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and CFO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Mammoth Energy's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

20.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

25.     Venue is proper in this District because Mammoth Energy and the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of Mammoth Energy common stock. Plaintiff has continuously held Mammoth Energy common stock at all relevant times.

### Nominal Defendant Mammoth Energy

27.     Mammoth Energy is a Delaware corporation with its principal executive offices at 14201 Caliber Drive, Suite 300, Oklahoma City, Oklahoma, 73134. Mammoth Energy's shares trade on the NASDAQ Global Select Exchange ("NasdaqGS") under the ticker symbol "TUSK."

**Defendant Straehla**

28.     Defendant Arty Straehla ("Straehla") has served as the Company's CEO and as a director since June 2016. According to the Company's Schedule 14A filed with the SEC on April 26, 2019 (the "2019 Proxy Statement"), as of April 1, 2019, Defendant Straehla beneficially owned 103,775 common shares[5] of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2019 was $16.94, Straehla owned approximately $1.76 million worth of Mammoth Energy stock.

29.     For the fiscal year ended December 31, 2018, Defendant Straehla received $1,832,087 in compensation from the Company. This included $600,000 in salary, $1,200,000 in bonuses, and $32,087 in other compensation.

30.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Straehla made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| November 14, 2017 | 18,289 | $ 18.71 | $ 342,187.19 |
| November 15, 2017 | 7,553 | $ 17.81 | $ 134,518.93 |
| November 8, 2018 | 36,611 | $ 26.87 | $ 983,737.57 |
| November 12, 2018 | 2,230 | $ 26.20 | $ 58,426.00 |

Thus, in total, before the fraud was exposed, he sold 64,683 Company shares on inside information, for which he received approximately $1.5 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

---

[5] Includes 1,792 shares under Defendant Straehla's control that are currently in custodial accounts for his grandchildren.

31.     The Company's 2019 Proxy Statement stated the following about Defendant Straehla:

> **Arty Straehla, age 65.** Arty Straehla has served as our Chief Executive Officer and as a member of our board of directors since our formation in June 2016. Mr. Straehla served as the Chief Executive Officer of the general partner of Mammoth Partners from February 2016 until October 2016. Prior to joining our company, Mr. Straehla was employed as Chief Executive Officer by Serva Group LLC, an oilfield equipment manufacturer, from July 2010 to January 2016. Mr. Straehla was employed by Diamondback Energy Services, Inc. an oilfield services company, from January 2006 to November 2008, where his last position was Chief Executive Officer. In December 2005, Mr. Straehla completed a 26-year career with the Goodyear Tire and Rubber Co. where his last position was the director of consumer tire manufacturing for the North American consumer tire operations. In this capacity, Mr. Straehla oversaw eight tire plants with 12,000 employees, a $2.5 billion operating budget, a $115.0 million capital expenditures budget and a production capacity of 100 million tires per year. Mr. Straehla holds a Bachelor of Science degree in Secondary Education and a Master of Arts degree in History from Oklahoma State University. Mr. Straehla also has a Master of Business Administration degree from Oklahoma City University. We believe Mr. Straehla's executive management experience and broad knowledge of oilfield services, manufacturing and oil and natural gas industries qualify him for service as a member of our board of directors.

### Defendant Layton

32.     Defendant Mark Layton ("Layton") has served as Mammoth Energy's CFO since June 2016 and as its Secretary since its initial public offering ("IPO") on October 14, 2016. According to the 2019 Proxy Statement, as of April 1, 2019, Defendant Layton beneficially owned 30,372 common shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2019 was $16.94, Layton owned approximately $514,501 worth of Mammoth Energy stock.

33.     For the fiscal year ended December 31, 2018, Defendant Layton received $1,108,250 in compensation from the Company. This included $600,000 in salary, $1,200,000 in bonuses, and $32,087 in other compensation.

34.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Layton made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| November 14, 2017 | 925 | $ 19.01 | $ 17,584.25 |
| March 1, 2018 | 4,373 | $ 26.13 | $ 114,266.49 |

Thus, in total, before the fraud was exposed, he sold 5,298 Company shares on inside information, for which he received approximately $131,850. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

35.     The 2019 Proxy Statement states the following about Defendant Layton:

**Mark Layton**. Mark Layton has served as our Chief Financial Officer since our formation on June 3, 2016 and as our Secretary since our IPO on October 14, 2016. Mr. Layton served as the Chief Financial Officer of the general partner of Mammoth Partners from August 2014 until October 2016. Mr. Layton served as Chief Financial Officer of Stingray Pressure Pumping LLC, a subsidiary of the Company, from January 2014 to August 2014. Mr. Layton was employed from August 2011 through January 2014 by Archer Well Company Inc., an oilfield services company, where his last position was Director of Finance for North America. From September 2009 through August 2011, Mr. Layton was employed by Great White Energy Services, Inc., an oilfield services company, where his last position was Corporate Controller and Director of Financial Reporting. Mr. Layton served as Vice President of Finance of Crossroads Wireless, Inc., a wireless telecommunications service company, from May 2007 through September 2009. From April 2004 through May 2007, Mr. Layton served as the Director of Financial Reporting for Chickasaw Holding Company, a telecommunications service company. He began his career in public accounting with Finley & Cook PLLC. Mr. Layton has a Bachelor of Science degree in Accounting from the University of Central Oklahoma. Mr. Layton is a Certified Public Accountant.

**Defendant Amron**

36.     Defendant Arthur Amron ("Amron") has served as a Company director since January 2019. He also serves as the Company's Independent Director, and as a member of the Nominating Committee and the Compensation Committee. Defendant Amron is also a Partner and the General Counsel at Wexford, which he joined in 1994. Pursuant to his employment agreement with Wexford, all of the Company shares granted to Defendant Amron are assigned to Wexford.

37.     The Company's 2019 Proxy Statement stated the following about Defendant Amron:

> **Arthur Amron, age 62.** Arthur Amron has served as a director of the Company since January 2019. Mr. Amron is a Partner at Wexford Capital and serves as its General Counsel. Mr. Amron has served on the board of directors of Nephros, Inc., a commercial stage medical device and commercial products company, since September 2007. Mr. Amron also served on the board of directors of the general partner of Rhino Resource Partners LP, or Rhino, a diversified energy limited partnership focused on coal and energy related assets and activities, from January 2010 until the sale of Wexford Capital's interest in Rhino to Royal Energy Resources, Inc. in March of 2016. From 1991 to 1994, Mr. Amron was an Associate at Schulte Roth & Zabel LLP, specializing in corporate and bankruptcy law and, from 1984 to 1991, Mr. Amron was an Associate at Debevoise & Plimpton LLP specializing in corporate litigation and bankruptcy law. Mr. Amron holds a J.D. from Harvard University, a B.A. in Political Theory from Colgate University and is a member of the New York Bar. We believe Mr. Amron's legal training and extensive transactional experience, as well as his experience serving on boards of directors of other public companies qualify him for service as a member of our board of directors.

**Defendant Heerwagen**

38.     Defendant Paul V. Heerwagen IV ("Heerwagen") has served as a Company director since January 2017.

39.     Defendant Heerwagen serves as Gulfport's Senior Vice President of Corporate Development and Strategy. He was nominated to Mammoth Energy's Board of Directors by

Gulfport pursuant to the Company's IPO agreement, whereby Gulfport is entitled to nominate one director to Mammoth Energy's Board so long as it holds at least 10% of the Company's stock. Pursuant to his employment agreement with Gulfport, all of the Company shares granted to Defendant Heerwagen are assigned to Gulfport.

40.     For the fiscal year ended December 31, 2019, Defendant Heerwagen received $233,576 in compensation from the Company. This included $70,000 in cash fees and $163,576 in stock awards.

41.     The Company's 2019 Proxy Statement stated the following about Defendant Heerwagen:

> **Paul Heerwagen, age 34.** Paul Heerwagen has served as a director of the Company since January 2017. Mr. Heerwagen serves as Senior Vice President of Corporate Development and Strategy for Gulfport Energy Corporation, or Gulfport, an independent oil and natural gas exploration and production company. Since joining Gulfport in May 2007, Mr. Heerwagen has served in multiple roles, including as the Director of Investor Relations and Corporate Affairs. In addition, Mr. Heerwagen was involved in the formation of the Stingray entities in 2012 where he served as their President from 2012 to 2014 and oversaw their business operations. Mr. Heerwagen holds a Bachelor of Science degree in Finance from Oklahoma State University. We believe Mr. Heerwagen's corporate strategic planning experience and his experience in the oil and natural gas industry, in particular his experience in the oilfield services business through his prior position with the Stingray entities (which are now our subsidiaries), qualifies him for service as a member of our board of directors.

**<u>Defendant McCarthy</u>**

42.     Defendant Marc McCarthy ("McCarthy") has served as the Company's Chairman of the Board since June 2016. He also serves as Chair of the Audit Committee.

43.     Defendant McCarthy serves as a Partner at Wexford. Pursuant to his employment agreement with Wexford, all of the Company shares granted to Defendant McCarthy are assigned to Wexford.

44.     For the fiscal year ended December 31, 2018, Defendant McCarthy received $238,576 in compensation from the Company. This included $75,000 in cash fees, and $163,576 in stock awards.

45.     The Company's 2019 Proxy Statement stated the following about Defendant McCarthy:

> **Marc McCarthy, age 48.** Marc McCarthy has served as Chairman of the Board of Directors since our formation in June 2016, and served as Chairman of the Board of Directors of the company that was the general partner of Mammoth Energy Partners LP, or Mammoth Partners, from September 2014 until October 2016. Mr. McCarthy is a Partner at Wexford Capital LP, or Wexford Capital, having joined Wexford in June 2008. Mr. McCarthy served as a director of Penn Virginia Corporation, an independent exploration and production company, from September 2016 to March 2018. Mr. McCarthy served as a director of Coronado Midstream LLC, a private gas gathering and processing operation in Midland, TX from October 2012 until March 2014. From September 2009 until June 2013, Mr. McCarthy served as Chairman of the Board and a director of EPL Oil & Gas, Inc., an independent oil and natural gas exploration and production company. He also served on the Nominating and Governance Committee of EPL Oil & Gas, Inc. Before joining Wexford, Mr. McCarthy was a Senior Managing Director at Bear Stearns & Co., Inc. within its Global Equity Research Department having joined in 1997. Prior to 1997, he worked in equity research at Prudential Securities, also following the oil and gas sector. Mr. McCarthy is a Chartered Financial Analyst and received a B.A. in Economics from Tufts University. We believe Mr. McCarthy's experience as a director of both publicly-traded and private oil and gas companies, as well as his experience in evaluating financial, strategic and operational aspects of companies in the oil and natural gas industry at Wexford, qualifies him for service as a member of our board of directors.

**Defendant Palm**

46.     Defendant James Palm ("Palm") has served as a Company director since June 2017. He also serves as a member of the Compensation Committee, the Nominating Committee, and the Audit Committee. According to the 2019 Proxy Statement, as of April 1, 2019, Defendant Palm beneficially owned 17,070 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2019 was $16.94, Palm owned approximately $289,165 worth of Mammoth Energy stock.

47.     For the fiscal year ended December 31, 2018, Defendant Palm received $280,357 in compensation from the Company. This included $85,000 in cash fees, and $195,357 in stock awards.

48.     The Company's 2019 Proxy Statement stated the following about Defendant Palm:

> **James Palm, age 74.** James Palm has served as a director of the Company since June 2017. Mr. Palm most recently served as a director of Gulfport from February 2006 and as Chief Executive Officer of Gulfport from December 2005, in each case until his retirement in February 2014. Prior to joining Gulfport, Mr. Palm pursued oil and gas investments primarily in Oklahoma, the Texas Panhandle and Kansas as the manager and owner of Crescent Exploration, LLC, a company he founded in 1995. Mr. Palm currently serves as a member of the Industry Advisory Committee of the Oklahoma Corporation Commission. From October 2001 through October 2003, Mr. Palm served as the Chairman of the Oklahoma Energy Resources Board. From 1997 through 1999, Mr. Palm served as the President of the Oklahoma Independent Petroleum Association. Mr. Palm received a Bachelor of Science degree in Mechanical Engineering in 1968, and a Master's in Business Administration in 1971, both from Oklahoma State University. We believe that Mr. Palm's experience in the oil and natural gas industry, as well as his prior management experience, qualifies him for service as a member of our board of directors.

### Defendant Ross

49.     Defendant Matthew Ross ("Ross") has served as a Company director since November 2016. He also serves as Chair of the Nominating Committee and as a member of the Audit Committee. According to the 2019 Proxy Statement, as of April 1, 2019, Defendant Ross beneficially owned 9,580 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2019 was $16.94, Ross owned approximately $162,285 worth of Mammoth Energy stock.

50.     For the fiscal year ended December 31, 2018, Defendant Ross received $238,576 in compensation from the Company. This included $75,000 in cash fees, and $163,576 in stock awards.

51.    The Company's 2019 Proxy Statement stated the following about Defendant

Ross:

> **Matthew Ross, age 65.** Matthew Ross has served as a director of the Company
> since November 2016. He served as Deputy General Counsel of Deloitte LLP
> from September 1990 until his retirement in May 2016. In addition, from
> November 2002 to May 2016, Mr. Ross served as a member of the board of
> directors of a global captive insurance company, where he chaired the investment
> committee and was a member of the underwriting committee. Prior to joining
> Deloitte, from September 1984 to September 1990, Mr. Ross was Associate
> General Counsel at KPMG and, from September 1978 to September 1984, a
> corporate attorney at Cravath, Swaine & Moore LLP, where he practiced
> securities, banking and financing law. Mr. Ross is a member of the advisory board
> of East End Financial Group. Mr. Ross holds a Bachelor of Science degree in
> Economics (summa cum laude) from The Wharton School at the University of
> Pennsylvania and a Doctor of Jurisprudence degree from the University of
> Virginia Law School. We believe Mr. Ross's management experience and
> financial background, combined with his experience in advising on a broad range
> of legal matters, qualifies him for service as a member of our board of directors.

### Defendant Smith

52.    Defendant Arthur Smith ("Smith") has served as a Company director since

October 2016. He also serves as Chair of the Audit Committee and as a member of the

Compensation Committee. According to the 2019 Proxy Statement, as of April 1, 2019,

Defendant Smith beneficially owned 9,580 shares of the Company's common stock. Given that

the price per share of the Company's common stock at the close of trading on April 1, 2019 was

$16.94, Smith owned approximately $162,285 worth of Mammoth Energy stock.

53.    For the fiscal year ended December 31, 2018, Defendant Smith received

$253,576 in compensation from the Company. This included $90,000 in cash fees, and

$163,576 in stock awards.

54.    During the period of time when the Company materially misstated information to

the investing public to keep the stock price inflated, and before the scheme was exposed,

Defendant Smith made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| December 3, 2018 | 6,000 | $ 24.85 | $ 149,100.00 |

Thus, in total, before the fraud was exposed, he sold 6,000 Company shares on inside information, for which he received approximately $149,100. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

55.     The Company's 2019 Proxy Statement stated the following about Defendant Smith:

**Arthur Smith, age 66.** Arthur Smith has served as a director of the Company since our IPO in October 2016. He founded Triple Double Advisors, LLC, an investment advisory firm focusing on the energy industry, in 2007 and is its President and Managing Member, a position he has held since August 2007. Mr. Smith was Chairman and Chief Executive Officer of John S. Herold, Inc., an independent energy research firm, from 1984 until the firm was merged into IHS, Inc. in 2007. Prior to that, Mr. Smith was an energy equity analyst at Oppenheimer & Co., Inc. (1982-1984), The First Boston Corp. (1979-1982) and Argus Research Corp. (1976-1979). Since September 2015, Mr. Smith has served on the board of independent crude storage operator, Fairway Energy Partners, LP. Mr. Smith served on the board of directors of Plains All American GP LLC, the general partner of Plains All America Pipeline, L.P., from 1999 until 2010. Mr. Smith is also a former director of PAA Natural Gas Storage, L.P. from April 2010 until December 2013 and Pioneer Southwest Energy Partners, L.P. from May 2008 until December 2013. Mr. Smith is a former director of Pioneer Natural Resources (1993-1998), Cabot Oil & Gas Corporation (1996-2000) and Evergreen Resources, Inc. (2000- 2004), and was a past appointee to the National Petroleum Council. Mr. Smith holds a Bachelor of Administration from Duke University and a Master's of Business Administration from New York University's Stern School of Business. In addition, he holds the Certified Financial Analyst designation. Mr. Smith is a Fellow and active in the National Association of Corporate Directors. We believe that Mr. Smith's experience with financial matters in the oil and gas industry qualifies him for service as a member of our board of directors.

### Gulfport Energy Corporation

56.     Gulfport is an oil and gas company, also based in Oklahoma City, that is heavily connected to Mammoth Energy. Gulfport was formed with equity financing from Wexford—which also owns 49% of Mammoth Energy's stock—in 1997.

57.     According to the 2019 Proxy Statement, as of April 1, 2019, Gulfport beneficially owned 9,826,893 (21.9%) of Mammoth Energy's common stock, making it a controlling shareholder. Given that the price per share of the Company's common stock at the close of trading on April 1, 2019 was $16.94, Gulfport owned over $166 million worth of Mammoth Energy stock.

58.     Pursuant to Mammoth Energy's IPO agreement dated October 16, 2016, Gulfport may nominate a director to the Board when it holds more than 10% ownership of the Company. This nominee, successfully elected in 2018, is Defendant Heerwagen, who is employed as a Senior Vice President at Gulfport. Under his employment agreement with Gulfport, all shares that Defendant Heerwagen receives from Mammoth Energy as directorial compensation are assigned to Gulfport. On June 5, 2019 for example, 12,235 of Gulfport's shares of Mammoth Energy stock—which were originally granted to Defendant Heerwagen—vested, as well as 2,655 restricted stock units.

59.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Gulfport made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| June 29, 2018 | 1,235,600 | $ 38.01 | $ 46,965,156.00 |
| July 30, 2018 | 118,974 | $ 38.01 | $ 4,522,201.74 |

Thus, in total, before the fraud was exposed, Gulfport sold 1,354,574 Company shares on inside information, for which it received approximately $51,487,357. Gulfport's insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate Gulfport's motive in facilitating and participating in the scheme.

60.     The Company's 2019 Proxy Statement stated the following about Gulfport's many business dealings with the Company:

In September 2014, effective October 1, 2014, Gulfport entered into an amended and restated master services agreement with Stingray Pressure Pumping LLC, or Pressure Pumping, for pressure pumping services. In July 2018, Gulfport and Pressure Pumping entered into an amended agreement, which extended the term of the existing agreement until December 31, 2021, unless it is terminated earlier in accordance with its terms, and expanded the service area to include both Ohio and Oklahoma. Pursuant to this agreement, Pressure Pumping has agreed to provide pressure pumping, stimulation and related completion and rework services to Gulfport, dedicating up to two spreads and related equipment for the performance of these services. Gulfport has agreed to pay Pressure Pumping a monthly service fee plus the associated costs of the services provided. Gulfport and Pressure Pumping have each agreed to maintain insurance at certain minimum thresholds. This agreement has a term of four years ending on December 31, 2021, and includes, among others, confidentiality and non-solicitation provisions. This agreement may be terminated in the event of a covenant breach by either party on 45 days written notice and a failure to cure. Pressure Pumping may also terminate in the event of payment default by Gulfport. Additionally, Gulfport can, without liability, countermand any work order given to us at any time before we begin such work. If the work had already begun, Gulfport could then still cancel the service at any time, being liable only for the value of the work performed prior to the cancellation. We can terminate the master service agreement by giving Gulfport written notice prior to receiving a notification from Gulfport to perform a specific service. *For the year ended December 31, 2018, we recognized revenue from Gulfport of approximately $96.0 million and, as of December 31, 2018, Gulfport owed us approximately $8.2 million for such services.*

In September 2014, effective October 1, 2014, Gulfport entered into a sand supply agreement, as amended on November 3, 2015 and August 6, 2018, with Muskie Proppant LLC, or Muskie Proppant. Pursuant to this agreement, Muskie Proppant has agreed to sell and deliver, and Gulfport has agreed to purchase, specified annual and monthly amounts of proppant sand, subject to certain exceptions

specified in the agreement, and pay certain costs and expenses. Failure by either Muskie Proppant or Gulfport to deliver or accept the minimum monthly amount results in damages calculated per ton based on the difference between the monthly obligation amount and the amount actually delivered or accepted, as applicable. In addition, failure to pick up the sand on a timely basis from the designated facility will lead to demurrage charges payable by Gulfport. If Gulfport fails to make payments when due, or Muskie Proppant fails to deliver the required amounts of sand over three consecutive months, the other party can terminate the sand supply agreement. The sand supply agreement has a term ending on December 31, 2021 and includes, among others, confidentiality and non-solicitation provisions. For the year ended December 31, 2018, we recognized revenue from Gulfport of approximately $25.1 million and, as of December 31, 2018, Gulfport owed us approximately $1.2 million for such services.

Our wholly owned subsidiaries, Stingray Energy, Stingray Cementing and Panther Drilling Systems LLC, or Panther Drilling, provide services to Gulfport pursuant to master service agreements. These master service agreements may be terminated by us at any time prior to the receipt of notification by Gulfport to perform work pursuant to the agreements. Gulfport may terminate the master service agreements at any time by giving us written notice. The master service agreements do not obligate Gulfport to call upon us to perform any work under the master service agreements, and we are not obligated to accept any work requests from Gulfport. The designation of any work to be performed by us and the cessation of such work is at the sole discretion of Gulfport. ***For the year ended December 31, 2018, Stingray Energy recognized revenue of approximately $14.7 million for services performed for Gulfport and, as of December 31, 2018, Gulfport owed Stingray Energy $1.7 million for such services. For the year ended December 31, 2018, Stingray Cementing recognized revenue of approximately $5.9 million for services performed for Gulfport. For the year ended December 31, 2018, Panther Drilling recognized revenue of approximately $.1 million for services performed for Gulfport.***

(Emphasis added).

## **Wexford Capital LP**

61.     Wexford is an investment advisory firm that manages hedge funds and private equity funds. Wexford specializes in bankruptcy, energy/natural resources, real estate, technology/telecommunications and transportation. Wexford manages MEH. According to the 2019 Proxy Statement, as of April 1, 2019, Wexford beneficially owned 21,988,473 (49.0%) of Mammoth Energy's common stock, making it a controlling shareholder. Given that the price

per share of the Company's common stock at the close of trading on April 1, 2019 was $16.94, Wexford owned over $372.4 million worth of Mammoth Energy stock.

62.     Wexford is party to an advisory services agreement with the Company whereby Wexford provides Mammoth Energy with general financial and strategic advisory services related to the Company's business in exchange for a $500,000 annual fee and out of pocket expenses. For the year ended December 31, 2018, Mammoth Energy paid Wexford $0.5 million pursuant to this agreement. Wexford and its affiliates provide other services to the Company as well. According to the 2019 Proxy Statement, the Company incurred "total costs under these arrangements of $1.0 million, and, as of December 31, 2018, owed approximately $0.1 million."

63.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Gulfport made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| June 29, 2018 | 2,764,400 | $ 38.01 | $ 105,074,844 |
| July 30, 2018 | 266,026 | $ 38.01 | $10,111,648 |

Thus, in total, before the fraud was exposed, Wexford sold 3,030,426 Company shares on inside information, for which it received approximately $115.186,492. Wexford's insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate Wexford's motive in facilitating and participating in the scheme.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

64.     By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of Mammoth Energy and because of their ability to control the business and

corporate affairs of Mammoth Energy, the Individual Defendants owed Mammoth Energy and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Mammoth Energy in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Mammoth Energy and its shareholders so as to benefit all shareholders equally.

65.     Each controlling shareholder, director and officer of the Company owes to Mammoth Energy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

66.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors and/or officers of Mammoth Energy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

67.     To discharge their duties, the controlling shareholders, officers and directors of Mammoth Energy were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

68.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Mammoth Energy, the absence of good faith on their part, or a reckless disregard for their duties

to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Mammoth Energy's Board at all relevant times.

69.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NasdaqGS, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

70.     To discharge their duties, the officers and directors of Mammoth Energy were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Mammoth Energy were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Oklahoma, and the United States, and pursuant to Mammoth Energy's own Code of Business Conduct and Ethics;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Mammoth Energy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Mammoth Energy and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Mammoth Energy's operations would comply with all applicable laws and Mammoth Energy's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full

and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

71.     Each of the Individual Defendants further owed to Mammoth Energy and the shareholders the duty of loyalty requiring that each favor Mammoth Energy's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

72.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Mammoth Energy and were at all times acting within the course and scope of such agency.

73.     Because of their advisory, executive, managerial, and directorial, and controlling shareholder positions with Mammoth Energy, each of the Individual Defendants had access to adverse, non-public information about the Company.

74.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Mammoth Energy.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

75.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. Defendants caused the Company to conceal the true facts as alleged herein. Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

76.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

77.     Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Defendants, who are directors of Mammoth Energy, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

78.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

79.     At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of Mammoth Energy and was at all times acting within the course and scope of such agency.

## MAMMOTH ENERGY'S CODE OF CONDUCT

80.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct"),

states that it applies to "[a]ll employees, including executive officers, and members of our

Board of Directors," as well as its consultants.

81.     The Code of Conduct provides, under the section titled, "Public Disclosure," that

the Company strives for high ethical standards, especially of honesty and integrity, stating that:

> It is the Company's policy that the information in its public communications,
> including all Securities and Exchange Commission ("SEC') filings, be full, fair,
> accurate, timely and understandable. All employees and directors who are
> involved in the disclosure process, including the Chief Financial Officer and his
> staff, are responsible for acting in furtherance of this policy. In particular, these
> individuals are required to maintain familiarity with the disclosure requirements
> applicable to the Company and are prohibited from knowingly misrepresenting,
> omitting, or causing others to misrepresent or omit, material facts about the
> Company to others, whether within or outside the Company, including the
> Company's independent auditors. In addition, any employee or director who has
> a supervisory role in the Company's disclosure process has an obligation to
> discharge his or her responsibilities diligently.

82.     The Code of Conduct provides that the Company prioritizes legal compliance,

including the prohibition against insider trading, stating, in relevant part:

> It is the Company's policy to comply with all applicable laws, rules and
> regulations. It is the personal responsibility of each employee and director to
> determine which laws, rules and regulations apply to his or her position with the
> Company and to adhere to the standards and restrictions imposed by those laws,
> rules and regulations. Generally, it is both illegal and against Company policy for
> any employee or director who is aware of material non-public information
> relating to the Company, any of the Company's clients or any other private or
> governmental issuer of securities to buy or sell any securities of the Company or
> any such other issuers, or recommend that another person buy, sell or hold the
> securities of the Company or those other issuers. Additionally, more detailed
> rules governing the trading of securities by the Company's officers and directors
> are set forth in the Company's insider trading policies, as in effect from time to
> time.

83.     The Code of Conduct also states that the Company does not seek any unfair

advantages and purports to succeed through "honest business competition," stating that:

The Company has a history of succeeding through honest business competition. It does not seek competitive advantages through illegal or unethical business practices. Each employee and director should endeavor to deal fairly with the Company's customers, service providers, suppliers, competitors and employees. No employee or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.

84.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

85.     Mammoth Energy is an energy company based in Oklahoma City that conducts its business in three core segments, the newest of which is infrastructure services. The Company was originally incorporated as a wholly owned subsidiary of Mammoth Energy Partners, LP, a Delaware limited liability company that was formed by Wexford in early 2014. The Company held its IPO in October 2016. Mammoth Energy is currently controlled by its two largest shareholders, Gulfport and Wexford.

### The Cobra Contracts

86.     In October 2017, the Company's subsidiary, Cobra, purportedly reached an agreement with PREPA to restore Puerto Rico's energy infrastructure following Hurricane Maria's destruction. Notably, as part of the agreement, PREPA, a bankrupt utility, would be providing $15 million upfront in order to facilitate Cobra's workforce. From the outset, the supposed agreement was questionable at best. The government and the press immediately began

questioning the suspicious contract arrangements the Company had begun to announce. For example, on October 31, 2017, *The Intercept* published an article questioning the Company's procurement of the First Cobra Contract, reporting that the Company's "leadership team went to Puerto Rico proactively to meet the authorities there and offer [its] services and expertise." Another article written by CNN in late 2017 questioned how "fledgling companies won such lucrative deals over larger, more established utilities," and noted that "many question[ed] whether PREPA followed the appropriate steps in awarding the contracts." The CNN article included statements by Brock Long, the head of FEMA—who stated that "There's not a lawyer within FEMA that would have ever approved that contract." This was in stark contrast to the Company's own representations during the Relevant Period.

87.     As early as December 2017, the Company's Cobra contract with PREPA was under government scrutiny. A letter sent to Defendant Straehla on December 1, 2017 by the Committee on Homeland Security and Governmental Affairs of the United States Senate requested detailed documentation and information about the First Cobra Contract and voiced concerns over the "company's apparent attempt to circumvent federal oversight."

88.     Nevertheless, on January 28, 2018, Cobra and PREPA amended the First Cobra Contract, doubling the total contract amount to $445.4 million. The following month, the parties amended and again increased the contract price significantly to a total of $945.5 million. On May 26, 2018, Cobra entered into the Second Cobra Contract, which was purportedly obtained through a competitive RFP bid process.

89.     On July 29, 2018, shortly after the Company announced the Second Cobra Contract, the Selling Controlling Shareholders completed the Underwritten Secondary Offering of 4,000,000 shares of Company stock at a price to the Selling Controlling Shareholders of

$38.01 per share. The Selling Controlling Shareholders also provided underwriters with an option to purchase up to an additional 600,000 shares of Company stock at the same price. On July 30, 2018, the option was exercised, and an additional 385,000 shares of Mammoth Energy stock was purchased by the underwriters. All proceeds from the Underwritten Secondary Offering went directly to the Selling Controlling Shareholders. Altogether, the Selling Controlling Shareholders sold over $166 million worth of Company stock at artificially inflated prices during the Underwritten Secondary Offering.

90.     During the fiscal year 2018, PREPA represented the Company's largest customer, accounting for approximately 60% of its revenue.

91.     Although the Cobra Contracts were under scrutiny, during the Relevant Period, the Company issued multiple statements through SEC filings, press releases, and conference calls that led the investing public to believe that it had been selected fairly for each of the Cobra Contracts.

### False and Misleading Statements

#### *October 19, 2017 Press Release*

92.     On October 19, 2017, Mammoth Energy issued a press release announcing that PREPA had selected Cobra, a subsidiary of the Company, to participate in the reconstruction of Puerto Rico's energy utility infrastructure. The contract was reportedly "expected to generate revenue of up to $200 million over the initial 120 days," and the selection of Cobra's bid represented a major step for the Company. The press release stated, in relevant part:

> Mammoth Energy Services, Inc. ("Mammoth") (NASDAQ:TUSK) today announced that ***its wholly owned subsidiary, Cobra Acquisitions LLC, has signed a contract to aid in the restoration of utility infrastructure on the island of Puerto Rico***. Cobra, a utility infrastructure business focused on the repair and construction of transmission and distribution (T&D) networks, will perform the work. The contract will commence immediately and is expected to generate

revenue of up to $200 million over the initial 120 days. *Arty Straehla, Mammoth's Chief Executive Officer, stated, "We are honored to be chosen to help restore the electric utility infrastructure for the residents of Puerto Rico.* After witnessing the destruction from Hurricane Maria first hand last weekend, where 85% of Puerto Rico's residents are currently living without electricity, we intend to work quickly both to help rebuild the electric grid and to help restore normalcy to people's lives." The work to be provided by Cobra includes the following:

- Comprehensive damage assessment of existing electrical grid.
- Engineering services to aid in the design of a new electric utility grid to Puerto Rico Electric Power Authority (PREPA) specifications.
- Construction services to rebuild the electric grid.
- Fully self-contained solution including all operational and life support related to operating within the disaster area without creating an additional strain on the local population.

The initial mobilization of construction equipment and personnel is expected to begin in the coming days with people currently in place performing an initial damage and engineering assessment to determine the full scope of work required. *This contract will be incremental to Mammoth's existing energy service operations*.

(Emphasis added).

93.     Mammoth Energy's stock price rose significantly after this release, jumping $2.77 (over 19%) upon this news, to a closing price of $17.26 on October 20, 2017 from a close of $14.49 on October 19, 2017.

### November 14, 2017 Form 10-Q

94.     On November 14, 2017, the Company filed with the SEC its quarterly report for the period ended September 30, 2017 on a Form 10-Q (the "3Q17"), which was signed by Defendants Straehla and Layton.

95.     The 3Q17 discussed the First Cobra Contract, stating, in relevant part:

On October 19, 2017, Cobra entered into a contract to aid in the restoration of utility infrastructure on the island of Puerto Rico. The contract provides for payments of up to $200.0 million, including an initial payment of $15.0 million at the time of signing. As of November 7, 2017, the Company had entered into $32.7 million of commitments related to this contract and made prepayments and deposits of $12.6 million with respect to these commitments.

96.     Attached to the 3Q17 were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Straehla and Layton, attesting to the accuracy of the 3Q17.

*January 29, 2018 Press Release*

97.     On January 29, 2018, Mammoth Energy announced that it had amended the First Cobra Contract, more than doubling its original value to $445.4 million. The press release was attached as an exhibit to a Form 8-K filed with the SEC on January 31, 2018.

98.     The First Cobra Contract was purportedly expanded to "address work requirements," and Defendant Straehla stated in the press release that:

> …at the request of PREPA, FEMA reviewed [Cobra's] original contract with PREPA and our rates of service. In a letter dated December 23, 2017, FEMA determined that PREPA awarded our contract in compliance with emergency procurement provisions of the Commonwealth of Puerto Rico and Executive Orders issued as a result of the disaster, and also determined the costs under the contract to be reasonable.

*February 28, 2018 Form 10-K*

99.     On February 28, 2018, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Straehla, Layton, Heerwagen, McCarthy, Palm, Ross, and Smith.

100.    The 2017 10-K discussed the First Cobra Contract and its amendments, most notably the second doubling of the contract from $445.4 million to $900 million, stating, in relevant part:

> We currently have agreements in place with government-funded utilities, private utilities, public IOUs and Co-Ops. In particular, on October 19, 2017, one of our subsidiaries, Cobra Acquisitions LLC, or Cobra, entered into an emergency master services agreement with PREPA (such agreement, as subsequently amended through December 21, 2017, is hereinafter referred to as the initial PREPA contract). The initial PREPA contract has a one-year term and provided for up to $200.0 million of services which was initially expected to be fully utilized within a 120-day period. The scope of the work provided for in the initial

PREPA contract included labor, supervision, tools and equipment to perform storm repairs at various locations in Puerto Rico. The initial PREPA contract was fully applied to services performed by Cobra as of January 3, 2018. ***Due to the continuing need for Cobra's services, on January 28, 2018, Cobra and PREPA amended the initial PREPA contract to increase the total contract amount by an additional $245.4 million up to a total of $445.4 million.*** Under the terms of this amendment, the number of workers requested by PREPA and provided by Cobra increased to at least 882, up from 434 in the initial PREPA contract, and the billable daily rate for those workers was decreased. ***On February 27, 2017, Cobra and PREPA again amended the PREPA contract to further increase the contract amount by $500.0 million up to a total of $945.4 million.*** In addition to continuing its repair and restoration work, under the terms of this amendment Cobra will be able to source construction materials needed to rebuild the electrical infrastructure in Puerto Rico on a pass-through basis. To support its efforts, Cobra has two berthing barges with accommodations for approximately 550 people mobilized to Puerto Rico. In addition to its employees, Cobra also subcontracts additional resources where needed to assist in its repair efforts, including helicopters and pilots to erect towers and pull wire for reconnection, steel workers to fix transmission poles and rework steel damaged in the storm, road equipment and operators to carve access to work sites, tree services to clear brush and trees and security teams. Based on the current level of services provided, Cobra anticipates the additional amounts specified in the amendments will fund its activities in Puerto Rico through mid-2018.

(Emphasis added).

101.    Attached to the 2017 10-K were SOX certifications signed by Defendants Straehla and Layton, attesting to the accuracy of the 2017 10-K.

***April 25, 2018 Proxy Statement***

102.    The Company filed its Schedule 14A with the SEC on April 25, 2018 (the "2018 Proxy Statement"). Defendants Heerwagen, McCarthy, Palm, Ross, Straehla, and Smith solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[6]

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

103.    The 2018 Proxy Statement provided, regarding the Company's Code of Conduct, that:

> We have adopted a Code of Business Conduct and Ethics designed to help directors and employees resolve ethical issues. Our Code of Business Conduct and Ethics applies to all directors and employees, including the Chief Executive Officer, the Chief Financial Officer, controller and persons performing similar functions. The Code of Business Conduct and Ethics covers various topics including, but not limited to, conflicts of interest, fair dealing, discrimination and harassment, confidentiality, compliance procedures and employee complaint procedures and is posted on our website at http://ir.mammothenergy.com/corporate-governance.cfm.

104.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by three of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

105.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to "assur[e] an alignment of interests between our senior management level employees and our stockholders," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

106.    The 2018 Proxy Statement also failed to disclose, *inter alia*, that (1) the Company's subsidiary, Cobra, had obtained the two Cobra Contracts worth over $1.8 billion through improper means; (2) specifically, Cobra had been unfairly steered into its contracts with PREPA, rather than securing them through an impartial RFP procedure; and (3) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *May 4, 2018 Form 10-Q*

107.   On May 4, 2018, the Company filed with the SEC its quarterly report for the period ended March 31, 2018 on a Form 10-Q (the "1Q18"), which was signed by Defendants Straehla and Layton.

108.   The 1Q18 detailed the two amendments to the First Cobra Contract, stating, in relevant part:

> On October 19, 2017, our wholly owned subsidiary Cobra Acquisitions LLC, or Cobra, entered into an emergency master services agreement with PREPA for repairs to PREPA's electrical grid as a result of Hurricane Maria. During the first quarter of 2018, we executed two amendments to the contract, increasing the total contract value to $945.4 million from $200.0 million originally. At March 31, 2018, we had approximately 1,000 people, and approximately 600 pieces of equipment, deployed in Puerto Rico.

109.   Attached to the 1Q18 were SOX certifications signed by Defendants Straehla and Layton, attesting to the accuracy of the 1Q18.

### *May 29, 2018 Form 8-K and Press Release*

110.   On May 29, 2018, Mammoth Energy issued a press release announcing that it had entered into a second contract with PREPA. This press release was also attached as an exhibit to a Form 8-K filed with the SEC on May 31, 2018.

111.   The press release represented that Cobra had been selected by PREPA a second time in a "competitive RFP bid process" to undertake more work, stating, in relevant part:

> Mammoth Energy Services, Inc. ("Mammoth" or the "Company") (NASDAQ: TUSK) today announced that its wholly owned subsidiary, Cobra Acquisitions LLC ("Cobra"), signed a one-year $900 million contract with the Puerto Rico Electric Power Authority ("PREPA") to complete the restoration of the critical electrical transmission and distribution system components damaged as a result of Hurricane Maria as well as to support the initial phase of reconstruction of the electrical power system in Puerto Rico. Cobra has been working to restore electrical services in Puerto Rico since October 2017.

**Request For Proposal (RFP) Process**

> *In mid-February, the Commonwealth of Puerto Rico began a competitive RFP bid process* (RFP #77844) to complete the restoration of critical electrical system components and to support the initial reconstruction phase of its electrical utility system following the impact of Hurricane Maria. *This process involved the submission of bids from qualified infrastructure construction companies and an analysis by PREPA of each bidder's experience, asset base, financial capacity, understanding of the project and overall cost to perform the work needed. After concluding the selection process, Cobra entered into a contract with PREPA on May 26, 2018.*

> **Restoration and Reconstruction Contract**
> Under the terms of the contract, Cobra is to perform hurricane restoration and reconstruction services at various locations in PREPA's service area. Cobra is increasing its total resource count in Puerto Rico to expedite the completion of the restoration process. As the restoration process comes to an end, Cobra will continue to work with the Commonwealth of Puerto Rico, PREPA and various other federal and Commonwealth agencies to transition to the long task of reconstructing the Puerto Rico power grid of the future. *This contract award is in addition to the original contract to provide restoration services that Cobra entered into in October 2017, as amended.*

(Emphasis added in bold and italics).

112.    Defendant Straehla, in the press release, gave a statement touting the Company's proficiency and represented that the Cobra team's "professionalism" was the reason that Cobra had been selected for another PREPA contract. He stated, in relevant part, that:

> We are very proud of our Cobra team in Puerto Rico and look forward to continuing our relationship with the Commonwealth of Puerto Rico, PREPA and the citizens of Puerto Rico. *Through the team's hard work, professionalism and technical ability, we have been selected to lead this very important effort to complete the restoration phase and transition to the reconstruction phase of the electric utility system in Puerto Rico*, which is expected to last for several years. The reconstruction of the electric utility infrastructure will improve the reliability and quality of service for the citizens of Puerto Rico.

(Emphasis added).

### August 8, 2018 Form 10-Q

113.    On August 8, 2018, the Company filed its quarterly report for the period ended June 30, 2018 with the SEC on a Form 10-Q (the "2Q18"), which was signed by Defendants Straehla and Layton.

114.    In its description of the Second Cobra Contract, the 2Q18 again represented that

Cobra had been chosen in a valid RFP procedure. The 2Q18 stated, in relevant part:

> On May 26, 2018, our wholly owned subsidiary Cobra Acquisitions LLC, or
> Cobra, entered into a new master services agreement with the Puerto Rico Electric
> Power Authority, or PREPA, to complete the restoration of the electrical
> transmission and distribution system components damaged by Hurricane Maria
> and to support the initial phase of reconstruction of the electrical power system in
> Puerto Rico, which we refer to as the New PREPA Contract. Cobra has agreed to
> provide the labor, supervision, tools and materials necessary to provide the
> restoration and reconstruction services under the New PREPA Contract, which
> has a one-year term ending May 25, 2019 and provides for total payments not to
> exceed $900.0 million. ***The New PREPA Contract was awarded at the
> conclusion of a request for proposal (RFP) bid process that began in February
> 2018.*** The New PREPA Contract is in addition to the contract that Cobra entered
> into in October 2017, as subsequently amended, to provide restoration services to
> PREPA.

(Emphasis added).

115.    Attached to the 2Q18 were SOX certifications signed by Defendants Straehla

and Layton, attesting to the accuracy of the 2Q18.

### *November 2, 2018 Form 10-Q*

116.    On November 2, 2018, the Company filed with the SEC its quarterly report for

the period ended September 31, 2018 on a Form 10-Q (the "3Q18"), which was signed by

Defendants Straehla Layton.

117.    The 3Q18 discussed the amended First Cobra Contract, stating, in relevant part:

> In 2017, we expanded into the electric infrastructure business, offering both
> commercial and storm restoration services to government-funded utilities, private
> utilities, public investor owned utilities and cooperatives. Since we commenced
> operations in this line of business, substantially all of our infrastructure revenues
> has been generated from storm restoration work, primarily from PREPA due to
> damage caused by Hurricane Maria. On October 19, 2017, Cobra and PREPA
> entered into an emergency master services agreement for repairs to PREPA's
> electrical grid. The one-year contract, as amended, provides for payments of up to
> $945.4 million. On May 26, 2018, Cobra and PREPA entered into a new one-
> year, $900.0 million master services agreement to provide additional repair
> services and begin the initial phase of reconstruction of the electrical power
> system in Puerto Rico. PREPA is currently subject to bankruptcy proceedings

pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency or other sources. In the event PREPA does not have or does not obtain the funds necessary to satisfy its obligations to Cobra under the contracts, terminates the contracts, curtails our services prior to the end of the contract terms or otherwise fails to pay amounts owed to us for services performed, our financial condition, results of operations and cash flows would be materially and adversely affected. In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.

118.    Attached to the 3Q18 were SOX certifications signed by Defendants Straehla and Layton, attesting to the accuracy of the 3Q18.

### *March 18, 2019 Form 10-K*

119.    On March 18, 2019, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Straehla, Layton, Amron, Heerwagen, McCarthy, Palm, Ross, and Smith.

120.    The 2018 10-K discussed the progress of the Second Cobra Contract:

We currently have agreements in place with government-funded utilities, private utilities, public IOUs and Co-Ops. To date, substantially all of our infrastructure services have been performed in Puerto Rico under two emergency master services agreements entered into by one of our subsidiaries, Cobra Acquisitions LLC, or Cobra, with PREPA for up to an aggregate of approximately $1.8 billion of services. The scope of the work contemplated by these agreements includes labor, supervision, tools, equipment and materials to perform storm repair, restoration and reconstruction services at various locations in Puerto Rico. Cobra performed the full $945 million of services under the initial contract as of July 21, 2018. The second contract with PREPA has a one-year term ending on May 25, 2019 and provides for total payments not to exceed $900 million. As of December 31, 2018 and March 8, 2019, Cobra had performed an aggregate of $280 million and $354 million, respectively, of services under the second contract. Although we continue to perform services under the second contract, we expect these services will end by March 31, 2019, and we do not expect that any further work orders will be issued to Cobra under this contract prior to the May 25, 2019 termination date.

121.    In its "Electric Infrastructure Industry" section, the 2018 10-K represented that the Company's Cobra Contracts, while not obtained through a 'formal' bid process, were nonetheless legitimately obtained and were probably due to the Company's competitive prices:

> Certain barriers to entry exist in the markets in which we operate, including adequate financial resources, technical expertise, high safety ratings and a proven track record of operational success. We compete based upon our industry experience, technical expertise, financial and operational resources, geographic presence, industry reputation, our safety record and customer service. ***While we believe our customers consider a number of factors when selecting a service provider, they award most of their work through a bid process, although our work with PREPA has not been obtained through a formal bid process. Consequently, price is often a principal factor in determining which service provider is selected***.

(Emphasis added).

122.    Attached to the 2018 10-K were SOX certifications signed by Defendants Straehla and Layton, attesting to the accuracy of the 2018 10-K.

### *April 26, 2019 Proxy Statement*

123.    The Company filed its 2019 Proxy Statement with the SEC on April 26, 2019. Defendants Heerwagen, McCarthy, Palm, Ross, Straehla, and Smith, with the addition of non-Defendant Arthur Amron, solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[7]

124.    The 2019 Proxy Statement stated, regarding the Company's Code of Conduct, that:

> We have adopted a Code of Business Conduct and Ethics designed to help directors and employees resolve ethical issues. Our Code of Business Conduct and Ethics applies to all directors and employees, including the Chief Executive

---

[7] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Officer, the Chief Financial Officer, controller and persons performing similar functions. The Code of Business Conduct and Ethics covers various topics including, but not limited to, conflicts of interest, fair dealing, discrimination and harassment, confidentiality, compliance procedures and employee complaint procedures and is posted on our website at http://ir.mammothenergy.com/ corporate-governance.cfm. We intend to satisfy the disclosure requirements under Item 5.05 of Form 8-K regarding an amendment to, or waiver from, a provision of the Code of Business Conduct and Ethics by posting such information on our website at the address specified above.

125. The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by three of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

126. The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to incentivize "growth of sustainable long-term value for our stockholders," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

127. The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company's subsidiary, Cobra, had obtained the two Cobra Contracts worth over $1.8 billion through improper means; (2) specifically, Cobra had been unfairly steered into its contracts with PREPA, rather than securing them through an impartial RFP procedure; and (3) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *May 2, 2019 Conference Call*

128. On May 2, 2019, the Company held a conference call to discuss its financial and operating results for the first quarter of 2019 ended March 31, 2019.

129.    During the conference call, Defendant Straehla, during a back-and-forth with a Tudor Pickering Holt analyst, represented that the Cobra Contracts were merely fortuitous arrangements that "morphed into" extremely lucrative opportunities for the Company, rather than arrangements for which Cobra was unfairly selected. Defendant Straehla stated, in relevant part:

> Well, Puerto Rico and *you go back to the history of how we started the infrastructure and we started off two small acquisitions in Puerto Rico came up and that morphed into a billion dollar opportunity*, but it also gave us a showcase-ability to showcase our talents and now with the integration of helicopters and that type of thing, it's really gotten us to where we proved what we could do in fairly tough conditions in Puerto Rico.

(Emphasis added).

### May 3, 2019 Form 10-Q

130.    On May 3, 2019, the Company filed with the SEC its quarterly report for the period ended March 31, 2019 on a Form 10-Q (the "1Q19"), which was signed by Defendants Straehla and Layton.

131.    The 1Q19 discussed both Cobra Contracts, stating, in relevant part:

> In 2017, we expanded into the electric infrastructure business, offering both commercial and storm restoration services to government-funded utilities, private utilities, public investor owned utilities and cooperatives. Since we commenced operations in this line of business, substantially all of our infrastructure revenues has been generated from storm restoration work, primarily from PREPA due to damage caused by Hurricane Maria. On October 19, 2017, Cobra and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid. The one-year contract, as amended, provides for payments of up to $945 million. On May 26, 2018, Cobra and PREPA entered into a new one-year, $900 million master services agreement to provide additional repair services and begin the initial phase of reconstruction of the electrical power system in Puerto Rico.

132.    Attached to the 1Q19 were SOX certifications signed by Defendants Straehla and Layton, attesting to the accuracy of the 1Q19.

133.    The statements in ¶¶ 92-101, 107-122, and 128-132 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's subsidiary, Cobra, had obtained the two Cobra Contracts worth over $1.8 billion through improper means; (2) specifically, Cobra had been unfairly steered into its contracts with PREPA, rather than securing them through an impartial RFP procedure; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

134.    On May 24, 2019, near the end of the trading day, the *Wall Street Journal* published an article reporting that Ahsha Tribble, the FEMA Administrator who had assigned the Cobra Contracts, was under investigation by the Department of Homeland Security for improperly directing work to the Company. Tribble was relieved of her duties and placed on administrative leave amidst the allegations. The article, titled "FEMA Official Probed Over Puerto Rico Power Restoration," stated the following:

> ***A high-ranking Federal Emergency Management Agency official who oversaw the reconstruction of Puerto Rico's electrical grid is under investigation by a government watchdog over allegations she steered work to a utility contractor***, according to people familiar with the matter.
>
> FEMA Deputy Regional Administrator Ahsha Tribble was relieved of her duties and placed on administrative leave last week amid a continuing probe by the Department of Homeland Security's Office of Inspector General, these people said.
>
> Ms. Tribble deployed to Puerto Rico after Hurricane Maria struck the U.S. island territory in September 2017 and spent the next year there coordinating FEMA's response to the storm-ravaged power system, according to her FEMA biography. ***The DHS Inspector General, which conducts investigations into FEMA, has probed her interactions with Cobra Acquisitions LLC, a grid-construction contractor hired by Puerto Rico's public electric utility after the hurricane,***

***people familiar with the matter said. The investigation has also focused on whether Cobra gained an improper advantage in the contracting process, they said.***

* * *

A FEMA spokeswoman said the agency can't comment on personnel matters. The DHS Inspector General said it couldn't confirm or deny the existence of any probe.

Cobra's parent company didn't respond to requests for comment. Cobra signed separate contracts worth up to $900 million and $945 million to repair downed transmission and distribution lines with the bankrupt power monopoly known as Prepa, according to securities filings.

A Prepa spokeswoman said several utility officials and consultants were interviewed this week by Inspector General agents.
"It is a top priority for Prepa to assist and collaborate with investigations conducted by state or federal agencies," the spokeswoman said.

Cobra became Puerto Rico's primary general contractor for repairing the power grid in late 2017, filling a void in the power restoration efforts after the departure of another contractor, Whitefish Energy Holdings LLC.

Whitefish's contract with Puerto Rico, came under intense scrutiny after FEMA raised concerns about how the $300 million deal was awarded and priced. Gov. Ricardo Rosselló canceled the Whitefish deal, and Puerto Rico increasingly came to rely on Cobra to turn the lights back on.

***But as Prepa's spending on contractors skyrocketed last year, utility officials raised concerns initially about Cobra's rates and why the company was doing so much of the power restoration work***, according to people familiar with the matter.

Ms. Tribble "wanted the work to get done and the power restored to Puerto Rico," Ms. Moore said. "Whoever did it, did it. She just wanted it to get done."
***Cobra has billed for more than $1.3 billion in emergency work through May 10, more than half of the utility's total emergency spending since the hurricane, according to public records.***

Ms. Tribble served in the National Security Council and Energy Department during the Obama administration and was involved in the White House response to disasters including Hurricanes Sandy and Irene and the deadly West, Texas chemical plant explosion, according to her FEMA biography.

At a February 2018 meeting of Puerto Rico's financial oversight board, Ms. Tribble said it was challenging to get utility contractors to do business with Prepa

after the storm given its strained public finances. Whitefish and Cobra each "took
a risk" in mobilizing to the island, she said.

(Emphasis added).

135.    On this news, Mammoth Energy's share price declined by $1.36 (over 11%) over
the following two trading days, from its May 24, 2019 opening price of $12.35 to close at
$10.99 on May 29, 2019.

136.    During the trading day on June 5, 2019, the Wall Street Journal published a
follow-up article, titled "Puerto Rico Grid Contractor Caught Up in Federal Probes," reporting
that the FBI had initiated a "related criminal inquiry" into the Cobra Contracts.

137.    In the wake of this second article, Mammoth Energy's stock price—which had
begun to recover—dropped again, falling $1.67 (almost 15%) on the day the article was
published, to close at $9.53 after opening at $11.20. The price plummeted an additional $3.42
(over 35%) during the following trading day, to close at $6.11 on June 6, 2019, representing a
45% total drop in the Company's stock price.

## DAMAGES TO MAMMOTH ENERGY

138.    As a direct and proximate result of the Individual Defendants' conduct, Mammoth
Energy has lost and expended, and will lose and expend, many millions of dollars.

139.    Such expenditures include, but are not limited to, legal fees associated with the
Securities Class Actions filed against the Company, its President and CEO, and its CFO, and
amounts paid to outside lawyers, accountants, and investigators in connection thereto.

140.    Additionally, these expenditures include, but are not limited to, handsome
compensation and benefits paid to the Individual Defendants who breached their fiduciary duties
to the Company, including bonuses tied to the Company's attainment of certain objectives, and
benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

141.    As a direct and proximate result of the Individual Defendants' conduct, Mammoth Energy has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

142.    Plaintiff brings this action derivatively and for the benefit of Mammoth Energy to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of Mammoth Energy, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

143.    Mammoth Energy is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

144.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Mammoth Energy. Plaintiff will adequately and fairly represent the interests of Mammoth Energy in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

145.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

146.    A pre-suit demand on the Board of Mammoth Energy is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven Individual Defendants: Amron Straehla, Heerwagen, McCarthy, Palm, Ross, and Smith (collectively, the

"Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

147.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while two of them engaged in insider sales based on material non-public information, netting proceeds of over $1.66 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

148.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

149.   Additional reasons that demand on Defendant Straehla is futile follow. Defendant Straehla is the co-founder of the Company and has served as the Company's CEO since June 2016. Thus, as the Company admits, Defendant Straehla is a non-independent director. The Company provides Defendant Straehla with his principal occupation, and he receives handsome compensation, including $1,832,087 during the fiscal year ended December 31, 2018. Defendant Straehla was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing earnings calls and press releases, which he personally made statements in, and the 3Q17, 1Q18, 2Q18, 3Q18, 1Q19, and the 2017

and 2018 10-Ks, all of which he signed and signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded $1.5 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.  Moreover, Defendant Straehla is a defendant in the Securities Class Actions. For these reasons, too, Defendant Straehla breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.    Additional reasons that demand on Defendant Amron is futile follow. Defendant Amron has served as a Company director since January 2019 and serves as the Company's Independent Director and as a member of the Nominating Committee and Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Amron signed, and thus personally made the false and misleading statements, in the 2018 10-K. Defendant McCarthy is also a Partner at Wexford, the Company's main controlling shareholder and party to numerous agreements with Mammoth Energy. Wexford, through its entity, participated in and benefitted from the Underwritten Secondary Offering. Defendant Amron is beholden to Wexford, which provides Amron with his principal occupation. Because Wexford is implicated in this suit, he is unlikely to take action against Wexford, or the other Individual

Defendants who have long-standing associations with Wexford, such as Defendant McCarthy. For these reasons, too, Defendant Amron breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151.   Additional reasons that demand on Defendant Heerwagen is futile follow. Defendant Heerwagen has served as a Company director since January 2017, when he was nominated by Gulfport pursuant to its IPO investors' rights agreement with the Company. Defendant Heerwagen is beholden to Gulfport, which provides Heerwagen with his principal occupation. Because Gulfport is implicated in this suit, he is unlikely to take action against Gulfport, or the other Individual Defendants who have long-standing associations with Gulfport, such as its former CEO, Defendant Palm. Gulfport participated in and benefitted from the Underwritten Secondary Offering.  Defendant Heerwagen receives handsome compensation, including $233,576 during the fiscal year ended December 31, 2018. Defendant Heerwagen also received a total of $1,290,288 in compensation from Gulfport for the fiscal year 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Heerwagen signed, and thus personally made the false and misleading statements in, the 2017 and 2018 10-Ks. For these reasons, too, Defendant Heerwagen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on Defendant McCarthy is futile follow. Defendant McCarthy has served as the Company's Chairman since June 2016. He also serves as Chair of the Compensation Committee. Defendant McCarthy is also a Partner at Wexford, the Company's main controlling shareholder and party to numerous agreements with Mammoth Energy. Wexford, through its entity, participated in and benefitted from the Underwritten Secondary Offering. Defendant McCarthy is beholden to Wexford, which provides McCarthy with his principal occupation. Because Wexford is implicated in this suit, he is unlikely to take action against Wexford or the other Individual Defendants who have long-standing associations with Wexford, such as Defendant Amron. Defendant McCarthy receives handsome compensation, including $238,576 during the fiscal year ended December 31, 2018. As Chairman of the Board and a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McCarthy signed, and thus personally made the false and misleading statements in, the 2017 and 2018 10-Ks. For these reasons, too, Defendant McCarthy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153.    Additional reasons that demand on Defendant Palm is futile follow. Defendant Palm has served as a Company director since June 2017 and serves as a member of the Audit Committee, the Compensation Committee, and the Nominating Committee. Defendant Palm receives handsome compensation, including $280,357 during the fiscal year ended December 31, 2018. As a Company director and member of all three Board committees, he conducted little, if

any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Palm signed, and thus personally made the false and misleading statements, in the 2017 and 2018 10-Ks. Defendant Palm has a history with Gulfport, also named as a defendant herein, having served as Gulfport's CEO and as a member of the board from 2005 until 2014. For these reasons, too, Defendant Palm breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154.    Additional reasons that demand on Defendant Ross is futile follow. Defendant Ross has served as a Company director since November 2016 and serves as Chair of the Nominating Committee and as a member of the Audit Committee. Defendant Ross receives handsome compensation, including $238,576 during the fiscal year ended December 31, 2018. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ross signed, and thus personally made the false and misleading statements, in the 2017 and 2018 10-Ks. For these reasons, too, Defendant Ross breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.    Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since October 2016 and serves as Chair of the Audit

Committee and as a member of the Compensation Committee. Defendant Smith receives handsome compensation, including $253,576 during the fiscal year ended December 31, 2018. As Chair of the Audit Committee and a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarding his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Smith signed, and thus personally made the false and misleading statements, in the 2017 and 2018 10-Ks. His insider sale before the fraud was exposed, which yielded $149,100 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Smith breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.    Additional reasons that demand on the Board is futile follow.

157.    As described above, two of the Directors directly engaged in insider trading, in violation of federal law. Defendants Straehla and Smith collectively received proceeds of over $1.66 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

158.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and its shareholders. All of the Individual Defendants except for Ross and Smith have

ties to the Selling Controlling Shareholders: Gulfport and/or Wexford. These relationships are as follows:

(a)     Charles E. Davidson, who is the founder, Chairman, and CIO of Wexford, was a controlling shareholder of Gulfport until 2011, and Gulfport still conducts much of its business with companies that are controlled by Wexford. Therefore, current Gulfport employee Defendant Heerwagen is unlikely to take action against Defendants McCarthy or Amron.

(b)     Defendant McCarthy has been a Wexford Partner since 2008. Defendant Amron has been at Wexford in some capacity since 1994.

(c)     Defendants Palm and Heerwagen overlapped at Gulfport in senior management roles from 2005 until Palm's retirement from his tenure as Gulfport's CEO and director in 2014. Defendant Heerwagen remains with Gulfport as a Senior Vice President, and he is Gulfport's chosen nominee to the Mammoth Energy Board.

(d)     Defendant Straehla was the CEO of Diamondback Energy Services, Inc. ("Diamondback") from 2006 to 2008, when that company was still private. According to Gulfport's contemporary SEC filings,[8] Wexford indirectly controlled Diamondback, and Diamondback later disclosed that at the time it derived much of its business and revenue from agreements with Wexford-controlled entities such as Gulfport (which is no longer controlled by Wexford) and Windsor Energy Group LLC. Diamondback's 2011 IPO was later equity-sponsored by Wexford.

(e)     Defendant Amron, as Wexford's General Counsel, is likely reluctant to take action against fellow Wexford Partner Defendant McCarthy.

---

[8] Gulfport Energy Corp., Definitive Proxy Statement (Schedule 14A) (Apr. 30, 2007).

159.   Five of the seven members of the Board at the time of this filing have aligned business interests through their varied associations with Wexford-controlled or affiliated companies. Aside from their intertwined backgrounds, all of the Directors owe their livelihoods and/or current position to Wexford or Gulfport (who own 49% and 21.9% of the Company's stock, respectively), and are therefore unlikely to take action against Defendant McCarthy, a Wexford Partner, or Heerwagen, a Senior Vice President at Gulfport who was specifically selected for Board membership by Gulfport. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' and Selling Controlling Shareholders' conduct. Thus, any demand on the Directors would be futile.

160.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

161.   Mammoth Energy has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Mammoth Energy any part of the damages Mammoth Energy suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

162.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

163.    The acts complained of herein constitute violations of fiduciary duties owed by Mammoth Energy officers and directors, and these acts are incapable of ratification.

164.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Mammoth Energy. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Mammoth Energy, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

165.    If there is no directors' and officers' liability insurance, then the Directors will not cause Mammoth Energy to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

166.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

167.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

169.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

170.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

171.     Under the direction and watch of the Directors, the 2017 and 2018 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company's subsidiary, Cobra, had obtained the two Cobra Contracts worth over $1.8 billion through improper means; (2) specifically, Cobra had been unfairly steered into its contracts with PREPA, rather than securing them through an impartial RFP procedure; and (3) the Company failed to maintain internal controls.

172.     The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including equity awards designed to _ while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

173.     The Proxy Statements also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging issuing false and misleading statements to the investing public and insider

trading, the Individual Defendants violated the Code of Conduct. The Proxy Statements failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

174.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

175.     The false and misleading elements of the Proxy Statements led to the re-election of Defendants Heerwagen, McCarthy, Palm, Ross, Smith, and Straehla, which allowed them to continue breaching their fiduciary duties to Mammoth Energy.

176.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

177.     Plaintiff on behalf of Mammoth Energy has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

178.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Mammoth Energy's business and affairs.

180.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

181.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Mammoth Energy.

182.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls. In further breach of their fiduciary duties owed to Mammoth Energy, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's subsidiary, Cobra, had obtained the two Cobra Contracts worth over $1.8 billion through improper means; (2) specifically, Cobra had been unfairly steered into its contracts with PREPA, rather than securing them through an impartial RFP procedure; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

183.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

184.    In breach of their fiduciary duties, ten of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

185.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

186.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

187.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

188.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Mammoth Energy has sustained and continues to sustain significant

damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

189.    Plaintiff on behalf of Mammoth Energy has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

190.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Mammoth Energy.

192.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Mammoth Energy that was tied to the performance or artificially inflated valuation of Mammoth Energy, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

193.    Plaintiff, as a shareholder and a representative of Mammoth Energy, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

194.    Plaintiff on behalf of Mammoth Energy has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

195.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

197.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

198.   Plaintiff on behalf of Mammoth Energy has no adequate remedy at law.

## PRAYER FOR RELIEF

199.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against the Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Mammoth Energy, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants and the Selling Controlling Shareholders have breached and/or aided and abetted the breach of their fiduciary duties to Mammoth Energy;

(c)   Determining and awarding to Mammoth Energy the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants and the Selling Controlling Shareholders, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Mammoth Energy and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Mammoth Energy and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Mammoth Energy to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Mammoth Energy restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: September 10, 2019

Of Counsel:

Timothy Brown
**THE BROWN LAW FIRM, P.C.**
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan, Bar No. 4089
Michael J. Farnan, Bar No. 5165
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Attorneys for the Plaintiff*