## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| In re MAMMOTH ENERGY SERVICES, | ) C.A. No. 19-1682-RGA |
| INC. CONSOLIDATED SHAREHOLDER | ) |
| LITIGATION | ) **JURY TRIAL DEMANDED** |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Aaron Randall, Mohammad Shaer, and Christopher Jones ("Plaintiffs"), by their attorneys, submit this First Amended Verified Stockholder Derivative Complaint for violations of federal securities laws, breach of fiduciary duty, waste of corporate assets, and unjust enrichment. As for their complaint against defendants, defined below, on behalf of Nominal Defendant Mammoth Energy Services, Inc., ("Mammoth" or the "Company"), Plaintiffs allege the following based upon personal knowledge as to their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Company's and defendants public documents, conference calls, and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding nominal defendant Mammoth, legal filings, news  reports, securities analysts' reports and advisories about the Company, information readily obtainable on the  Internet, and the allegations contained in the indictment

styled *United States of America v. Tribble, el al.*, Criminal No. 19-541 (FAB) filed Sept. 3, 2019 in the U.S. District Court for the District of Puerto Rico (the "Indictment") referenced herein.[1] Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiffs on behalf of Nominal Defendant Mammoth against Individual Defendants Arty Straehla, Mark Layton, Arthur Amron, Paul V. Heerwagen IV, Marc McCarthy, Jim Palm, Matthew Ross, and Arthur Smith (collectively, the "Individual Defendants") and Defendants Gulfport Energy Corporation ("Gulfport") and Wexford Capital LP ("Wexford") (collectively, the "Selling Controlling Shareholders," and together with the Individual Defendants, the "Defendants").

2.      The wrongdoing alleged herein has caused substantial damage to Mammoth's reputation, goodwill, and standing in the business community.  This wrongdoing exposed Mammoth to substantial potential liability for violations of federal securities laws, criminal sanction, and the costs associated with defending itself. In addition, the Selling Controlling Shareholders were unjustly enriched by selling more than $165 million worth of the Company's common stock based on material, non-public information during a secondary offering that took place in June 2018 while the Company's stock was trading at an artificially inflated level.

3.      Mammoth is an oilfield and infrastructure service company operating in three areas: Infrastructure Services, Pressure Pumping Services, and Natural Sand Proppant Services. The Company serves government-funded operations, private and public investor-owned operations, cooperative utilities, independent oil and natural gas companies, and land-based drilling

---

[1]All references hereafter to "Indictment ¶___" are to the Indictment.

contractors in North America.

4.     In 2017, Mammoth formed a wholly owned subsidiary, Cobra Acquisitions, LLC., ("Cobra") and began its foray into the infrastructure sector.   Thereafter, Cobra has almost exclusively operated in Puerto Rico pursuant to two contracts with the Puerto Rico Electric Power Authority ("PREPA") to restore electricity to the island after the devastation caused by Hurricane Maria in September 2017.

5.     Mammoth announced the first of these contracts (the "First Cobra Contract") on October 19, 2017, less than a month after Hurricane Maria devastated the island. Mammoth's stock price rose over 19% during the day after the announcement, from a close of $14.49 on October 19, 2017 to close at $17.26 on October 20, 2017.

6.     On January 29, 2018, the Company issued another press release, reporting that the First Cobra Contract was amended and increased to a value of $445.4 million.

7.     The First Cobra Contract was again amended on February 27, 2018 and increased to a total value of $945.4 million.

8.     On May 29, 2018, Mammoth announced that Cobra had entered into a second contract with PREPA (the "Second Cobra Contract") worth $900 million. Both the First and Second Cobra Contracts (together the "Cobra Contracts") involved the same infrastructure restoration services in Puerto Rico.

9.     On June 29, 2018, shortly after the Company announced the Second Cobra Contract, when the Company's shares were trading at an all-time high, the Selling Controlling Shareholders executed an underwritten secondary public offering (the "Underwritten Secondary Offering") of approximately 4 million shares of Company stock at a price of $38.01 per share. On July 30, 2019, the underwriters purchased an additional 385,000 shares of common stock from the

Selling Controlling Shareholders at the same price per share. Altogether, the Selling Controlling Shareholders sold over $165 million worth of Company stock at artificially inflated prices during the Underwritten Secondary Offering.

10.     As detailed herein, the Cobra Contracts were procured through illegal conduct, including bribery.

11.     The Company's officers and directors caused the Company to file false information with the SEC during the period from October 19, 2017 through June 5, 2019 (the "Relevant Period") regarding the terms of the Cobra Contracts and how they were procured and negotiated, and stating that the Company expected remuneration of $1.8 billion under the agreements. These filings were based on false assertions that the Cobra Contracts with PREPA were properly entered and not tainted by any improper dealings.  This was far from the case, as demonstrated by the clear averments in the Indictment and subsequent revelations.

12.     This misconduct did not occur simply at the level of a subsidiary.  Mammoth's most senior management was involved from the beginning.   For example, Mammoth's Chief Executive Officer ("CEO"), Defendant Arty Straehla ("Straehla"), claimed that he was integral in securing the First Cobra Contract with PREPA.  Straehla stated that he and then-president of Cobra, Donald Keith Ellison ("Ellison"), soon-to-be-indicted, both went to Puerto Rico to work on obtaining the contract, claiming that "we did everything absolutely right" and that he and Ellison gave "a very legitimate effort."  Accordingly, Straehla admitted he was part of the Company's negotiation team that secured the Cobra Contracts.

13.     Almost immediately after the contract was awarded to Cobra, however, government officials and news reporters questioned the legitimacy of the process surrounding the award of the Cobra Contracts.

14.     Ellison and Straehla continued to falsely deny any wrongdoing.

15.     For example, Ellison was interviewed by E&E News on October 31, 2017 regarding the contract award and stated, "We feel we had a really good package put together that would provide for the community without taking needed resources away from the island." He characterized his company's relationship with PREPA as a "standard bidding process for a storm contract." As would come to light, Ellison simply lied and would soon be indicted for his illegal conduct.

16.     That the Cobra Contracts were tainted by improper dealings began to come to light on March 15, 2019.  That day, Straehla shocked the investing public by revealing that Mammoth was "in the process of leaving the island completely within the next 60 days," and that "there can be no assurances that we will be able to secure contracts for any of this work." On this news, Mammoth's stock price fell 12%, or $2.50 per share, on March 15, 2019.

17.     On that same day, unbeknownst to the investing public, Ellison was interviewed by agents from the Federal Bureau of Investigation ("FBI") and the Department of Homeland Security ("DHS") regarding Cobra's contract awards in Puerto Rico.

18.     On May 24, 2019, *The Wall Street Journal* published an article titled "FEMA Official Probed Over Puerto Rico Power Restoration," in which it reported that the Federal Emergency Management Agency ("FEMA") Deputy Regional Administrator, Ahsha Nateef Tribble ("Tribble"), who oversaw FEMA's response to the damage wrought by Hurricane Maria, was under investigation by the DHS, relieved of her duties, and placed on administrative leave over allegations that she steered work to Cobra in exchange for things of value. The report was published in the middle of the day on May 24, 2019, and, subsequently, the Company's stock price fell $1.36 over the next two trading days, from opening at $12.35 on May 24, 2019 to close at

$10.99 on May 29, 2019, representing a drop of over 11%.

19. On June 5, 2019, *The Wall Street Journal* published another article titled "Puerto Rico Grid Contractor Caught Up in Federal Probes," in which it reported that the FBI had "opened a related criminal inquiry" into the origin of the Cobra Contracts. According to the article, the DHS Inspector General, which conducts investigations into FEMA, had probed Tribble's interactions with Cobra and whether Cobra gained an improper advantage in the contracting process. On this news, Mammoth's stock price fell from its closing price on June 4, 2019, $11.20 per share, to close at $9.53 per share on June 5. The Company's stock price continued to fall the next day, closing at $6.11 per share on June 6, 2019, representing a two-day drop of 45%.

20. Further, on September 3, 2019 the U.S. Attorney's Office in Puerto Rico disclosed that Federal authorities arrested two former FEMA officials and Ellison, charging them with bribery and fraud in connection with efforts to restore electricity to Puerto Rico in the wake of Hurricane Maria. In the 15-count Indictment, the U.S. Attorney's Office detailed that Ellison gave Tribble airline flights, hotel accommodations, personal security services, and the use of his personal credit card.

21. In return, Tribble "*used any opportunity she had to benefit Cobra*," said United States Attorney for the District of Puerto Rico, Rosa Emilia Rodriguez-Vélez. Tribble accelerated payments to Cobra and pressured local power authority officials to award it contracts. Her wrongdoing did not end there. Ellison also gave a job to a friend of Tribble, Jovanda R. Patterson ("Patterson"), who had been FEMA's deputy chief of staff in Puerto Rico before resigning in July 2018 to work for Cobra, according to the Indictment. Tribble was FEMA's primary leader during efforts to restore electrical power after Hurricane Maria destroyed the power grid in 2017.

22. The Indictment was unsealed on September 10, 2019. That same day, the

Department of Justice issued a press release disclosing that a grand jury investigation had been ongoing for the past year, stating, "[t]his investigation was a top priority for the Department of Homeland Security (DHS) Office of Inspector General (OIG), which dedicated significant personnel and resources over the last year to investigate the defendants and the events outlined in today's indictment."

23. In an article published on September 10, 2019, Rosa Emilia Rodriguez-Vélez told *Caribbean Business* that "the investigation remains underway." Mammoth's stock price fell from its intra-day high of $4.25 per share on September 10, 2019 to close at $3.19 per share a few days later.

24. In total, nearly $325 million in Mammoth's market capitalization was wiped out.

25. The Defendants breached their fiduciary duties to the Company by knowingly or recklessly causing or allowing it, through Cobra, to illegally enter into the Cobra Contracts.

26. As detailed herein and in the federal securities class action pending in the United States District Court for Western District of Oklahoma styled *Normantas v. Mammoth, et al.,* Case 5:19-cv-00560-SLP (the "Securities Action"), during the Relevant Period, Defendants breached their fiduciary duties to the Company by knowingly or recklessly making and/or causing the Company to make to the investing public a series of materially false and misleading statements that failed to disclose that, *inter alia*, Mammoth's subsidiary, Cobra, improperly obtained two infrastructure contracts with PREPA that totaled over $1.8 billion and were awarded as the result of improper steering and not a competitive request for proposal ("RFP") process, and as a result, the Company's statements about Mammoth's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

27. The Defendants also breached their fiduciary duties by knowingly or recklessly

failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

28.     Moreover, during the Relevant Period, three of the Individual Defendants knowingly or recklessly breached their fiduciary duties by engaging in insider sales, netting proceeds of over $1.7 million. Defendants also breached their fiduciary duties by conspiring with the Selling Controlling Shareholders to both facilitate and expedite the sale of approximately 4.4 million shares of Mammoth common stock at artificially inflated prices pursuant to the Underwritten Secondary Offering.

29.     In light of the Defendants' misconduct, which has subjected Mammoth, its CEO, its Chief Financial Officer ("CFO"), and the former President of Cobra to being named as defendants in the Securities Action, the former President of Cobra to the Indictment, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

30.     In light of the breaches of fiduciary duty engaged in by the Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO-director's liability in the Securities Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Mammoth's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness

and independence.

## JURISDICTION AND VENUE

31.     Pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities and Exchange Act of 1934 ("Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

32.     This Court has jurisdiction over each defendant named herein because each is either an entity that is incorporated or formed in this District or individual with sufficient contacts with this District to render the exercise of jurisdiction by the District court permissible under traditional notions of fair play and substantial justice.

33.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Mammoth and Gulfport are incorporated and Wexford is formed in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this District, including the Defendants' primary participation in the wrongful acts detailed herein as well as aiding and abetting and conspiracy in violation of fiduciary duties owed to Mammoth; and (iii) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

34.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

## THE PARTIES

### Plaintiffs

35.     Plaintiffs currently are stockholders of Mammoth and have continuously been stockholders of Mammoth during the wrongdoing complained of herein.

### Nominal Defendant Mammoth

36.     Nominal Defendant Mammoth is a Delaware corporation. Its principal executive offices are located at 14201 Caliber Drive, Suite 300, Oklahoma City, Oklahoma, 73134. Mammoth is an energy services company serving companies engaged in the exploration and development of North American onshore unconventional oil and natural gas reserves as well as government-funded utilities, private utilities, public investor-owned utilities, and cooperative utilities engaged in energy infrastructure. Mammoth securities trade on the NASDAQ under the ticker symbol "TUSK."

37.     Mammoth Energy Services, Inc., incorporated in Delaware in June 2016 as a wholly-owned subsidiary of Mammoth Energy Partners, LP, a Delaware limited liability company (the "Mammoth Partnership"). The Mammoth Partnership was originally formed by Wexford in February 2014 as a holding company under the name Redback Energy Services Inc. and converted to a Delaware limited partnership in August 2014. On November 24, 2014, Mammoth Energy Holdings, LLC ("Mammoth Holdings," an entity controlled by Wexford), Gulfport, and Rhino Resource Partners LP ("Rhino") contributed their interests in certain of the entities to the Mammoth Partnership in exchange for 20 million limited partner units. Mammoth Energy Partners GP, LLC (the "General Partner") held a non-economic general partner interest in the Mammoth Partnership.

38.     In October 12, 2016, the Mammoth Partnership was converted into a Delaware limited liability company named Mammoth Energy Partners LLC ("Mammoth LLC"), and then Mammoth Holdings, Gulfport, and Rhino—*i.e.*, all the members of Mammoth LLC—contributed their member interests in Mammoth LLC to the Company (the "Contribution"). Prior to the conversion and the Contribution, the Company was a wholly owned subsidiary of the Mammoth Partnership. Following the conversion and the Contribution, Mammoth LLC (as the converted

successor to the Mammoth Partnership) was a wholly owned subsidiary of the Company. The Company did not conduct any material business operations until the Contribution. On October 19, 2016, Mammoth closed its initial public offering of 7,750,000 shares of common stock (the "IPO"), which included an aggregate of 250,000 shares that were offered by Mammoth Holdings, Gulfport, and Rhino, at a price to the public of $15.00 per share.

39.     In 2017, Mammoth formed Cobra as a wholly owned subsidiary of the Company. Cobra is a limited liability company organized and existing under the laws of the State of Delaware and headquartered in Oklahoma City, Oklahoma. Ellison was President of Cobra starting in or about October 2017 to in or about June 2019. Cobra Energy LLC and Cobra Logistics Holdings, LLC are both affiliates of Cobra and wholly owned subsidiaries of Mammoth.

40.     The Company is currently controlled by Wexford and Gulfport. As of April 1, 2019, Wexford owned 21,988,473 shares, or 49%, and, Gulfport owned 9,826,893 shares, or 21.9%, of the Company's common stock.

**Individual Defendants**

41.     Defendant Straehla has been the Company's Chief Executive Officer ("CEO") and a member of the Board since June 3, 2016. Straehla served as CEO of the General Partner from February 2016 until October 2016. According to the Company's Form DEF 14A filed with the SEC on April 29, 2019 (the "2019 Proxy Statement"), he owns 103,775 shares of common stock and 83,334 restricted stock units. He was granted a compensation package worth approximately $2.8 million by the Company in 2017 and 2018.

42.     During the Relevant Period, Defendant Straehla made no purchases of Company stock and made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
| --- | --- | --- | --- |

| November 14, 2017 | 18,289 | $18.71 | $342,187.19 |
| November 15, 2017 | 7,553 | $17.81 | $134,518.93 |
| November 8, 2018 | 36,611 | $26.87 | $983,737.57 |
| November 12, 2018 | 2,230 | $26.20 | $58,426.00 |

43.     Thus, in total, before the fraud was exposed, Straehla sold 64,683 Company shares on inside information, for which he received approximately $1.5 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

44.     Defendant Mark Layton ("Layton") has been the Company's CFO since June 3, 2016. Layton also served as CFO of the General Partner from August 2014 until October 2016. According to the 2019 Proxy Statement, he owns 30,732 shares of common stock and 7,500 restricted stock units.  He was paid a compensation package of approximately $2.5 million by the Company in 2017 and 2018.

45.     During the Relevant Period, Defendant Layton made no purchases of Company stock and made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| November 14, 2017 | 925 | $19.01 | $17,584.25 |
| March 1, 2018 | 4,373 | $26.13 | $114,266.49 |

46.     Thus, in total, before the fraud was exposed, Layton sold 5,298 Company shares on inside information, for which he received approximately $131,850. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

47.     Defendant Arthur Amron ("Amron") has been a director of the Company since January 2019.  Amron is a Partner at Wexford and serves as its General Counsel. Amron also served on the

board of directors of the general partner of Rhino from January 2010 until the sale of Wexford's interest in Rhino to Royal Energy Resources, Inc. in March of 2016.  Pursuant to his employment agreement with Wexford, all the Company shares granted to Defendant Amron are assigned to Wexford.

48.     Defendant Marc McCarthy ("McCarthy") has served as Chairman of Mammoth's Board since June 3, 2016 and served as chairman of the board of directors of the General Partner from September 2014 until October 2016. McCarthy joined Wexford in June 2008 and currently is a Partner at Wexford. He received $238,576 in compensation for 2018, which consisted of $75,000 in fees earned or paid in cash and $163,576 in stock awards.  He also serves as Chair of the Audit Committee. Pursuant to his employment agreement with Wexford, all the Company shares granted to Defendant McCarthy are assigned to Wexford.

49.     Defendant Paul Heerwagen ("Heerwagen") was a director of the Company from January 2017 until he resigned on November 18, 2019. Heerwagen served as Senior Vice President of Corporate Development and Strategy for Gulfport, one of the Company's controlling stockholders. Since joining Gulfport in May 2007, Heerwagen served in multiple roles, including as the Director of Investor Relations and Corporate Affairs. He received $233,576 in compensation for 2018, which consisted of $70,000 in fees earned or paid in cash and $163,576 in stock awards. (Heerwagen was replaced by Jonathan H. Yellen, who was first designated as a director by Gulfport.)

50.     Defendant James Palm ("Palm") has been a director of the Company since June 2017. Palm served as a director of Gulfport from February 2006 and as CEO of Gulfport from December 2005, in each case until February 2014. According to the 2019 Proxy Statement, he owns 17,070 shares of common stock. He received $280,357 in compensation for 2018, which

consisted of $85,000 in fees earned or paid in cash and $195,357 in stock awards.

51.     Defendant Arthur Smith ("Smith") has been a director of the Company since October 2016. According to the 2019 Proxy Statement, he owns 9,580 shares of common stock. He received $253,576 in compensation for 2018, consisting of $90,000 in fees earned or paid in cash and $163,576 in stock awards. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee.

52.     During the Relevant Period, Defendant Smith made no purchases of Company stock and made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| December 3, 2018 | 6,000 | $24.85 | $149,100.00 |

Thus, in total, before the fraud was exposed, Smith sold 6,000 Company shares on inside information, for which he received approximately $149,100. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

53.     Defendant Matthew Ross ("Ross") has been a director of the Company since November 7, 2016. According to the 2019 Proxy Statement, he owns 9,580 shares of common stock. He received $238,576 in compensation for 2018, consisting of $75,000 in fees earned or paid in cash and $163,576 in stock awards.

54.     Defendants Straehla, McCarthy, Heerwagen, Smith, Ross, Palm, and Amron above are collectively referred to herein as the "Director Defendants" where it is appropriate to do so.

**Selling Controlling Shareholders**

55.     Defendant Wexford is a hedge fund manager that is located in Greenwich, Connecticut and that is a Delaware limited partnership. The firm was formed in February 2009

and is the successor to Wexford Capital LLC, formed in December 1995, and Wexford Management Corp., which was originally incorporated in May 1994. The firm purportedly serves as investment adviser, sub-adviser, manager, or general partner with discretionary trading authority to private pooled investment vehicles, including U.S. limited partnerships and limited liability companies and non-U.S. corporations structured as hedge funds and private equity funds. Wexford specializes in bankruptcy, energy/natural resources, real estate, technology/telecommunications, and transportation.

56.     According to the 2019 Proxy Statement, as of April 1, 2019, Wexford beneficially owned 21,988,473 (49.0%) of Mammoth's common stock, rendering it a controlling stockholder. Wexford is also party to an advisory services agreement with the Company whereby Wexford provides the Company with general financial and strategic advisory services related to the Company's business in exchange for a $500,000 annual fee and expenses.

57.     During the Relevant Period, Wexford sold 3,030,426 Company shares on inside information pursuant to an Underwritten Secondary Offering discussed herein, for which it received approximately $115,186,492.

58.     Defendant Gulfport purports to be a value-driven, growth-oriented oil and gas exploration and production company.  Gulfport is based in Oklahoma City and is a Delaware corporation.  Gulfport was reportedly formed with equity financing from Wexford in 1997.

59.     According to the 2019 Proxy Statement, as of April 1, 2019, Gulfport beneficially owned 9,826,893 (21.9%) of Mammoth's common stock, making it, along with Wexford, a controlling stockholder. Given that the price per share of the Company's common stock at the close of trading on April 1, 2019 was $16.94, Gulfport owned over $166 million worth of Mammoth stock.

60.    During the Relevant Period, Gulfport sold 1,354,574 Company shares on inside information, for which it received approximately $51,487,357.

61.    Pursuant to Mammoth IPO agreement dated October 16, 2016, Gulfport may nominate a director to the Board when it holds more than 10% ownership of the Company. This nominee, successfully elected in 2018, is Defendant Heerwagen, who is employed as a Senior Vice President at Gulfport. Under his employment agreement with Gulfport, all shares that Defendant Heerwagen receives from Mammoth as directorial compensation are assigned to Gulfport. On June 5, 2019 for example, 12,235 of Gulfport's shares of Mammoth stock—which were originally granted to Defendant Heerwagen—vested, as did 2,655 restricted stock units.

62.    As detailed in the 2019 Proxy Statement, Gulfport has extensive ties with the Company and its subsidiaries. For example, for the year ended December 31, 2018, the Company recognized revenue from Gulfport of approximately $96.0 million and, as of December 31, 2018, Gulfport owed the Company approximately $8.2 million for certain services.  The 2019 Proxy Statement states the following:

> In September 2014, effective October 1, 2014, Gulfport entered into an amended and restated master services agreement with Stingray Pressure Pumping LLC, or Pressure Pumping, for pressure pumping services. In July 2018, Gulfport and Pressure Pumping entered into an amended agreement, which extended the term of the existing agreement until December 31, 2021, unless it is terminated earlier in accordance with its terms, and expanded the service area to include both Ohio and Oklahoma. Pursuant to this agreement, Pressure Pumping has agreed to provide pressure pumping, stimulation and related completion and rework services to Gulfport, dedicating up to two spreads and related equipment for the performance of these services. Gulfport has agreed to pay Pressure Pumping a monthly service fee plus the associated costs of the services provided. Gulfport and Pressure Pumping have each agreed to maintain insurance at certain minimum thresholds. This agreement has a term of four years ending on December 31, 2021, and includes, among others, confidentiality and non- solicitation provisions. This agreement may be terminated in the event of a covenant breach by either party on 45 days written notice and a failure to cure. Pressure Pumping may also terminate in the event of payment default by Gulfport. Additionally, Gulfport can, without liability, countermand any work order given to us at any time before we begin such

work. If the work had already begun, Gulfport could then still cancel the service at any time, being liable only for the value of the work performed prior to the cancellation. We can terminate the master service agreement by giving Gulfport written notice prior to receiving a notification from Gulfport to perform a specific service.  For the year ended December 31, 2018, we recognized revenue from Gulfport of approximately $96.0 million and, as of December 31, 2018, Gulfport owed us approximately $8.2 million for such services.

In September 2014, effective October 1, 2014, Gulfport entered into a sand supply agreement, as amended on November 3, 2015 and August 6, 2018, with Muskie Proppant LLC, or Muskie Proppant. Pursuant to this agreement, Muskie Proppant has agreed to sell and deliver, and Gulfport has agreed to purchase, specified annual and monthly amounts of proppant sand, subject to certain exceptions specified in the agreement, and pay certain costs and expenses. Failure by either Muskie Proppant or Gulfport to deliver or accept the minimum monthly amount results in damages calculated per ton based on the difference between the monthly obligation amount and the amount actually delivered or accepted, as applicable. In addition, failure to pick up the sand on a timely basis from the designated facility will lead to demurrage charges payable by Gulfport. If Gulfport fails to make payments when due, or Muskie Proppant fails to deliver the required amounts of sand over three consecutive months, the other party can terminate the sand supply agreement. The sand supply agreement has a term ending on December 31, 2021 and includes, among others, confidentiality and non-solicitation provisions. For the year ended December 31, 2018, we recognized revenue from Gulfport of approximately $25.1 million and, as of December 31, 2018, Gulfport owed us approximately $1.2 million for such services.

Our wholly owned subsidiaries, Stingray Energy, Stingray Cementing and Panther Drilling Systems LLC, or Panther Drilling, provide services to Gulfport pursuant to master service agreements. These master service agreements may be terminated by us at any time prior to the receipt of notification by Gulfport to perform work pursuant to the agreements. Gulfport may terminate the master service agreements at any time by giving us written notice. The master service agreements do not obligate Gulfport to call upon us to perform any work under the master service agreements, and we are not obligated to accept any work requests from Gulfport. The designation of any work to be performed by us and the cessation of such work is at the sole discretion of Gulfport. ***For the year ended December 31, 2018, Stingray Energy recognized revenue of approximately $14.7 million for services performed for Gulfport and, as of December 31, 2018, Gulfport owed Stingray Energy $1.7 million for such services. For the year ended December 31, 2018, Stingray Cementing recognized revenue of approximately $5.9 million for services performed for Gulfport. For the year ended December 31, 2018, Panther Drilling recognized revenue of approximately $.1 million for services performed for Gulfport.***

(Emphasis added.)

## SUBSTANTIVE ALLEGATIONS CONCERNING THE SCHEME

### Hurricane Maria Devastates Puerto Rico and the Government's Response

63.     Category 4 Hurricane Maria made landfall in Puerto Rico on September 20, 2017, extensively damaging Puerto Rico's electrical power system. On that same day, President Donald Trump issued a major disaster declaration for Puerto Rico (the "Declaration"). PREPA is a government-owned corporation responsible for electricity generation, power distribution and power transmission in Puerto Rico. Created in 1941, PREPA was the sole provider of electricity for 1.5 million residential, commercial, and industrial clients in Puerto Rico.  It was authorized to contract to acquire supplies and services from contractors and suppliers.

64.     FEMA is a federal agency tasked with assisting the public once the President declares that a state of emergency or major disaster exists. FEMA coordinates the federal government's role in preparing for, preventing, mitigating the effects of, responding to, and recovering from all domestic disasters, whether natural or man-made, including acts of terror.

65.     Pursuant to the Declaration, FEMA was authorized to provide Individual Assistance, Public Assistance ("PA"), and Hazard Mitigation to Puerto Rico. Through its PA program, FEMA provided supplemental federal disaster grant assistance for debris removal, emergency protective measures, and the restoration of disaster-damaged, publicly owned facilities and the facilities of certain private nonprofit organizations. The PA program also encouraged protection of these damaged facilities from future events by providing assistance with hazard mitigation measures.

66.     FEMA processes PA grant funding according to the type of work the applicant undertakes. Eligible work must be (i) required as a result of the declared incident, (ii) located in the designated area, (iii) the legal responsibility of the applicant, and (iv) undertaken at a reasonable

cost. Eligible applicants include states, federally recognized tribal governments (including Alaska Native villages and organizations so long as they are not privately owned), U.S. territories, local governments, and certain private non-profit organizations. Puerto Rico was an eligible applicant.

67.     From in or about October 2017 to in or about September 2018, Tribble was Sector Lead for Power and Infrastructure in Puerto Rico ("Sector Lead") as part of FEMA's response to Hurricane Maria. She was also designated Recovery Office Deputy Director - Infrastructure Directorate/Disaster Recovery Manager ("Recovery Manager") in the Office of the FEMA Federal Coordinating Officer in Puerto Rico. Her official duties included, but were not limited to, approval of requisition for supplies and services and approval of worksheets submitted as part of the PA program.

68.     Starting in or about October 2017 and up until March 2018, Patterson was a FEMA Deputy Chief of Staff assigned to San Juan, Puerto Rico. Patterson resigned from her position with FEMA on or about July 2018.

69.     Public officials like Tribble and Patterson owe a fiduciary duty to the United States and its citizens to perform the duties and responsibilities of their offices free from deceit, fraud, concealment, bias, self-enrichment, and self-dealing.

**PREPA Hired the Company Purportedly to Rebuild Puerto Rico's Energy Infrastructure**

70.     On October 19, 2017, the Defendants caused Mammoth to publish in a press release that its subsidiary, Cobra, reached an agreement with PREPA to rebuild Puerto Rico's energy infrastructure pursuant to the First Cobra Contract. The release stated:

> Mammoth Energy Services, Inc. ("Mammoth") (NASDAQ: TUSK) today announced that its wholly owned subsidiary, Cobra Acquisitions LLC, has signed a contract to aid in the restoration of utility infrastructure on the island of Puerto Rico. Cobra, a utility infrastructure business focused on the repair and construction of transmission and distribution (T&D) networks, will perform the work. The contract will commence immediately and is expected to generate revenue of up to $200 million over the initial 120 days.

Arty Straehla, Mammoth's Chief Executive Officer, stated, "We are honored to be chosen to help restore the electric utility infrastructure for the residents of Puerto Rico. After witnessing the destruction from Hurricane Maria First hand last weekend, where 85% of Puerto Rico's residents are currently living without electricity, we intend to work quickly both to help rebuild the electric grid and to help restore normalcy to people's lives."

The work to be provided by Cobra includes the following:

- Comprehensive damage assessment of existing electrical grid.
- Engineering services to aid in the design of a new electric utility grid to Puerto Rico Electric Power Authority (PREPA) specifications.
- Construction services to rebuild the electric grid.
- Fully self-contained solution including all operational and life support related to operating within the disaster area without creating an additional strain on the local population.

The initial mobilization of construction equipment and personnel is expected to begin in the coming days with people currently in place performing an initial damage and engineering assessment to determine the full scope of work required. This contract will be incremental to Mammoth's existing energy service operations.

71. Under Article 21 of the First Cobra Contract, Cobra had the ongoing obligation to inform PREPA of all information and circumstances of its relations with clients and third persons and to disclose any interest that could reasonably influence PREPA when executing the contract or during its terms. Cobra was to avoid even the appearance of any conflicting interests (Indictment ¶ 25(e)). Article 21 provided:

ARTICLE 21: Conflict of Interest

The Contractor certifies that none of its representatives under this Contract receive payment or compensation of any nature, for services rendered regularly through an appointment to a governmental agency, body, public corporation or municipality of Puerto Rico. The Contractor also certifies that he may have consulting services contracts with other governmental agencies or bodies, but such condition does not constitute a conflict of interest for the Contractor.

The Contractor acknowledges that in executing the services pursuant to Contract **it has a duty of complete loyalty towards PREPA** which includes not having adverse interests to those of PREPA related to the services. Those adverse interests include representation of clients which have or may have opposed interests to those of PREPA in relation to the services. **Also, the Contractor shall have the**

**continuous obligation to disclose to PREPA all information and circumstances of its relations with clients and third persons and any interest which could reasonably influence PREPA when executing this Agreement or during its term.**

1)      The Contractor represents conflicting interests when on behalf of a client he must contend for that which it is his duty to oppose to comply with its obligations with another previous, present or potential client. Also, the Contractor represents conflicting interests when his conduct is described as such in the canons of ethic applicable to the Contractor and his personnel or in the laws or regulations of the Commonwealth of Puerto Rico.

2)      In the event that any of the partners, directors or employees of the Contractor should incur in the conduct described herein, said conduct shall constitute a violation to the prohibitions provided herein. **The Contractor shall avoid even the appearance of the existence of conflicting interests.**

3)      The Contractor acknowledges that the PREPA's Chief of Supply Chain Division and Contracting Officer shall have the power to intervene the acts of the Contractor and/or its agents, employees, and subcontractors regarding the enforcement of the prohibitions contained herein. In the event that PREPA should discover the existence of adverse interests with the Contractor, the Chief of Supply Chain Division and Contracting Officer shall inform the Contractor, in writing, of PREPA's intention to terminate this Contract within a thirty (30) day period. During said period, the Contractor may request a meeting with the Chief of Supply Chain Division and Contracting Officer to present his arguments regarding the alleged conflict of interests, which meeting shall be granted by PREPA in every case of alleged conflict of interests. In the event that the Contractor does not request such a meeting during the specified thirty (30) day period or the controversy is not satisfactorily settled during the meeting, this Contract shall be cancelled.

4)      The Contractor certifies that, at the time of award of this Contract, it does not have any other contractual relation that can enter in a conflict of interest with this Contract. The Contractor also certifies that no public employee has any personal or economical interest in this Contract.

(Emphasis added.)

## **Immediate Scrutiny**

72.      The press was quick to question how Cobra was selected for such a large and important undertaking.  For example, on October 26, 2017, *Vox* published an article ("the Vox Article") titled "Puerto Rico just hired 2 contractors with little experience to fix its broken power grid." The article reported that the contractors were unsuited to perform the project:

> Puerto Rico's power crisis has improved little a month after Hurricane Mari[a] took out the power grid. As of Tuesday, 76 percent of power users still didn't have electricity.
>
> In response, Puerto Rico's public power company has awarded big contracts to US energy companies with no experience responding to a major disaster. Generally, experienced utility crews take on the daunting task of repairing power grids in most US disaster zones.
>
> Neither contract was awarded through a regular bidding process either, though it could be optional under a technical rule from the Federal Emergency Management Agency. Still, the decision to forgo an official process concerns experts and set off alarm bells in Washington, . . .

73.     The Vox Article referred to Mammoth's conference call on October 20, 2017. Straehla and Layton participated in that conference call, along with Donald Peter Crist, Mammoth's Director of Investor Relations. During the call, Straehla responded to a question from an analyst that Cobra performs infrastructure repairs for utility companies across the Midwest, has 275 full-time employees, and recently completed electrical work in Texas and Florida after the hurricanes. The Vox Article stated, in pertinent part:

> In a follow-up conversation with Vox, a spokesperson for [Cobra] was unable to give further details about Cobra's contracts in Texas and Florida, or any of the clients they have served. The company has not won any federal contracts in the past or handled contracts for the state of Texas, based on a search of government procurement databases.
>
> Straehla said Cobra planned to send about 500 workers to Puerto Rico in the coming days. PREPA already put down a $15 million deposit to start work on the grid, he said, though the contract didn't go through a bidding process:
>
> This contract included a $15 million upfront payment and from that point -- and then we also put in the contract that it will be -- we will be paid -- we will bill twice weekly. And **the contract is with a PREPA, but it was drafted and -- in the room every step of the way with FEMA**. So there is -- it does comply with FEMA reimbursement requirements. So -- and quite honestly, **we wouldn't have entered this contract if we didn't think we would -- if we didn't think we'd get paid. And we feel very, very strongly about that**. And again, we negotiated the $15 million payment upfront to start with the mobilization efforts.

(Emphasis added.)

74.     On October 31, 2017, *The Intercept* published an article titled "There's a Shady Puerto Rico Contract You Didn't Hear About," reporting that "Cobra's creation is Mammoth's first foray into the utility sector" (the "Intercept Article"). Cobra was created when Mammoth acquired two small transmission and distribution companies for around $8 million earlier in 2017. The Intercept Article further reported that the Company did not offer much detail on how the First Cobra Contract originally came about. According to the Company's statement shortly after the First Cobra Contract was signed, "[Mammoth's] leadership team went to Puerto Rico proactively to meet the authorities there and offer our services and expertise."  The First Cobra Contract was suspicious, due to the absence of a normal bidding process and because PREPA had signed a $300 million contract with Whitefish Energy – a firm with only two full-time employees, based in the same hometown of then-Interior Secretary, Ryan Zinke – just two days prior to entering into the contract with Cobra.

75.     Also, on October 31, 2017, *E&E News* released an article titled "Echoes of Whitefish Surface in $200M Puerto Rico grid deal" reporting on PREPA's unusual decision-making:

> Two days [prior to the Cobra contract], PREPA had approved a separate $300 million grid repair deal with Whitefish Energy, a small contracting firm that hails from Interior Secretary Ryan Zinke's hometown of Whitefish, Mont.
>
> The costly terms of PREPA's deal with Whitefish came under intense scrutiny after they were made public, and Ramos [PREPA's executive director] ultimately announced he would move to cancel the contract Sunday after calls from Puerto Rico's governor to end the deal.
>
> Several U.S. lawmakers, including Rep. Raja Krishnamoorthi (D-Ill.), a former official in Illinois' anti-corruption unit, voiced concerns about language in the Whitefish contract that appeared aimed at avoiding government oversight.
>
> "In no event shall PREPA, the Commonwealth of Puerto Rico, the [Federal Emergency Management Agency] Administrator, the Comptroller General of the United States, or any of their authorized representatives have the right to audit or

review the cost and profit elements of the labor rates specified herein," the document stated.

The same language appears word for word in PREPA's arrangement with Cobra, according to a copy of the contract provided to E&E News. The news publication Caribbean Business posted a copy of the same document on Oct. 20, the day after it was finalized.

However, the section directly above that statement in both contracts grants those same government entities "access to any books, documents, papers, and records of the Contractor" for up to three years of the final payment under the Contract.

A Cobra spokesman said the contract "imposes extensive disclosure obligations on Cobra in favor of all appropriate governmental authorities" and said there had been no requests to change the language in the documentation.

**PREPA's deal with Cobra also states that FEMA officials had the chance to review the arrangement, finding it "an acceptable form to qualify for funding from FEMA or other U.S. Governmental agencies."**

That same line landed Whitefish Energy and PREPA in hot water after FEMA representatives claimed they had not reviewed the contract and that FEMA also had "significant concerns" with its contents. Representatives for FEMA did not respond to a request for comment on the agency's oversight of Cobra, **but Mammoth Energy executives said in a recent conference call that FEMA was closely involved in reviewing its subsidiary's interactions with PREPA, in apparent contrast to Whitefish.**

\*　　　\*　　　\*

Reached by phone for comment, Cobra Energy President Keith Ellison defended his company's contract while noting that he could only speak in a personal, unofficial capacity. **"We feel we had a really good package put together that would provide for the community without taking needed resources away from the island,"** he said, **characterizing his company's relationship with PREPA as a "standard bidding process for a storm contract."**

Ellison deferred official comment on specific contractual language to Mammoth representatives. He also suggested E&E News reach out to PREPA about its choice of "boilerplate" contract language.

**Arty Straehla,** the CEO of Mammoth (the parent company of Cobra), **said in a conference call on Friday that Cobra** does infrastructure repairs for utility companies across the Midwest. The company, founded in 2017 according to SEC filings, has 275 full-time employees, he said, and **recently completed electrical work in Texas and Florida after the hurricanes.**

> **In a follow-up conversation with Vox, a spokesperson for the company was unable to give further details about Cobra's contracts in Texas and Florida, or any of the clients they have served. The company has not won any federal contracts in the past or handled contracts for the state of Texas, based on a search of government procurement databases.**
>
> Straehla said Cobra planned to send about 500 workers to Puerto Rico in the coming days. PREPA already put down a $15 million deposit to start work on the grid, he said, though the contract didn't go through a bidding process.
>
> **"[The contract] was drafted in the room and every step of the way with FEMA, so it does comply with FEMA reimbursement," Straehla said. "We wouldn't have entered this contract if we didn't think we would get paid."**

(Emphasis added.)

76.     On November 1, 2017, PREPA and Cobra amended the First Cobra Contract ("Amendment No. 1"). Defendant Straehla signed the amended contract for Cobra. These changes removed the provisions disallowing the government's right to audit or review the costs and profit elements of the contracts and removed the representation from PREPA that FEMA reviewed and approved the contracts. Both FEMA and the DHS OIG would later determine that FEMA's eligibility determination of the Cobra contract was unsound and unsupported.

77.     The amended version of Article 68 contained in the First Cobra Contract removed the language that FEMA had reviewed and approved the contract. By agreeing to and acknowledging these amendments, Straehla knew, or recklessly disregarded, that the Company was risking its ability to receive payment and PREPA's ability to be reimbursed by FEMA, as Article 68 removes PREPA's acknowledgement that FEMA reviewed and approved the contract. It also removed Straehla's public justification for why the circumstances surrounding the Cobra contract award were dissimilar from those surrounding the Whitefish contract award.

78.     On November 2, 2017, the House Committee on Energy & Commerce held a hearing on the energy recovery efforts after Hurricane Maria. U.S. Representative Frank Pallone,

Jr. (D-NJ), addressed his concerns about how the contract was awarded to Cobra:

> I am also troubled by the maze of contracts with numerous companies for overlapping missions—a patchwork that is failing to turn the lights back on in Puerto Rico. It needs to change now. I am deeply concerned by the terms of the contracts PREPA signed with Whitefish and Cobra Acquisitions, which went so far as to bar PREPA from holding the companies liable for delayed completion of grid repair work or letting the government audit their work.

79.     During the hearing, House Representative Fred Upton (R-MI) asked Charles Alexander, Director of Contingency Operations for the U.S. Army Corps of Engineers the following question:

> Did the Corps have any advance knowledge of working with PREPA prior to the contract that they established with Whitefish and Cobra? Were you aware of that contract before it was signed?

80.     Charles Alexander responded as follows:

> No, sir, we were not. We were engaged in our temporary power mission under the Stafford Act, and we have been working that since the 6th of September. The news that PREPA had independently committed in a contract to another company, we were not consulted; we were not aware.

81.     Also on November 2, 2017, Mammoth held a call with investors to discuss the Company's 3Q17 financial results. During the call, James Wicklund from Credit Suisse AG asked Straehla how he intended to handle the upcoming hearings concerning the contracts:

> Cobra has made the news lately because of Puerto Rico, but not just Puerto Rico but because of another company that's operating there, and I know you're both called to Washington. I don't expect you to make any comments about the Montana-based company, but I don't think you guys have hired the Secretary of Interior's son as an intern, and I know you guys have more than 2 full-time employees. So, we won't talk about the Montana company, but can you talk about how you guys expect to address the hearings in Washington on Puerto Rico? Straehla responded:

> Yes, we haven't – there has not been anything. **And I will tell you, we are absolutely – we did everything absolutely right.** Let me give just a little bit of backdrop of how we did this. We did this the old-fashioned way on the 13th of October – and we had this competency within our group. We had performed extremely well when the hurricanes, unfortunately, hit South Texas when Harvey

and Irma went through. So we had this ability, built on our logistics group that we have, built on our lodging group that we have and experience. **So myself and my President [Ellison] flew down to Puerto Rico on the 13th of October. We met with people, started meeting on Saturday at the convention center where everybody was there, that's the command and control center. We went from meeting to meeting, talking with FEMA officials, talking with the governors, officials, talking with officials from PREPA, that resulted in a meeting that evening – Saturday evening around 7:00 p.m. with PREPA.** We had a fully self-contained plan that nobody else has – had put together for them. That includes having berthing barge, that includes housing our folks. We have, in fact, began the logistics aspect of that with the First barge departed on the 29th loaded with 75 pieces of equipment, mostly buckets and diggers. Yesterday, another barge departed from Fourchon, Louisiana, with 28 pieces of equipment. We'll have more barges departing. We've actually sent large cargo planes full of equipment as well. So our mobilization, **the way that we have done this, it's been right from the very beginning,** and our goal and our operational is to get the lights turn back on in Puerto Rico with our team. **We've got a very …**

James Wicklund interjected:

**A very legitimate effort, a very legitimate effort.**

To which Straehla confirmed:

**Yes, sir.**

(Emphasis added.)

82.    On November 3, 2017, *The Atlantic* published an article titled "The Puerto Rico Power Scandal Expands," (the "Atlantic Article") quoting a November 1, 2017 letter from the House Committee on Energy & Commerce criticizing the First Cobra Contract, that stated that it "would appear to have the effect of preventing government oversight of the agreement, [raising] additional questions about the contracting review process," including FEMA's role in contracts paid out with its funds. The Atlantic Article further reported that the First Cobra Contract reflected ongoing concerns with the PREPA decision-making process following Hurricane Maria, and asked the following questions: "Just how did [PREPA] come to terms with those companies? What exactly was its bidding process? Why did it choose to enter into expensive contracts with private

companies instead of entering into the mutual-aid agreements usually favored by utility companies, which allows them to contract with other utility companies in other states for rebuilding services?"

83.     On November 6, 2017, CNN published an article titled "Here's the other small firm that won a big Puerto Rico power deal" (the "CNN Article"). The CNN Article said that the Cobra Contract was "one of two major contracts greenlighted by PREPA that have come under scrutiny on Capitol Hill since recovery efforts began on the island over a month ago." The CNN Article also reported that "PREPA, the embattled state-owned utility led by executive director Ricardo Ramos, has faced scrutiny over how these fledgling companies won such lucrative deals over larger, more established utilities," and that "many question whether PREPA followed the appropriate steps in awarding the contracts."

84.     The CNN Article also outlined that U.S. Representative Peter DeFazio (D-OR), had asked Brock Long, the head of FEMA, at a House hearing whether he or anyone at FEMA approved the Cobra contract or a prior $300 million contract between Whitefish and PREPA related to energy restoration after the hurricane. Long said in response "[t]here's not a lawyer within FEMA that would have ever approved that contract." Disturbingly, he also said, "it was not our contract [a]nd the other thing to be clear here is we don't approve contracts." In contrast, Straehla had assured analysts on an October 20, 2017 conference call that FEMA was "in the room" and involved "every step of the way" when PREPA was sealing the deal with Cobra. FEMA declined to address whether it was involved in the discussions and told CNN that Cobra's contract was "solely between PREPA and the other party."

85.     On December 1, 2017, The Committee on Homeland Security and Governmental Affairs of The United States Senate sent a letter to Straehla requesting that Mammoth provide information and documents regarding the bidding, negotiation, and signing of the First Cobra

Contract, including detail about FEMA or any other federal agency's involvement in the process. The letter stated that the committee "is concerned about the company's apparent attempt to circumvent federal oversight." In particular, the letter queried the First Cobra Contract prohibiting PREPA, the Commonwealth of Puerto Rico, the FEMA Administrator, or the Controller General of the United States from being able to audit or review certain costs and profit. Further, the letter raised the issue that these sections conflict with PREPA and FEMA's obligations.

86.     Despite the heightened scrutiny, on or about January 28, 2018, Cobra and PREPA amended the First Cobra Contract to increase the value of the contract by $245.4 million to a total of $445.4 million.

87.     On February 27, 2018, Cobra and PREPA again amended the contract to increase the payable amount by another $500 million to a total of $945.4 million. In addition to continuing with its repair and restoration work, under the terms of this amendment, Cobra would have the ability to source construction materials needed to rebuild the electrical infrastructure in Puerto Rico on a pass-through basis.

88.     On May 26, 2018, Cobra entered into a new master services agreement with PREPA to complete restoration of the electrical transmission and distribution system components damaged by Hurricane Maria and to support the initial phase of reconstruction of the electrical power system in Puerto Rico (the "Second Cobra Contract" and, together with the First Cobra Contract, the "Cobra Contracts"). Cobra agreed to provide the labor, supervision, tools, and materials necessary for the restoration and reconstruction services called for under the Second Cobra Contract, which had a one-year term ending May 25, 2019 and provided for total payments not to exceed $900 million. According to the Company, the Second Cobra Contract was allegedly awarded pursuant to an RFP bid process that began in February 2018.

89.     PREPA was the Company's largest customer for the year ended December 31, 2018, in which it accounted for approximately 60% of Mammoth's revenue. PREPA was Mammoth's second largest customer for the year ended December 31, 2017, in which it accounted for approximately 29% of the Company's revenue.

**Insider Sales by Controlling Stockholders**

90.     On June 3, 2018 Tribble emailed Ellison to inform him that $200 million in payments were being delayed and a work stoppage loomed (Indictment ¶ 76).

91.     On June 15, 2018, Layton wrote the SEC that "Mammoth Energy Services, Inc., . . . respectfully requests that the effective date for the Registration Statement on Form S-3 . . ., filed with the Securities and Exchange Commission . . . on November 1, 2017, as amended by Amendment No. 1 filed with the Commission on June 6, 2018, be made June 19, 2018 . . . or as soon thereafter as practicable." On June 19, 2018, the SEC granted it effective, thereby enabling Wexford and Gulfport to sell their shares.

92.     By July 30, 2018, the Selling Controlling Shareholders completed the Underwritten Secondary Offering of approximately 4.4 million shares of the Company's common stock at a price of $38.01 per share.  Both Wexford and Gulfport have designees on Mammoth's Board of Directors with Wexford's designee, Individual Defendant McCarthy, being the Chairman of the Board.  Wexford sold 3,030,426 shares of Mammoth common stock for $115,186,492. Gulfport sold 1,354,574 shares of Mammoth common stock for $51,487,357. Conveniently, the Underwritten Secondary Offering took place when the Company's stock was traded at an all-time high, shortly after the Company announced execution of the Second Cobra Contract.  Also, the Selling Controlling Shareholders granted the underwriters an option to purchase up to an aggregate of 600,000 additional shares of the Company's common stock at the same price. This option was exercised, in part, when on July 30, 2018, the underwriters purchased an additional 385,000 shares

of common stock from the Selling Controlling Shareholders at the same price per share. The

Selling Controlling Shareholders received all proceeds from the Underwritten Secondary Offering.

The chart reproduced below demonstrates that the sale occurred at a time when the Company was

trading at an inflated value:



**FEMA Officials Probed and Indicted for Steering Work to Cobra**

93.     On May 24, 2019, *The Wall Street Journal* released an article titled "*FEMA Official

Probed Over Puerto Rico Power Restoration*," reporting that the FEMA Deputy Regional

Administrator who oversaw FEMA's response to the damage wrought by Hurricane Maria was

under investigation by DHS, relieved of her duties, and placed on administrative leave over

allegations that she improperly steered work to Cobra. The article reported as follows:

> ***A high-ranking Federal Emergency Management Agency official who oversaw
> the reconstruction of Puerto Rico's electrical grid is under investigation by a
> government watchdog over allegations she steered work to a utility contractor,
> according to people familiar with the matter.***
>
> FEMA Deputy Regional Administrator Ahsha Tribble was relieved of her duties
> and placed on administrative leave last week amid a continuing probe by the
> Department of Homeland Security's Office of Inspector General, these people said.
>
> Ms. Tribble deployed to Puerto Rico after Hurricane Maria struck the U.S. island
> territory in September 2017 and spent the next year there coordinating FEMA's
> response to the storm-ravaged power system, according to her FEMA biography.

*The DHS Inspector General, which conducts investigations into FEMA, has probed her interactions with Cobra Acquisitions LLC, a grid-construction contractor hired by Puerto Rico's public electric utility after the hurricane, people familiar with the matter said. The investigation has also focused on whether Cobra gained an improper advantage in the contracting process, they said.*

\*     \*     \*

A FEMA spokeswoman said the agency can't comment on personnel matters. The DHS Inspector General said it couldn't confirm or deny the existence of any probe.

Cobra's parent company didn't respond to requests for comment. Cobra signed separate contracts worth up to $900 million and $945 million to repair downed transmission and distribution lines with the bankrupt power monopoly known as Prepa, according to securities filings.

A Prepa spokeswoman said several utility officials and consultants were interviewed this week by Inspector General agents.

"It is a top priority for Prepa to assist and collaborate with investigations conducted by state or federal agencies," the spokeswoman said.

Cobra became Puerto Rico's primary general contractor for repairing the power grid in late 2017, filling a void in the power restoration efforts after the departure of another contractor, Whitefish Energy Holdings LLC.

Whitefish's contract with Puerto Rico came under intense scrutiny after FEMA raised concerns about how the $300 million deal was awarded and priced. Gov. Ricardo Rosselló canceled the Whitefish deal, and Puerto Rico increasingly came to rely on Cobra to turn the lights back on.

*But as Prepa's spending on contractors skyrocketed last year, utility officials raised concerns internally about Cobra's rates and why the company was doing so much of the power restoration work, according to people familiar with the matter.*

Ms. Tribble "wanted the work to get done and the power restored to Puerto Rico," Ms. Moore said. "Whoever did it, did it. She just wanted it to get done."

*Cobra has billed for more than $1.3 billion in emergency work through May 10, more than half the utility's total emergency spending since the hurricane, according to public records.*

Ms. Tribble served in the National Security Council and Energy Department during the Obama administration and was involved in the White House response to disasters including Hurricanes Sandy and Irene and the deadly West, Texas,

chemical plant explosion, according to her FEMA biography.

At a February 2018 meeting of Puerto Rico's financial oversight board, Ms. Tribble said it was challenging to get utility contractors to do business with Prepa after the storm given its strained public finances. Whitefish and Cobra each "took a risk" in mobilizing to the island, she said.

(Emphasis added.)

94.     Following the release of this information to the investing public, the Company's shares dropped $1.25 per share, or over 10%, over the next three trading days on unusually high volume to close at $10.99 per share on May 29, 2019, damaging stockholders and the Company.

95.     Subsequently on June 5, 2019, while the market was open for trading, *The Wall Street Journal* published an article titled "Puerto Rico Grid Contractor Caught Up in Federal Probes," in which it reported that the FBI "opened a related criminal inquiry" into the origin of Cobra's contracts with PREPA.

96.     Following this news, the Company's shares dropped $5.09 per share, or over 45%, over the next two trading days to close at $6.11 per share on June 6, 2019, further damaging investors and punishing the Company's market capitalization.

97.     On September 3, 2019, Tribble, Ellison, and Patterson were indicted and arrested on charges of: conspiracy to commit bribery of public officials; acts affecting a personal financial interest; false statements; disaster fraud; honest services wire fraud; Travel Act violations; and wire fraud.

98.     According to the Indictment, a part and an object of the conspiracy was that Ellison, directly and indirectly, corruptly gave, offered, and promised a thing of value to a public official, namely Tribble, with intent to influence an official act, in violation of Title 18, United States Code, Section 201(b)(1)(A). It was further a part and an object of the conspiracy that Tribble, being a public official, directly and indirectly, would and did corruptly

demand, seek, receive, accept, and agree to receive and accept a thing of value from Ellison in return for Tribble being influenced in the performance of any official act, in violation of Title 18, United States Code, Section 20I(b)(2)(A).

99.     As part of the conspiracy, Ellison was to give, offer, promise, and agree to give, offer, and promise things of value to Tribble in order to influence her performance of official acts as a FEMA employee, particularly as Deputy Regional Administrator, Sector Lead, and Recovery Manager, in connection with PREPA contracts. For her part, Tribble was to demand, seek, receive, accept, and agree to receive and accept items of value from Defendant Ellison, and he would promise, offer and give Tribble a stream of things of value, including airfare, ground transportation, helicopter flights, hotel rooms, meals, entertainment expenses for Tribble and another individual at her suggestion and behest, employment for Patterson at the behest of Tribble, and personal security services for Tribble.

100.    According to the Indictment, the following things of value were promised and given to Tribble by Ellison:

- A helicopter tour over Puerto Rico on or about February 7, 2018;

- Assistance procuring a place to live in New York in or about February 2018;

- The negotiation and hiring of Patterson by Cobra Energy;

- Hotel accommodations in Fort Lauderdale, Florida on or about July 17 to July 18, 2018;

- Airfare from Miami to Orlando for travel on or about July 20, 2018;

- First class airfare from San Juan to New York for travel on or about September 22, 2018;

- Personal security services in or about November to December 2018;

- Roundtrip airfare from Washington, D.C. to Charlotte for travel on or about November 29, 2018 to November 30, 2018;

- Hotel accommodations in Charlotte on or about November 29-30, 2018;

- Access to and use of Ellison's credit card; and

- Access to and use of an apartment located in San Juan, Puerto Rico.

101.    The Indictment further alleges that, to conceal their actions, Tribble frequently communicated and corresponded with Ellison using her private email account, her private cellular number, a disposable prepaid cellular number, Apple iMessages, SMS texts, and photographs, rather than through her FEMA-issued email account or FEMA-issued cellular telephone. Tribble and Ellison also concealed and attempted to conceal Tribble's receipt of things of value from Ellison by paying with credit cards in Ellison's name in his personal capacity or as Cobra's President.

102.    Tribble's iCloud Photo Library contained a photograph of the front and back of Ellison's personal credit card. Ellison's iCloud Photo Library contained a photograph of a proposal prepared by a competitor of Cobra submitted in response to Request of Proposal announced by PREPA on February 16, 2018. By having access to competitors' proposals, Cobra had an upper hand in the bidding process, and, not surprisingly, Cobra was one of three companies selected by the Evaluation Committee designated by PREPA.

103.    To further please Tribble, Ellison offered Patterson, a former FEMA official and Tribble's friend, a job with a compensation package three times higher than her compensation at FEMA. In his March 22, 2018, email to Tribble, Ellison wrote the following:

> "I ran into [Patterson] last night at Ben & Jerry's. I asked her directly if she was serious. She said yes, I told her to get with Michelle to start the paperwork. I was dead serious and sincere when I said I would take care of her. She will be our rotation coordinator located here in PR to start with."

104.    On June 1, 2018, Cobra's Director of Human Resources and Administration emailed Patterson an "Offer Letter" for a job in Business Development for Cobra Logistics. The compensation breakdown accompanying the Offer Letter outlined Patterson's annual salary as

$160,000 with an opportunity to bonus up to 30% of her annual salary and a *per diem,* bringing her potential compensation to $274,000. As of January 7, 2018, Patterson's annual FEMA salary was less than $100,000.

**The Individual Defendants Made and/or Caused the Company to Issue False and Misleading Statements of Material Fact, Exposing it to Massive Liability and Sanction**

105.    On October 19, 2017, Mammoth announced in a press release that its subsidiary, Cobra, entered into the First Cobra Contract to rebuild Puerto Rico's energy infrastructure, stating, in pertinent part:

> Mammoth Energy Services, Inc. ("Mammoth") (NASDAQ:TUSK) today announced that its wholly owned subsidiary, Cobra Acquisitions LLC, has signed a contract to aid in the restoration of utility infrastructure on the island of Puerto Rico. Cobra, a utility infrastructure business focused on the repair and construction of transmission and distribution (T&D) networks, will perform the work. The contract will commence immediately and is expected to generate revenue of up to $200 million over the initial 120 days.
>
> Arty Straehla, Mammoth's Chief Executive Officer, stated, "We are honored to be chosen to help restore the electric utility infrastructure for the residents of Puerto Rico. After witnessing the destruction from Hurricane Maria First hand last weekend, where 85% of Puerto Rico's residents are currently living without electricity,  we intend to work quickly both to help rebuild the electric grid and to help restore normalcy to people's lives."
>
> *          *          *
>
> The initial mobilization of construction equipment and personnel is expected to begin in the coming days with people currently in place performing an initial damage and engineering assessment to determine the full scope of work required. This contract will be incremental to Mammoth's existing energy service operations.

106.    When an analyst during a conference call asked about Mammoth's "margin expectations," Layton replied: "…we expect that this contract will have a significant impact on both Q4' 17 and Q1 2018. Further, we look forward to discussing our Q3 results in the coming weeks. We're in the preliminary assessment of damage and there are a number of variables and storm work but we expect this to be accretive to our corporate margin."

107.    The following day, on October 20, 2017, Mammoth held a conference call with

analysts, attended by Straehla, Layton, and Donald Peter Crist, Mammoth's Director of Investor

Relations. In response to a question from an analyst regarding what "the payment terms [are]

going to look like," Straehla said:

> This contract included a $15 million upfront payment and from that point-- and then
> we also put in the contract that it will be -- we will be paid -- we will bill twice
> weekly. And **the contract is with a PREPA, but it was drafted and -- in the room
> every step of the way with FEMA.** So there is -- it does comply with FEMA
> reimbursement requirements. So -- and quite honestly, we wouldn't have entered
> this contract if we didn't think we would -- if we didn't think we'd get paid. And
> we feel very, very strongly about that. And again, we negotiated the $15 million
> payment upfront to start with the mobilization efforts.

(Emphasis added.)

108.    Straehla's statements above were false and misleading statements that exposed the

Company to both regulatory and litigation risk because Mammoth was not, as Straehla falsely

claimed, entitled to remuneration under the terms of the contract as it "was drafted and – in the

room every step of the way with FEMA." By stating that FEMA was "in the room," *i.e.*, reviewed

and approved the contract, Straehla harmed the Company and exposed it to myriad liabilities.

Straining to falsely assure that Mammoth would be remunerated under the contract, Straehla

declared: "we wouldn't have entered this contract if we didn't think we would – if we didn't think

we'd get paid.  And we feel very, very strongly about that."  The FEMA official "in the room"

was Tribble, who Ellison was bribing with gifts and other accommodations to secure the benefits

of the agreement for Cobra.

109.    As stated above, on October 31, 2017, Ellison was quoted by *E&E News:*

> Reached by phone for comment, Cobra Energy President Keith Ellison defended
> his company's contract while noting that he could only speak in a personal,
> unofficial capacity. "We feel we had a really good package put together that would
> provide for the community without taking needed resources away from the island,"
> he said, characterizing his company's relationship with PREPA as a "standard
> bidding process for a storm contract."

110.     Ellison's statement was untruthful and deceptive when made. Cobra and Mammoth were able to lock in their contract with PREPA not because they "had a really good package put together," but because Ellison had bribed Tribble to obtain the contract. He falsely stated that Cobra's connection with PREPA was a "standard bidding process for a storm contract," which couldn't have been further from the truth. In fact, the "bidding process" was a deal centered around bribes.

111.     Uncoincidentally, on November 1, 2017, Straehla signed an amendment to the contract that removed language that "PREPA represents and warrants" that FEMA had reviewed and approved the contract, as alleged above. In fact, FEMA did not review or approve of the contract, and it was deceptive to tell investors that Mammoth would ultimately receive full remuneration under the contract because FEMA had purportedly approved it from the outset.

112.     On November 2, 2017, Mammoth held a call with investors and analysts to discuss the Company's 3Q17 financial results. During the call, James Wicklund from Credit Suisse AG asked Defendant Straehla:

> Cobra has made the news lately because of Puerto Rico, but not just Puerto Rico but because of another company that's operating there, and I know you're both called to Washington. I don't expect you to make any comments about the Montana-based company, but I don't think you guys have hired the Secretary of Interior's son as an intern, and I know you guys have more than 2 full-time employees. So we won't talk about the Montana company, but can you talk about how you guys expect to address the hearings in Washington on Puerto Rico?

Straehla responded:

> Yes, we haven't – there has not been anything. **And I will tell you, we are absolutely – we did everything absolutely right.** Let me give just a little bit of backdrop of how we did this. We did this the old-fashioned way on the 13th of October – and we had this competency within our group. We had performed extremely well when the hurricanes, unfortunately, hit South Texas when Harvey and Irma went through. So we had this ability, built on our logistics group that we have, built on our lodging group that we have and experience. **So myself and my President [Ellison] flew down to Puerto Rico on the 13th of October. We met with people, started meeting on Saturday at the convention center where**

**everybody was there, that's the command and control center. We went from meeting to meeting, talking with FEMA officials, talking with the governors, officials, talking with officials from PREPA, that resulted in a meeting that evening – Saturday evening around 7:00 p.m. with PREPA.** We had a fully self-contained plan that nobody else has – had put together for them. That includes having berthing barge, that includes housing our folks. We have, in fact, began the logistics aspect of that with the First barge departed on the 29th loaded with 75 pieces of equipment, mostly buckets and diggers. Yesterday, another barge departed from Fourchon, Louisiana, with 28 pieces of equipment. We'll have more barges departing. We've actually sent large cargo planes full of equipment as well. So our mobilization, **the way that we have done this, it's been right from the very beginning,** and our goal and our operational is to get the lights turn back on in Puerto Rico with our team. **We've got a very …**

James Wicklund interjected:

**A very legitimate effort, a very legitimate effort.**

To which Straehla confirmed:

**Yes, sir.**

(Emphasis added.)

113.    Straehla's statements above that "we did absolutely everything right," "the way that we have done this, it's been right from the very beginning," and that he and Ellison put forth a "very legitimate effort" were false and misleading when made. Cobra and Mammoth were able to lock in their contracts due to Ellison's bribery of a FEMA official, which conduct was neither "right" nor "legitimate". Additionally, Straehla was aware that Cobra's contract with PREPA contained the same questionable provision, that, when included in the Whitefish contract, led to that contract being cancelled. Despite this knowledge, Straehla falsely attempted to distinguish Cobra's contract from the extremely problematic Whitefish contract. Further, Straehla knew that Cobra's contract was entered into without FEMA's approval, and on the day before the call, November 1, 2017, he signed an amendment to the First Cobra Contract excising the language that "PREPA represents and warrants" that FEMA had reviewed and approved the contract.

114.    On November 14, 2017, Mammoth filed a Form 10-Q with the SEC detailing its

financial results and position for the fiscal quarter ending September 30, 2017 (the "3Q 2017 10-Q"). The 3Q17 10-Q was signed by Defendants Straehla and Layton.

115.     The 3Q 2017 10-Q reported the following with respect to the Company's contract with PREPA:

> On October 19, 2017, Cobra entered into a contract to aid in the restoration of utility infrastructure on the island of Puerto Rico. The contract provides for payments of up to $200.0 million, including an initial payment of $15.0 million at the time of signing. As of November 7, 2017, Cobra had entered into $32.7 million of commitments related to this contract and made prepayments and deposits of $12.6 million with respect to these commitments.

116.     The 3Q 2017 10-Q contained the following statements in a subpart to Item 1A Risk Factors:

> ***One of our energy services subsidiaries recently entered into a contract with the Puerto Rico Electric Power Authority, or PREPA, which provides for payments to us of up to $200.0 million. PREPA is currently subject to pending bankruptcy proceeding. In the event that PREPA does not have or does not obtain the funds necessary to satisfy its payment obligations to our subsidiary under the contract or terminates the contract prior to the end of the contract term, our financial condition, results of operations and cash flows could be materially and adversely affected.***

> On October 19, 2017, our energy services subsidiary Cobra Acquisitions LLC, or Cobra, and PREPA entered into an energy master services agreement for repairs to PREPA's electrical grid as a result of Hurricane Maria. The one-year contract provides for payments of up to $200.0 million, including an initial payment of $15.0 million. As of November 7, 2017, Cobra had entered into $32.7 million of commitments related to this contract and made prepayments and deposits of $12.6 million with respect to these commitments. PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency, or FEMA, or other sources. PREPA's contracting practices in connection with restoration and repair of PREPA's electrical grid in Puerto Rico, and the terms of certain of those contracts, have been subject to critical comment and are the subject of review and hearings by U.S. federal and Puerto Rican governmental entities. Recently, a contract for restoration and repair services entered into by PREPA with an unrelated third party was terminated by PREPA. In the event that PREPA does not have or does not obtain the funds necessary to satisfy its obligations to Cobra under the contract or terminates the contract prior to the

end of the contract term, our financial condition, results of operations and cash flows could be materially and adversely affected.

(Emphasis in original.)

117.    The statements reproduced above were false and misleading when made because they omitted information necessary to render the statements not misleading, namely that: (1) Mammoth failed to disclose that Cobra entered into the same contract provision as did the "unrelated third party," Whitefish, whose contract was terminated by PREPA; (2) Mammoth failed to disclose that FEMA did not review or approve the contract Cobra entered into with PREPA, thereby putting Mammoth's ability to collect on the work performed at greater risk; and (3) Mammoth failed to state that Cobra obtained the PREPA contracts due to Ellison's bribes to FEMA officials.

118.    On January 31, 2018, Mammoth filed a Form 8-K with the SEC and signed by Layton that reported that on January 28, 2018 "Cobra and PREPA amended the First Cobra Contract to increase the total agreement amount by an additional $245.4 million to a total of $445.4 million." The press release stated in part:

**Contract Increase**

On January 28, 2018, the Puerto Rico Electric Power Authority ("PREPA") and Cobra executed a contract amendment that expanded the aggregate contract amount by approximately $245 million to address work requirements. The original $200 million contract value was effective on October 19, 2017 and fully utilized during the fourth quarter of 2017 due to the substantially greater deployment of resources. This contract amendment allows for continued deployment of resources into 2018.

Under the terms of the amended contract, the number of skilled workers requested by PREPA and provided by Cobra has increased to at least 880, up from 434, and the billable daily rate of those workers has been decreased. A copy of the amendment will be filed as an exhibit to the Form 8-K that will be filed with the Securities and Exchange Commission ("SEC") in conjunction with this release.

Arty Straehla, Mammoth's Chief Executive Officer, stated, "We are proud that **through our team's hard work and professionalism PREPA has elected to increase the value of our contract. Our team is working closely with PREPA,**

**FEMA, the US Army Corps of Engineers** and other governmental agencies and, together, we are making significant progress to restore power to the affected areas in an orderly fashion. **Furthermore, at the request of PREPA, FEMA reviewed our original contract with PREPA and our rates of service.** In a letter dated December 23, 2017, FEMA determined that PREPA awarded our contract in compliance with emergency procurement provisions of the Commonwealth of Puerto Rico and Executive Orders issued as a result of the disaster, and also determined the costs under the contract to be reasonable."

(Emphasis added.)

119.   The statements reproduced above were false and misleading because they did not include information necessary to render them not misleading. The statements concerning the December 23, 2017 FEMA legal review and cost reasonableness letter were false and misleading because the Individual Defendants failed to disclose that the letter was the product of Ellison's relationship with Tribble. As alleged in the Indictment:

- On December 8, 2017, Ellison emailed Tribble regarding the status of FEMA's legal review, and asked her, "Are you in a position as we spoke to go on the record?" (Indictment ¶ 50);

- In response, Tribble provided Ellison with an update on the review, stating she had "worked with the [Puerto Rican] Governor" to assist Cobra with obtaining information from PREPA and was going to PREPA in person the next morning to assist Cobra (*Id.* ¶ 51); and

- Tribble had taken official action to cause the letter to be sent from FEMA's Federal Coordinating Officer to the Puerto Rico Government's Authorized Representative (*Id.* ¶ 47(a)).

120.   Without this letter, PREPA would not have hiked the value of the First Cobra Contract by $245 million because, as noted in the Form 8-K above, PREPA's ability to meet its payment obligations was contingent on funding from FEMA.  In a report issued on July 3, 2019,

the DHS OIG confirmed that FEMA's determination of the eligibility for reimbursement and costs under the PREPA contract was the product of Tribble's influence on behalf of Ellison and Cobra. The report, titled "FEMA's Eligibility Determination of Puerto Rico Electric Power Authority's Contract with Cobra Acquisitions LLC," stated that:

> FEMA conducted an analysis of the Cobra contract rates and determined that contract costs were reasonable and eligible for the PA program. However, FEMA's eligibility determination was not sound because it did not evaluate the actual time and materials costs for reasonableness and because its analyses of contract rates for labor, equipment, and other costs were not always logical, complete, and supported. As a result, FEMA approved a PA grant and reimbursed millions of dollars for Cobra contract costs based on an unsound eligibility determination.

121.    The report also stated that based on the findings, "FEMA will make a final determination of the eligibility of the contract costs and disallow any costs that are not reasonable." Significantly, the estimated completion date of the final evaluation would be well into the future - - May 29, 2020.

122.    Additionally, the statements indicating Cobra's close working relationship with FEMA and other government agencies as a reason for the Company's success in locking in the additional $245 million under a subsequent amendment were false and misleading because the Defendants caused the Company to fail to disclose that Ellison and Tribble's bribery scheme created a conflict of interest between Cobra and PREPA, in violation of Article 21 of the First Cobra Contract (Indictment ¶ 43). Ellison's relationship with Tribble also meant that Cobra was in violation of the "Anti-Corruption Code for a New Puerto Rico," with which Cobra had agreed to comply pursuant to Amendment No. 4 (Indictment ¶ 45). Amendment No. 4 was executed by Straehla and included as an exhibit to the January 31, 2018 Form 8-K.

123.    Further, the Company's comment that "Cobra intends to seek additional repair and restoration work for PREPA's electric grid beyond the service period provided for in the

Amendment, as well as work rebuilding and modernizing PREPA's electrical grid once the repair and restoration phase is complete" was untrue and misleading because the Company's prospects of securing such additional work would be significantly in jeopardy if and once the nature of Ellison and Tribble's relationship became known to the public.

124.    In addition to increasing the value of the First Cobra Contract, Cobra assured in this amendment that the work as provided under the First Cobra Contract and its Amendments was to be done in a way consistent with all applicable FEMA laws, regulations, and eligibility guidelines and would only include work eligible for FEMA reimbursement assistance (Indictment ¶ 30). Amendment No. 4, introduced various changes, including:

> 8.    Anti-corruption Code for a New Puerto Rico: Contractor agrees to comply with the provisions of Act 2-2018, known as the Anti- Corruption Code for a New Puerto Rico, as the same may be amended from time to time.

> 9.    Government Ethics Act: The Contractor hereby certifies that it is in compliance with Act 1 of January 3, 2012, as amended, known as the Ethics Act of the Government of Puerto Rico, which, stipulates that, no employee or executive of the Contractor, nor any member of his/he[r] immediate family (spouse, dependent children or other members of his/her household or any individual whose financial affairs are under the control of the employee) shall have any direct or indirect pecuniary interest in the Services to be rendered under this Agreement, except as may be expressly authorized by the Governor of Puerto Rico in consultation with the Secretary of Treasury and the Secretary of Justice of the Government.

125.    On February 28, 2018, Mammoth filed its annual report on Form 10-K with the SEC, in which it stated its financial results and position for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Straehla, Layton, McCarthy, Heerwagen, Ross, Smith, and Palm.

126.    The 2017 10-K stated the following about the Company's contract with PREPA:

> We currently have agreements in place with government-funded utilities, private utilities, public IOUs and Co-Ops. In particular, on October 19, 2017, one of our subsidiaries, Cobra Acquisitions LLC, or Cobra, entered into an emergency master services agreement with PREPA (such agreement, as subsequently amended

through December 21, 2017, is hereinafter referred to as the First Cobra contract). The First Cobra contract has a one-year term and provided for up to $200.0 million of services which was initially expected to be fully utilized within a 120-day period. The scope of the work provided for in the First Cobra contract included labor, supervision, tools and equipment to perform storm repairs at various locations in Puerto Rico. The First Cobra contract was fully applied to services performed by Cobra as of January 3, 2018. Due to the continuing need for Cobra's services, on January 28, 2018, Cobra and PREPA amended the First Cobra contract to increase the total contract amount by an additional $245.4 million up to a total of $445.4 million. Under the terms of this amendment, the number of workers requested by PREPA and provided by Cobra increased to at least 882, up from 434 in the First Cobra contract, and the billable daily rate for those workers was decreased. On February 27, 2017, Cobra and PREPA again amended the PREPA contract to further increase the contract amount by $500.0 million up to a total of $945.4 million. In addition to continuing its repair and restoration work, under the terms of this amendment Cobra will be able to source construction materials needed to rebuild the electrical infrastructure in Puerto Rico on a pass- through basis. To support its efforts, Cobra has two berthing barges with accommodations for approximately 550 people mobilized to Puerto Rico. In addition to its employees, Cobra also subcontracts additional resources where needed to assist in its repair efforts, including helicopters and pilots to erect towers and pull wire for reconnection, steel workers to fix transmission poles and rework steel damaged in the storm, road equipment and operators to carve access to work sites, tree services to clear brush and trees and security teams. Based on the current level of services provided, Cobra anticipates the additional amounts specified in the amendments will fund its activities in Puerto Rico through mid-2018.

\*       \*       \*

### *Regulation of Infrastructure Services*

**In our infrastructure business, our operations are subject to various federal, state and local laws and regulations including**:

- licensing, permitting and inspection requirements applicable to contractors, electricians and engineers;

- regulations related to worker safety;

- permitting and inspection requirements applicable to construction projects;

- wage and hour regulations;

- building and electrical codes; and

- **special bidding, procurement and other requirements on government**

**projects.**

We believe that we have all the licenses required to conduct our energy infrastructure services and that **we are in substantial compliance with applicable regulatory requirements**. Our failure to comply with applicable regulations could result in substantial fines or revocation of our operating licenses, as well as give rise to termination or cancellation rights under our contracts or disqualify us from future bidding opportunities.

(Emphasis added.)

127.     The Individual Defendants' and Company's statements in the 2017 10-K were false and misleading when made because they omitted material facts necessary to make the statements not misleading. The Individual Defendants' and Company's statements concerning the January 28, 2018 and February 27, 2018 Amendments to the First Cobra Contract were materially false and misleading because they did not disclose that the PREPA work was improperly procured and steered to Mammoth's subsidiary as a result of the bribery and relationship between Ellison and Tribble.

128.     In the 2017 10-K, Individual Defendants and Company made the materially false and misleading statement that "[w]e believe that . . . we are in substantial compliance with applicable regulatory requirements" for "special bidding, procurement and other requirements on government projects."  This statement was false and misleading because, in fact, the Company was in violation of the conflict of interest provision under Article 21 to the First Cobra Contract (Indictment ¶ 43), the Anti-Corruption Code for a New Puerto Rico, with which, under Amendment No. 4, Individual Defendants had said they would comply (Indictment ¶ 45), and, as a result of Ellison bribing Tribble to steer the contracts and work to Cobra, federal law.  Further Cobra breached the terms of its contract by hiring Patterson from FEMA, which was a conflict of interest or created the appearance of a conflict of interest.

129.     The 2017 10-K also contained the following in a subpart to Item 1A Risk Factors:

***Our customer base is concentrated and the loss of one or more of our significant customers, or their failure to pay the amounts they owe us, could cause our revenue to decline substantially.***

Our top five customers accounted for approximately 71% and 80%, respectively, of our revenue for the years ended December 31, 2017 and 2016. Gulfport was our largest customer for the years ended December 31, 2017 and 2016 accounting for approximately 30% and 57%, respectively, of our revenue. PREPA was second largest customer for the year ended December 31, 2017 accounting for approximately 29% of our revenue. It is likely that we will continue to derive a significant portion of our revenue from a relatively small number of customers in the future. If a major customer decided not to continue to use our services, our revenue would decline and our operating results and financial condition could be harmed. In addition, we are subject to credit risk due to the concentration of our customer base. Any nonperformance by our counterparties, including their failure to pay the amounts they owe us on a timely basis or at all, either as a result of changes in financial and economic conditions or otherwise, could have an adverse impact on our operating results and could adversely affect our liquidity.

*       *       *

**One of our infrastructure services subsidiaries recently entered into a contract with PREPA, which, as amended, provides for payments to us of up to $945.4 million. PREPA is currently subject to pending bankruptcy proceedings. In the event that PREPA does not have or does not obtain the funds necessary to satisfy its payment obligations to our subsidiary under the contract or terminates the contract prior to the end of the contract term, our financial condition, results of operations and cash flows could be materially and adversely affected.**

On October 19, 2017, one of our subsidiaries, Cobra, and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid as a result of Hurricane Maria. The one-year contract, as amended through February 27, 2018, provides for payments of up to $945.4 million. PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, **PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency, or FEMA**, or other sources. **PREPA's contracting practices in connection with restoration and repair of PREPA's electrical grid in Puerto Rico, and the terms of certain of those contracts, have been subject to critical comment and are the subject of review and hearings by U.S. federal and Puerto Rican governmental entities**. Recently, a contract for restoration and repair services entered into by PREPA with an unrelated third party was terminated by PREPA. In the event that PREPA does not have or does not obtain the funds necessary to satisfy its current obligations to Cobra under the contract or terminates the contract prior to the end of the contract term, our financial condition,

results of operations and cash flows could be materially and adversely affected. **In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.**

\*      \*      \*

*We provide the majority of our infrastructure services to one customer, and the termination of this relationship could adversely affect our operations.*

We provide infrastructure services that focus on the repair, maintenance and construction of transmission and distribution networks. The majority of our revenue from this business has been derived from PREPA pursuant to a contract entered into on October 19, 2017, as subsequently amended, with a term of up to one year. **We cannot assure you that we will be able to continue our contract with PREPA on favorable terms and conditions or at all**. Likewise, we cannot assure you that we will be able to obtain one or more replacement contracts with other customers sufficient to continue providing the level of services as we currently do with PREPA. **The termination of our relationship with PREPA could have a material adverse effect on our business, financial condition, results of operations and cash flows.**

(Emphasis in bold added, emphasis in bold and italics in original.)

130.    These purported  disclosures were false and misleading when made because they did not disclose material information necessary to render them not misleading including that: (1) Cobra had entered into the same contract provision as did the "unrelated third party," Whitefish, the contract of which was terminated by PREPA; (2) FEMA did not review or approve the PREPA contract Cobra entered into with PREPA, thereby putting Mammoth's ability to collect on the work in great jeopardy; and (3) Mammoth's ability to be reimbursed by PREPA for its work was at risk and subject to recovery because Cobra had secured its contracts through a scheme whereby Ellison was bribing Tribble.

131.    Further the purported risks factors outlined in the 2017 10-K were materially misleading as they failed to disclose that Cobra's own contracts with PREPA were among the

"certain of those contracts" entered by PREPA that were subject to review by U.S. federal authorities.

132.    On May 3, 2018, Defendants held an earnings call with analysts and investors concerning 1Q18 results.  During the call, Straehla made false and misleading statements in response to questions from analysts about the ongoing RFP process with PREPA. Specifically, Daniel Joseph Burke from Johnson Rice & Company asked Straehla:

> I guess, I will start out with a couple on Puerto Rico, if you don't mind. Arty, can you maybe update us, I know it's essentially a public process, but where the RFP process might stand for potential reconstruction work on the island?

Straehla responded:

> Sure, Daniel**.** The RFP process has begun and in earnest, there's nothing to really announce right now, but we are working through the processes as PREPA and the Puerto Rican government are. **We think we have a competitive advantage**, in that we have nearly 1,000 people and 600 pieces of equipment. So we think that as we go forward, **we are looking forward to [the] possibility of getting that RFP. We think it's – we expect to be very competitive**.

(Emphasis added.)

133.    Subsequently, Daniel Joseph Burke asked the following question about the outcome of the RFP process:

> Fair enough. I guess the last one for me, the Puerto Rico contract, that gets the most questions from clients. And I know you've mentioned nothing formal to announce now but there's, I guess, the RFP process with respect to reconstruction. When would you expect to have any visibility on an outcome from that?

134.    Straelha responded as follows:

> We think that something will come within the next 30 days**. It's generally a very competitive long process**, but we would hope – it started actually in February time frame, and we would like to see – we expect to see something in the next 30 days.

(Emphasis added.)

135.    Straehla's statement that "we have a competitive advantage" was false and

misleading because he omitted to disclose the material fact that Cobra's "competitive advantage" was that Ellison was bribing Tribble to steer work and contracts to Cobra and Mammoth. Straehla's statement that "it's generally a very competitive long process" was also misleading as the bribery scheme eliminated competition for contracts.

136.    During the same day, Mammoth filed a Form 10-Q with the SEC, which provided its financial results and position for the fiscal quarter ended March 31, 2018 (the "1Q 2018 10-Q"). The 1Q18 10-Q was signed by Defendants Straehla and Layton.

137.    The 1Q 2018 10-Q stated the following concerning the Company's contract with PREPA:

> In 2017, we expanded into the electric infrastructure business, offering both commercial and storm restoration services to government-funded utilities, private utilities, IOUs and Co-Ops. Since we commenced operations in this line of business, substantially all of our infrastructure revenues has been generated from storm restoration work, including revenue from PREPA due to the damage by Hurricane Maria. Our contract with PREPA, as amended during the First quarter of 2018, provides for 2018 revenue of approximately $745 million for services estimated to be performed through mid-2018. Cobra intends to seek additional repair and restoration work for PREPA's electric grid as well as work rebuilding and modernizing PREPA's electric grid once the repair and restoration phase is complete. However, there can be no assurance that Cobra will be successful in securing any additional work. Further, PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency or other sources. In the event PREPA does not have or does not obtain the funds necessary to satisfy its obligations to Cobra under the contract, terminates the contract or curtails our services prior to the end of the contract term, our financial condition, results of operations and cash flows could be materially and adversely affected. In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.

138.    The above statements made in the 1Q18 10-Q were materially false and misleading when made because Defendants omitted to disclose material facts necessary to make the statements

that were made not misleading. Defendants omitted disclosures that: (1) FEMA did not review or approve Cobra's contract with PREPA, leaving Mammoth at increased risk of not being reimbursed for the work it performed; (2) Ellison's bribery of Tribble risked not only Mammoth's payments being withheld or delayed, but the Company being forced to refund payments already received; and (3) Cobra's ability to secure additional work was at risk because it obtained its existing work by bribing FEMA officials.

139.    The 1Q18 10-Q was also false and misleading because, under the section Item 1A Risk Factors, Defendants stated and/or caused the Company to state: "Other than set forth below, there have been no material changes to the Risk Factors previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2017." None of the additional risk factors listed in the 1Q18 10-Q relate to PREPA or Mammoth's infrastructure business. Thus, those risk factors were false and misleading when made because they omitted to disclose the risks described above. The facts omitted from the 2017 10-K were omitted again in the 1Q18 10-Q, and they were necessary in order to make the statements made by Mammoth not materially misleading.

140.    On May 29, 2018, Mammoth published a press release reporting that Cobra had entered into the Second Cobra Contract, a $900 million contract with PREPA, stating in pertinent part:

> OKLAHOMA CITY, May 29, 2018 (GLOBE NEWSWIRE) -- Mammoth Energy Services, Inc. ("Mammoth") (NASDAQ:TUSK) today announced that its wholly owned subsidiary, Cobra Acquisitions LLC ("Cobra"), signed a one-year $900 million contract with the Puerto Rico Electric Power Authority ("PREPA") to complete the restoration of the critical electrical transmission and distribution system components damaged as a result of Hurricane Maria as well as to support the initial phase of reconstruction of the electrical power system in Puerto Rico. Cobra has been working to restore electrical services in Puerto Rico since October 2017.

> **Request for Proposal (RFP) Process**

> In mid-February, the Commonwealth of Puerto Rico began a competitive RFP bid

process (RFP #77844) to complete the restoration of critical electrical system components and to support the initial reconstruction phase of its electrical utility system following the impact of Hurricane Maria. ***This process involved the submission of bids from qualified infrastructure construction companies and an analysis by PREPA of each bidder's experience, asset base, financial capacity, understanding of the project and overall cost to perform the work needed. After concluding the selection process, Cobra entered into a contract with PREPA on May 26, 2018.***

### Restoration and Reconstruction Contract

Under the terms of the contract, Cobra is to perform hurricane restoration and reconstruction services at various locations in PREPA's service area. Cobra is increasing its total resource count in Puerto Rico to expedite the completion of the restoration process. As the restoration process comes to an end, Cobra will continue to work with the Commonwealth of Puerto Rico, PREPA and various other federal and Commonwealth agencies to transition to the long task of reconstructing the Puerto Rico power grid of the future. This contract award is in addition to the original contract to provide restoration services that Cobra entered into in October 2017, as amended.

Arty Straehla, Mammoth's Chief Executive Officer, stated, "We are very proud of our Cobra team in Puerto Rico and look forward to continuing our relationship with the Commonwealth of Puerto Rico, PREPA and the citizens of Puerto Rico. Through the team's hard work, professionalism and technical ability, we have been selected to lead this very important effort to complete the restoration phase and transition to the reconstruction phase of the electric utility system in Puerto Rico, which is expected to last for several years. The reconstruction of the electric utility infrastructure will improve the reliability and quality of service for the citizens of Puerto Rico."

(Emphasis added.)

141.    The Company's statements in the press release concerning the RFP process were materially false and misleading, as Tribble was bribed to procure and steer PREPA work to Cobra, giving Mammoth an unfair advantage over other contractors and making the process to secure the Second Cobra Contract anything but "competitive and rigorous."

142.    On May 31, 2018, Mammoth filed a Form 8-K with the SEC, signed by Layton, which, in addition to including the press release described above as an exhibit, contained a copy of the Second Cobra Contract signed by Straehla.

143.    The Second Cobra Contract contained the same conflict of interest provision under Article 21 that was in the First Cobra Contract. As such, Cobra was required to avoid even the appearance of the existence of conflicting interests. Straehla also certified in the Second Cobra Contract that Cobra and its representatives were in compliance with various ethical regulations and laws, including the "Anti- Corruption Code for a New Puerto Rico" – a certification that Straehla had previously made when he signed Amendment No. 4 to the First Cobra Contract. The claims of compliance in the press release and the May 2018 Form 8-K were false and misleading when made because, in fact, Cobra was not in compliance with the conflict of interest provision of Article 21 or the Anti-Corruption Code for a New Puerto Rico contained in Article 49 of the Second PREPA Contract. These misrepresentations put Mammoth at risk of not being paid for some or all of its work for PREPA and meant that Mammoth would potentially face civil and criminal penalties and/or costly litigation.

144.    On June 6, 2018, Mammoth filed a Form S-3/A with the SEC to effectuate the Underwritten Secondary Offering in order for Wexford and Gulfport to sell their four million shares of stock. The S-3/A was declared effective on June 19, 2018, and it contained the following false and misleading statements:

> Our customer base is concentrated and the loss of one or more of our significant customers, or their failure to pay the amounts they owe us, could cause our revenue to decline substantially.
>
> Our top five customers accounted for approximately 71% and 80%, respectively, of our revenue for the years ended December 31, 2017 and 2016. Gulfport Energy Corporation, or Gulfport, was our largest customer for the years ended December 31, 2017 and 2016 accounting for approximately 30% and 57%, respectively, of our revenue. Puerto Rico Electric Power Authority, or PREPA, was our second largest customer for the year ended December 31, 2017 accounting for approximately 29% of our revenue. For the three months ended March 31, 2018, PREPA was our largest customer and Gulfport was our second largest customer, representing 64% and 12%, respectively, of our total revenue for such period. It is likely that we will continue to derive a significant portion of our revenue from a

relatively small number of customers in the future. If a major customer decided not to continue to use our services, our revenue would decline and our operating results and financial condition could be harmed. In addition, we are subject to credit risk due to the concentration of our customer base. Any nonperformance by our counterparties, including their failure to pay the amounts they owe us on a timely basis or at all, either as a result of changes in financial and economic conditions or otherwise, could have an adverse impact on our operating results and could adversely affect our liquidity.

One of our infrastructure services subsidiaries has entered into service contracts with PREPA, which provide for aggregate payments to us of up to approximately $1.8 billion. PREPA is currently subject to pending bankruptcy proceedings. In the event that PREPA does not have or does not obtain the funds necessary to satisfy its payment obligations to our subsidiary under the contracts or terminates the contracts prior to the end of their terms, our financial condition, results of operations and cash flows could be materially and adversely affected.

On October 19, 2017, one of our subsidiaries, Cobra Acquisitions LLC, or Cobra, and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid as a result of Hurricane Maria. The one-year contract, as amended through February 27, 2018, provides for payments of up to $945.4 million. On May 26, 2018, Cobra and PREPA entered into a new one-year, $900.0 million master services agreement to provide additional repair services and begin the initial phase of reconstruction of the electrical power system on Puerto Rico. PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contracts will be largely dependent upon funding from the Federal Emergency Management Agency, or FEMA, or other sources. PREPA's contracting practices in connection with restoration and repair of PREPA's electrical grid on Puerto Rico, and the terms of certain of those contracts, have been subject to critical comment and are the subject of review and hearings by U.S. federal and Puerto Rican governmental entities. In 2017, a contract for restoration and repair services entered into by PREPA with an unrelated third party was terminated by PREPA. In the event that PREPA does not have or does not obtain the funds necessary to satisfy its current obligations to Cobra under the contracts or terminates the contracts prior to the end of the contract terms, our financial condition, results of operations and cash flows could be materially and adversely affected. In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.

### *We provide the majority of our infrastructure services to one customer, and the termination of this relationship could adversely affect our operations.*

We provide infrastructure services that focus on the repair, maintenance and construction of transmission and distribution networks. The majority of our

revenue from this business is derived from PREPA pursuant to contracts entered into on October 19, 2017, as subsequently amended, and on May 26, 2018, each with a term of up to one year. We cannot assure you that we will be able to continue our contracts with PREPA on favorable terms and conditions or at all. Likewise, we cannot assure you that we will be able to obtain one or more replacement contracts with other customers sufficient to continue providing the level of services as we currently do with PREPA. The termination of our relationship with PREPA could have a material adverse effect on our business, financial condition, results of operations and cash flows.

(Emphasis in original.)

145.     These statements did not warn investors that Mammoth's ability to be reimbursed by PREPA for its work was in jeopardy and subject to claw-back because Cobra secured its contracts through a scheme of bribery. These statements also failed to disclose that Cobra's own contracts with PREPA were among "certain of those contracts" entered into by PREPA that were subject to review by U.S. federal authorities. The omitted information was necessary in order to make the statements made not materially misleading.

146.     The Company's statements in the S-3/A concerning the possibility of delayed payments were also materially false and misleading because, just three days prior to Mammoth filing the S-3/A, Tribble informed Ellison of a work stoppage due to PREPA being $200 million behind in payments to Cobra. The omitted facts were necessary in order to make the statements made not materially misleading. The S-3/A was signed by Defendants Straehla and Layton.

147.     On August 7, 2018, Defendants held an earnings call with analysts and investors. In addition to reiterating the false statements concerning PREPA contained in the 2Q18 10-Q, discussed in above, Straehla made the following false and misleading statement:

Now let me give you an update on our current operations, starting with the infrastructure division. Our team has been in Puerto Rico for over 275 days or nearly 10 months as of today. **We continue to work closely with PREPA and other governmental agencies** to improve the resiliency of the energy infrastructure network and have begun the task of reconstructing parts of the electrical grid to both harden it and provide better protection from future storms.

(Emphasis added.)

148.  Straehla's statement that "[w]e continue to work closely with PREPA and other governmental agencies" was materially false and misleading when made because it omitted to disclose that the Company's "work[ing] closely with . . . other governmental agencies" – FEMA – consisted of Ellison bribing Tribble to procure and steer work from PREPA to Cobra.

149.  During the question and answer portion of the call, Straehla made false and misleading statements in response to the following questions from Thomas Allen Moll of Stephens Inc. concerning ongoing and future work in Puerto Rico:

> So I wanted to start on Puerto Rico. As you roll onto the new contract there, how do you expect the number of personnel on the island to fluctuate over the next few quarters? How does the top line evolve along with that? And then, as well, on the margin side, how should we think about that?

Straehla responded:

> Well, Tommy, let me, First of all, say that our team -- our infrastructure team in Puerto Rico has executed at a tremendously high level, and we are very proud of the work that they have done.
>
> As you know, we are nearing the end of the restoration phase and going to reconstruction. We increased our personnel on the island during the past quarter and it'll start falling somewhat as it comes back to much more normalcy.
>
> What occurred was that the Corps of Engineers, when they exited the island, there was still quite a bit of restoration work and we took our increases up. With that said, we're still about 700 on the island today. Now that's down from a high of about 1,000.
>
> So this -- we still view this as long-term work. We have the $900 million contract **that we won during the course of the second quarter,** and we feel like that as we make the transition to reconstruction, we still have a long time to be on the island.

(Emphasis added.)

150.  Straehla's statement that Mammoth "won" the $900 million contract was false and misleading when made because Mammoth/Cobra did not competitively win any contracts but,

instead, Cobra was awarded the contract due to Ellison having bribed Tribble.

151.    On August 8, 2018, Mammoth filed a Form 10-Q with the SEC in which it stated

its financial results and financial position for the fiscal quarter ended June 30, 2018 (the "2Q 2018

10-Q"). The 2Q18 10-Q was signed by Defendants Straehla and Layton.

152.    The 2Q 2018 10-Q contained the following false and misleading statements:

> In 2017, we expanded into the electric infrastructure business, offering both
> commercial and storm restoration services to government-funded utilities, private
> utilities, public investor owned utilities and cooperatives. Since we commenced
> operations in this line of business, substantially all of our infrastructure revenues
> have been generated from storm restoration work, primarily from PREPA due to
> damage caused by Hurricane Maria. On October 19, 2017, Cobra and PREPA
> entered into an emergency master services agreement for repairs to PREPA's
> electrical grid. The one-year contract, as amended, provides for payments of up to
> $945.4 million. On May 26, 2018, Cobra and PREPA entered into a new one-year
> $900.0 million master services agreement to provide additional repair services and
> begin the initial phase of reconstruction of the electrical power system in Puerto
> Rico. PREPA is currently subject to bankruptcy proceedings pending in the U.S.
> District Court for the District of Puerto Rico. As a result, PREPA's ability to meet
> its payment obligations under the contract will be largely dependent upon funding
> from the Federal Emergency Management Agency or other sources. In the event
> PREPA does not have or does not obtain the funds necessary to satisfy its
> obligations to Cobra under the contracts, terminates the contracts, curtails our
> services prior to the end of the contract terms or otherwise fails to pay amounts
> owed to us for services performed, our financial condition, results of operations and
> cash flows would be materially and adversely affected. In addition, government
> contracts are subject to various uncertainties, restrictions and regulations, including
> oversight audits by government representatives and profit and cost controls, which
> could result in withholding or delayed payments to us or efforts to recover payments
> already made.

153.    The above statements made in the 2Q18 10-Q were false and misleading because

Defendants failed to disclose and/or caused the Company to fail to disclose material facts

necessary to make the statements that were made not misleading. Defendants omitted and/or

caused the Company to omit that: (1) FEMA did not review or approve Cobra's contract with

PREPA, leaving Mammoth at heightened risk of not being reimbursed for the work it performed;

(2) Mammoth was at risk of its expected payments being withheld or delayed and its received

payment becoming subject to repayment due to the bribery scheme between Ellison and Tribble; (3) Cobra's ability to secure additional work was at risk because it obtained its existing work by bribing FEMA officials; and (4) Cobra hired Patterson, who provided prior assistance with obtaining work from PREPA, at a salary nearly three times what she earned at FEMA, thereby placing the Company in violation of the conflict of interest provision in Article 21 and the Anti-Corruption provision in Article 49 of the Second PREPA Contract.

154.    The Company's statements in the 2Q18 10-Q concerning the possibility of delayed payments were also materially false and misleading because Ellison had already been informed by Tribble about a work stoppage due to PREPA being $200 million behind in payments to Cobra.

155.    On November 2, 2018, Mammoth filed a Form 10-Q in which it stated its financial results and financial position for the fiscal quarter ended September 30, 2018 ("3Q18 10-Q") with the SEC. The 3Q18 10-Q was signed by Defendants Straehla and Layton.

156.    The 3Q18 10-Q contained the following false and misleading statements:

In 2017, we expanded into the electric infrastructure business, offering both commercial and storm restoration services to government-funded utilities, private utilities, public investor owned utilities and cooperatives. Since we commenced operations in this line of business, substantially all of our infrastructure revenues has been generated from storm restoration work, primarily from PREPA due to damage caused by Hurricane Maria. On October 19, 2017, Cobra and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid. The one- year contract, as amended, provides for payments of up to $945.4 million. On May 26, 2018, Cobra and PREPA entered into a new one-year, $900.0 million master services agreement to provide additional repair services and begin the initial phase of reconstruction of the electrical power system in Puerto Rico. PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency or other sources. In the event PREPA does not have or does not obtain the funds necessary to satisfy its obligations to Cobra under the contracts, terminates the contracts, curtails our services prior to the end of the contract terms or otherwise fails to pay amounts owed to us for services performed, our financial condition, results of operations and cash flows would be materially and adversely affected. **In addition, government**

**contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.**

The demand for our infrastructure services in the continental United States has increased since we expanded into the infrastructure business. Our infrastructure teams are working for multiple utilities primarily across the northeastern, midwestern and southwestern portions of the United States. We believe we will be able to continue to grow our customer base in the continental United States and increase the backlog of work over the coming years. In Puerto Rico, the reconstruction process is just beginning with significant front-end engineering required prior to the reconstruction of the electric grid. Staffing levels in Puerto Rico have fluctuated between 500 and 600 people over the past 60 days and we anticipate a ramp up in reconstruction projects throughout 2019.

(Emphasis added.)

157.   The above statements made in the 3Q18 10-Q were materially false and misleading when made because Defendants failed to disclose and/or caused the Company to fail to disclose material facts necessary to make the statements that were made not misleading. Specifically, Defendants failed to disclose and/or caused the Company to fail to disclose that: (1) FEMA did not review or approve Cobra's contract with PREPA, leaving Mammoth at heightened risk of not receiving reimbursement for the work it performed; (2) Mammoth was at risk of its expected payments being withheld or delayed and its received payment becoming subject to repayment due to the bribery scheme between Ellison and Tribble; (3) Cobra's ability to secure additional work was at risk because it obtained its existing work by bribing FEMA officials; and (4) Cobra hired Patterson, who provided prior assistance with obtaining work from PREPA, at a salary nearly three times what she earned at FEMA, thereby placing the Company in violation of the conflict of interest provision in Article 21 and the Anti-Corruption provision in Article 49 of the Second PREPA Contract.

158.   On March 15, 2019, Mammoth held a call with investors and analysts to discuss its

4Q18 and fiscal 2018 financial results. Layton made the following false and misleading statement during the call:

> As of December 31, 2018, we had $68 million in cash and no borrowings under our $185 million credit facility, resulting in total liquidity of $243 million net of letters of credit. **On March 13, 2019, we borrowed $82 million under our credit facility for 2018 Puerto Rico taxes to be paid today. Pursuant to the terms of our original PREPA contract, once our 2018 Puerto Rico income taxes are paid and the applicable returns are filed, we are entitled to receive $45 million from PREPA related to a contractual income tax provision.**

(Emphasis added.)

159.    Layton's statement that Mammoth would "receive $45 million from PREPA related to a contractual income tax provision" was materially false and misleading because the Company was in violation of the conflict of interest and Anti-Corruption provisions contained in Articles 21 and 49 to the First and Second Cobra Contracts, and it was therefore highly unlikely that PREPA would pay Mammoth those funds.

160.    Layton also made the following false and misleading statement in response to a question from an analyst concerning the work in Puerto Rico:

> Marshall, I think **it's important to characterize Puerto Rico as a pause. It's not a shutdown, it's a pause while the engineering catches up**. So we fully expect that RFPs will be pushed out in Q3 or Q4 of this year. And the same amount of work that we anticipated all along still has to be done in Puerto Rico. So while we work through this pause in Puerto Rico, we'll shift those assets back to North America and put them to work. But it's certainly not a "stop" in Puerto Rico, it's just a pause on that work.

161.    Layton's statement characterizing Cobra's work in Puerto Rico as "a pause" and not a "stop" was materially false and misleading and omitted to disclose material facts because, by this time, the FBI and DHS were investigating how Cobra was awarded its PREPA contracts and Ellison was already interviewed as part of that investigation. Given that Cobra was under investigation for how its contracts were awarded, a reasonable investor would understand that

Cobra's ability to obtain additional contracts was at risk. Additionally, Tribble informed Ellison in June 2018 that a work stoppage was coming.

162.    On March 15, 2019, Ellison was met by FBI and DHS OIG officials at his farm in LaGrange, Georgia, where he was interviewed regarding his activities related to Cobra's business in Puerto Rico. At this meeting, Ellison told federal law enforcement agents that he had no personal relationship with Tribble and that they were just business associates. Ellison also said he had not taken a helicopter trip with Tribble (Indictment ¶¶ 119-20).

163.    That same day, Mammoth's Vice President and General Counsel, Rusty LaForge, resigned from the Company. LaForge's resignation was not made public until April 26, 2019, and Mammoth never gave a reason for LaForge's sudden and unexpected withdrawal.

164.    Mammoth's stock price fell $2.50 per share, or over 12%, from its closing price of $20.28 per share on March 14, 2019 to a closing price of $17.78 per share on March 15, 2019.

165.    On March 18, 2019, Mammoth filed a Form 10-K with the SEC in which it reported the Company's financial results and position for the fiscal year ending December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Straehla, Layton, McCarthy, Heerwagen, Ross, Smith, Palm, and Amron.

166.    The 2018 10-K stated the following about the Company's contracts with PREPA:

> We currently have agreements in place with government-funded utilities, private utilities, public IOUs and Co-Ops. To date, substantially all of our infrastructure services have been performed in Puerto Rico under two emergency master services agreements entered into by one of our subsidiaries, Cobra Acquisitions LLC, or Cobra, with PREPA for up to an aggregate of approximately $1.8 billion of services. The scope of the work contemplated by these agreements includes labor, supervision, tools, equipment and materials to perform storm repair, restoration and reconstruction services at various locations in Puerto Rico. Cobra performed the full $945 million of services under the initial contract as of July 21, 2018. The second contract with PREPA has a one-year term ending on May 25, 2019 and provides for total payments not to exceed $900 million. As of December 31, 2018, and March 8, 2019, Cobra had performed an aggregate of $280 million and $354

million, respectively, of services under the second contract. Although we continue to perform services under the second contract, we expect these services will end by March 31, 2019, and we do not expect that any further work orders will be issued to Cobra under this contract prior to the May 25, 2019 termination date.

As previously reported, during the third quarter of 2018, our staffing levels in Puerto Rico fluctuated between 500 and 600 people. During the fourth quarter of 2018, our staffing levels generally ranged from 475 to 550, dropping to approximately 130 at year end for a period of three days due to the holidays. To date in 2019, our staffing levels in Puerto Rico have decreased from approximately 500 in January to 200 as of March 8, 2019. We currently expect our staffing levels in Puerto Rico to decline to approximately 50 by early April 2019 as we complete the work contemplated by our existing work orders and undertake demobilization efforts. For additional information regarding our services to PREPA, see Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.

### *Regulation of Infrastructure Services*

**In our infrastructure business, our operations are subject to various federal, state and local laws and regulations including**:

- licensing, permitting and inspection requirements applicable to contractors, electricians and engineers;

- regulations related to worker safety;

- permitting and inspection requirements applicable to construction projects;

- wage and hour regulations;

- building and electrical codes; and

- **special bidding, procurement and other requirements on government projects.**

**We believe that** we have all the licenses required to conduct our energy infrastructure services and that **we are in substantial compliance with applicable regulatory requirements**. Our failure to comply with applicable regulations could result in substantial fines or revocation of our operating licenses, as well as give rise to termination or cancellation rights under our contracts or disqualify us from future bidding opportunities.

(Emphasis added.)

- 62 -

167.    The Individual Defendants' and Company's statements in the 2018 10-K were false and misleading when made because they failed to disclose that the PREPA work was improperly procured and steered to Cobra as a result of Ellison bribing Tribble.

168.    Additionally, the Individual Defendants' and Company's statements in the 2018 10-K that, "Although we continue to perform services under the second contract, we expect these services will end by March 31, 2019, and we do not expect that any further work orders will be issued to Cobra under this contract prior to the May 25, 2019 termination date," was false and misleading because, in fact, Defendants did not expect any additional work under the contract given that the fraudulent scheme was beginning to unravel. The same day that the 2018 10-K was issued, Ellison was meeting with FBI and DHS OIG agents regarding activities in Puerto Rico. That same day, Mammoth's general counsel, LaForge, suddenly resigned from the Company – a fact Mammoth did not disclose until the end of April 2019.

169.    As a result of the foregoing, it was materially false and misleading for the Individual Defendants and the Company to state in the 2018 10-K that "[w]e believe that . . . we are in substantial compliance with applicable regulatory requirements" for "special bidding, procurement and other requirements on government projects" when, in fact, as a result of Ellison and Tribble's fraudulent scheme and Cobra's violation of the terms of its contract, the Company was in violation of several regulations and laws. Specifically, the Company was in violation of the conflict of interest provision under Article 21 to the First and Second PREPA Contracts (¶¶ 43, 48), the Anti-Corruption Code for a New Puerto Rico with which Defendants had agreed to comply pursuant to Amendment No. 4 of the First Cobra Contract and the Second PREPA Contract (¶¶ 45, 48), and federal law..

170.    The 2018 10-K also contained the following false and misleading statements in a

subpart to Item 1A Risk Factors:

Our customer base is concentrated and the loss of one or more of our significant customers, or their failure to pay the amounts they owe us, could cause our revenue to decline substantially.

Our top five customers accounted for approximately 77% and 71%, respectively, of our revenue for the years ended December 31, 2018 and 2017.  PREPA was our largest customer for the year ended December 31, 2018 accounting for approximately 60% of our revenue and our second largest customer for the year ended December 31, 2017 accounting for approximately 29% of our revenue. Gulfport was our second largest customer for the year ended December 31, 2018 accounting for approximately 8% of our revenue and our largest customer for the year ended December 31, 2017 accounting for approximately 30% of our revenue. It is likely that we will continue to derive a significant portion of our revenue from a relatively small number of customers in the future. If a major customer decided not to continue to use our services, our revenue would decline and our operating results and financial condition could be harmed. In addition, we are subject to credit risk due to the concentration of our customer base. In particular, as of December 31, 2018, PREPA owed us approximately $225 million for services performed on or before December 31, 2018. As of March 8, 2019, the amount owed to us by PREPA had increased to approximately $281 million. Any nonperformance by our counterparties, including their failure to pay the amounts they owe us on a timely basis or at all, either as a result of changes in financial and economic conditions or otherwise, could have an adverse impact on our operating results and could adversely affect our liquidity.

Cobra, one of our infrastructure services subsidiaries, has entered into service contracts with PREPA, which provide for aggregate payments to us of up to approximately $1.8 billion. PREPA is currently subject to pending bankruptcy proceedings. In the event that PREPA (i) does not have or does not obtain the funds necessary to satisfy its payment obligations to our subsidiary under the contracts, (ii) obtains the necessary funds but refuses to pay the amounts owed to us, (iii) terminates the contracts or curtails our services prior to the end of the contract terms or (iv) otherwise fails to pay amounts owed to us for services performed, our financial condition, results of operations and cash flows would be materially and adversely affected.

On October 19, 2017, one of our subsidiaries, Cobra, and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid as a result of Hurricane Maria. The one-year contract, as amended, provided for payments of up to $945 million. On May 26, 2018, Cobra and PREPA entered into a new one-year, $900 million master services agreement to provide additional repair services and begin the initial phase of reconstruction of the electrical power system on Puerto Rico. PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result,

PREPA's ability to meet its payment obligations under the contracts is largely dependent upon funding from the Federal Emergency Management Agency, or FEMA, or other sources. PREPA's contracting practices in connection with restoration and repair of PREPA's electrical grid on Puerto Rico, and the terms of certain of those contracts, have been subject to critical comment and are the subject of review and hearings by U.S. federal and Puerto Rican governmental entities. In 2017, a contract for restoration and repair services entered into by PREPA with an unrelated third party was terminated by PREPA. As of December 31, 2018, PREPA owed us approximately $225 million for services performed on or before December 31, 2018. As of March 8, 2019, the amount owed to us by PREPA had increased to approximately $281 million. In the event that PREPA (i) does not have or does not obtain the funds necessary to satisfy its current obligations to Cobra under the contracts, (ii) obtains the necessary funds but refuses to pay the amounts owed to us, (iii) terminates the contracts or curtails our services prior to the end of the contract terms or (iv) otherwise fails to pay amounts owed to us for services performed, our financial condition, results of operations and cash flows would be materially and adversely affected. In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.

171.    These purported risk disclosures failed to warn investors that, because Cobra secured its contracts through a scheme whereby Ellison was bribing Tribble to steer contracts and procure work for Cobra, Mammoth's ability to be reimbursed by PREPA for its work was at risk and payments it had already received may become subject to recovery. The purported risk factors further failed to disclose that Cobra's own contracts with PREPA were among the "certain of those contracts" entered into by PREPA that were subject to review by U.S. federal authorities. The omitted facts were necessary in order to make the statements made by Mammoth not materially misleading.

172.    The 2018 10-K contained an additional false and misleading risk disclosure that did not appear in the 2017 10-K. Specifically, the 2018 10-K stated:

> ***Opportunities associated with government contracts could lead to increased governmental regulation applicable to us.***
>
> Most government contracts are awarded through a regulated competitive bidding process. If we were to be successful in being awarded government contracts,

significant costs could be incurred by us before any revenues were realized from these contracts. Government agencies may review a contractor's performance, cost structure and compliance with applicable laws, regulations and standards. If government agencies determine through these reviews that costs were improperly allocated to specific contracts, they will not reimburse the contractor for those costs or may require the contractor to refund previously reimbursed costs. If government agencies determine that we engaged in improper activity, we may be subject to civil and criminal penalties. Government contracts are also subject to renegotiation of profit and termination by the government prior to the expiration of the term.

(Emphasis in original.)

173.    This statement was materially false and misleading because it omitted to disclose that: (1) the Second Cobra Contract was obtained through a corrupt bidding process; (2) Mammoth's subsidiary was not in compliance with "applicable laws, regulations and standards"; (3) government agencies, including the FBI and DHS OIG, were, at the time the above statement was made, actively investigating Ellison in relation to the contracts with PREPA; and (4) as a result of the investigations and Ellison's criminal activity, Mammoth faced a substantial likelihood of being subjected to civil and criminal penalties. The omitted facts were necessary in order to make the statements made by Mammoth not materially misleading.

174.    On April 26, 2019, FBI agents obtained warrants in the District of Puerto Rico to seize the majority of Ellison's assets (over $5 million in value), virtually all of which were acquired by Ellison after 2017.

175.    On May 2, 2019, Defendants held an earnings call with analysts and investors where Layton provided a financial update in which he made the following false and misleading statement:

As of March 31, 2019, we had $21 million in cash and $82 million in borrowing under our $185 million credit facility, resulting in total liquidity of $115 million, net of letters of credit. Pursuant to the terms of our original PREPA contract, once our 2018 Puerto Rico income tax returns are filed, which we currently expect to happen in mid- May, **we're entitled to receive $45 million from PREPA related to a contractual income tax provision.**

(Emphasis added.)

176.     Layton's statement that Mammoth would "receive $45 million from PREPA related to a contractual income tax provision" was materially false and misleading because the Company was in violation of the conflict of interest and Anti-Corruption provisions contained in Articles 21 and 49 of the First and Second Cobra Contracts, rendering the prospects that PREPA would pay Mammoth the funds highly unlikely. Receiving the payments was even more unlikely because of the ongoing federal investigation into Cobra's procurement of the PREPA contracts.   Indeed, Ellison had already been interviewed by FBI and DHS OIG agents and his assets were seized and frozen.

177.     Barclays analyst Dave Anderson said, on March 15, 2019, that Mammoth's backlog was reduced to $765 from $1.2 billion largely from the removal of future work in Puerto Rico. He is quoted as stating: "It appears the Puerto Rico story is taking a pause."

178.     On May 3, 2019, filed a Form 10-Q with the SEC, in which it detailed its financial results and position for the fiscal quarter ended March 31, 2019 (the "1Q 2019 10-Q"). The 1Q19 10-Q was signed by Defendants Straehla and Layton.

179.     The 1Q 2019 10-Q reported the following with respect to the Company's contracts with PREPA:

> In 2017, we expanded into the electric infrastructure business, offering both commercial and storm restoration services to government-funded utilities, private utilities, public investor owned utilities and cooperatives. Since we commenced operations in this line of business, substantially all of our infrastructure revenues have been generated from storm restoration work, primarily from PREPA due to damage caused by Hurricane Maria. On October 19, 2017, Cobra and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid. The one-year contract, as amended, provides for payments of up to $945.4 million. On May 26, 2018, Cobra and PREPA entered into a new one-year, $900.0 million master services agreement to provide additional repair services and begin the initial phase of reconstruction of the electrical power system in Puerto Rico. PREPA is currently subject to bankruptcy proceedings pending in the U.S.

District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency or other sources. In the event PREPA does not have or does not obtain the funds necessary to satisfy its obligations to Cobra under the contracts, terminates the contracts, curtails our services prior to the end of the contract terms or otherwise fails to pay amounts owed to us for services performed, our financial condition, results of operations and cash flows would be materially and adversely affected. In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.

180.    The above statements made in the 1Q19 10-Q were materially false and misleading when made because they omitted material facts necessary to make the statements that were made not misleading. Defendants failed to disclose and/or caused the Company to fail to disclose that: (1) FEMA did not review or approve Cobra's contract with PREPA leaving Mammoth at heightened risk to not be reimbursed for the work it performed; (2) Mammoth was at risk of its expected payments being withheld or delayed and the amounts already paid to it subject to clawbacks because Ellison was bribing Tribble to steer the contracts and work to Cobra; (3) Cobra's ability to secure additional work was at risk because it obtained its existing work by bribing FEMA officials; (4) Cobra hired Patterson, who provided prior assistance with obtaining work from PREPA, at a salary nearly three times what she earned at FEMA, thereby placing the Company in violation of the conflict of interest provision in Article 21 and the Anti-Corruption provision in Article 49 of the Second PREPA Contract; and (5) the FBI had obtained multiple warrants to seize the vast majority of Ellison's assets, and had, by the time of the filing of the 1Q19 10-Q, seized nearly $5 million worth of Ellison's assets. Defendants either knew or recklessly disregarded that the President of their most important business segment was in the midst of a far-reaching federal investigation into how Cobra obtained its PREPA contracts.

181.    The 1Q19 10-Q was also false and misleading because under Item 1A Risk Factors,

- 68 -

Defendants stated and/or caused the Company to state that "[t]here have been no material changes to the Risk Factors previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2018," failing to disclose the risks described above. The facts omitted from the 2018 10-K, which were omitted again in the 1Q19 10-Q, were necessary in order to make the statements made by Mammoth not materially misleading.

182.    On May 14, 2019, FEMA relieved Tribble of her duties and placed her on administrative leave due to the federal investigation into her alleged illegal conduct in steering contracts to Cobra.

183.    On June 7, 2019, Mammoth issued a press release titled "Mammoth Issues Statement Regarding Its Work in Puerto Rico." The Press Release stated in pertinent part:

> Following Hurricane Maria in Puerto Rico and its complete destruction of the Island's power grid, Mammoth, through its wholly owned subsidiary Cobra, made a proposal to do reconstruction work to help restore power and rebuild Puerto Rico's grid.  This solicitation was reviewed by the Puerto Rico Electric Power Authority (PREPA) and Cobra was awarded an initial $200 million reconstruction contract in 2017. Through five separate amendments to the original contract, the aggregate contract amount was eventually increased to up to $945 million. A second contract, in the amount of up to $900 million, was awarded to Cobra by PREPA in response to a Request For Proposals (RFP) process.

> *       *       *

> All of the agreements relating to the work provided by Cobra were negotiated, and entered into, with PREPA. The detailed agreements set forth the rates charged by Cobra and well as other information regarding the services to be performed. PREPA was assisted by various agencies including the Office of Contract and Procurement Compliance (OCPC), the Financial Oversight and Management Board (FOMB), the Governor's Office and the Central Office of Recovery, Reconstruction and Resiliency (COR3). In addition, PREPA's outside counsel, which is also representing PREPA in its chapter 11 bankruptcy case, participated in negotiating the agreements with Cobra, and various other parties had oversight roles as a result of PREPA's bankruptcy filing.

> PREPA regularly and thoroughly reviewed Cobra's work. In addition to ongoing oversight of the services performed to ensure that work was being provided in a thorough and professional manner and consistent with industry standards, PREPA

performed a detailed review of invoices submitted by Cobra to ensure that all payments were made in accordance with the contracts and in connection with services that had been properly provided. When work was completed on an individual project basis, an invoice was issued to PREPA for the specific project. As of April 10, 2019, Cobra submitted approximately $1,296 million in invoices and received approximately $1,057 million in payments.

Given the magnitude of the total costs of the project and its importance to the Island's economy, Cobra has faced significant governmental scrutiny since the commencement of the work. Cobra has met with various congressional members visiting the Island to review the work and assess the damage. In addition, Cobra has been in contact with a number of US government agencies and local Puerto Rico authorities throughout the process. Further, it has been reported that an independent evaluation of Cobra's work by the Rand Corporation said that the contract rates charged for its services were reasonable considering the "situational uncertainty that prevailed" after Hurricane Maria.

Mammoth stands by the quality and reasonableness of its work and welcomes an open inquiry into its performance.

184.    Mammoth's June 7, 2019 press release omitted the fact that Ellison had been terminated from his employment with the Company on June 7, 2019. Nor does the press release reveal the ongoing criminal investigation of Ellison, the fact that Ellison had met with federal investigators regarding his relationship with Tribble, or that Ellison had nearly all of his assets seized. Also, just one week after the press release, on June 12, 2019, in a declaration Ellison filed in a lawsuit seeking to have his assets returned, Ellison revealed that Mammoth was paying his legal bills.

185.    Additionally, the statement in the press release that "[a]s of April 10, 2019, Cobra has submitted approximately $1,296 million in invoices and received approximately $1,057 million in payments" failed to disclose that Cobra had not received a single payment from PREPA since May 24, 2019 – the day that the *Wall Street Journal* first exposed the investigation. On September 30, 2019, Cobra filed a Motion for Allowance and Payment of Administrative Expense Claims in a case related to PREPA's bankruptcy. In the motion, Cobra stated that it "has made

every reasonable effort to obtain payment without resorting to legal action" and stated further as follows:

> Cobra has not received any payment from PREPA since May 24, 2019. Since May 24, 2019, Cobra has flown executives and counsel to Puerto Rico to meet with PREPA on at least five occasions in an attempt to resolve the payment issues without court involvement. Despite promises made by PREPA officials, payments have not been forthcoming, even for invoices that PREPA does not dispute in any way.

186. On August 1, 2019, Mammoth issued a press release announcing its 2Q19 financial results. Straehla stated in the press release:

> The second quarter of 2019 was a challenging environment as further capital restraint by our oilfield customers continued to apply downward pressure on pricing and resulted in several completions being delayed or canceled with short notice. In addition, we worked through the challenges of demobilizing our equipment from Puerto Rico. As a result of current market conditions, we have begun to right size our operations and we expect this process to be completed in the coming months. Demand for infrastructure services remains high with the competencies and experience of our crews allowing for unique bidding opportunities in both the US and overseas. While our work in Puerto Rico has ended, we have continued to receive payments from PREPA, with $42 million received in the second quarter of 2019. . . .

187. Straehla's statement regarding continued payments from PREPA was false and misleading. Cobra had not received a single payment from PREPA since May 24, 2019, despite purportedly making every "reasonable effort to obtain payment without resorting to legal action."

188. The Indictment revealed that the FBI had subsequently seized an additional $3.4 million, a boat trailer, and two tractors from Ellison. The government is also seeking forfeiture of two homes in Panama City Beach, Florida, purchased by Ellison in 2018 for a combined $1.185 million, as well as a 178-acre farm that Ellison purchased in 2018 for $854,000.22.

189. While the Indictment does not mention Straehla by name, it is clear that the person identified as "Individual A" throughout the Indictment is Straehla. In discussing the First Cobra Contract and amendments thereto, as well as the Second PREPA Contract, the Indictment states

that in each instance, Cobra was represented by "Individual A." Copies of the contracts and amendments included as exhibits to Mammoth's filings with the SEC reveal that Straehla represented Cobra in each instance. In an article published on September 10, 2019 in *Caribbean Business*, titled "U.S. District Attorney on FEMA, Cobra fraud: We cannot reveal identity of Individual A," United States Attorney for the District of Puerto Rico, Rosa Emilia Rodriguez-Vélez, declined to identify Individual A, noting that the investigation is still ongoing.

**Cobra's Contracts with PREPA were Critical to Mammoth's Financial Performance**

190.     During the Relevant Period, the Defendants repeatedly touted and/or caused the Company to tout Cobra's contracts with PREPA as a critical driver of Mammoth's strong financial performance.

191.     Prior to the award of the First Cobra Contract, Mammoth had revenues of $74.4 million and a net loss of $4.9 million in its First quarter of 2017; revenues of $98.3 million and a net loss of $1.2 million in its second quarter of 2017; and revenues of $149.3 million and a net loss of $800,000 in its third quarter of 2017. After the contract award, Mammoth had revenues of $369 million and earnings of $65.9 million in its fourth quarter of 2017.

192.     As stated in the press release announcing the First Cobra Contract, "[t]he contract will commence immediately and is expected to generate revenue of up to $200 million over the initial 120 days." The PREPA contract represented an increase of 87% over the $230.6 million in total revenues that Mammoth reported for all of fiscal 2016.

193.     Throughout the Relevant Period, Defendants continued to highlight and to cause the Company to highlight the financial benefits that Mammoth was reaping from Cobra's work with PREPA. For example:

        •        On a February 22, 2018 earnings call, Straehla stated, "Turning to

infrastructure. As many of you saw, over the past three weeks, we announced the extension of the contract in Puerto Rico from $200 million to approximately $445 million. Once the work of restoring power is complete, we anticipate a shift to reconstructing the electrical infrastructure on the island to both modernize and provide better protection from future natural disasters. Given our performance to date, during the restoration phase, we are hopeful that we will participate in the rebuilding phase which will occur over the next several years."

• In a May 2, 2018 press release announcing Mammoth's 1Q18 financial results, Straehla stated, "The First quarter was our third sequential record quarter on an EBITDA basis, which was underpinned by the hard work performed by our teams in Puerto Rico."

• On an earnings call held on May 3, 2018, Straehla stated, "The quarter was driven by successful execution within our infrastructure segment." Later in the call, Straehla emphasized, "While Mark [Layton] will elaborate further on our financial performance in his comments, I wanted to point out a few key highlights I am particularly proud of. Our infrastructure segment [Cobra] made up approximately 65% of our overall revenue during the First quarter underscoring our differentiation."

• On an August 7, 2018 earnings call, Straehla stated, "While Mark [Layton] will elaborate further on our financial performance in his comments, I wanted to point out a few key highlights I am particularly proud of. Our infrastructure division [Cobra] performed exceptionally well in Puerto Rico."

• In an October 31, 2018 press release announcing Mammoth's 3Q18

financial results, Straehla stated, "The third quarter . . . was a record quarter on a net income basis. . . . While the third quarter was challenging for oil field services, we were pleased with the execution in our infrastructure business [Cobra]."

•      On an earnings call held on November 1, 2018, Straehla told investors, "While Mark [Layton] will elaborate further - - elaborate further on our financial performance in his comments, I wanted to point out a few key highlights. Cobra continues to perform exceptionally well."

•      In a March 14, 2019 press release announcing Mammoth's 4Q18 and fiscal 2018 financial results, the Company stated, "The infrastructure segment [Cobra] contributed revenues of $1.1 billion for the year ended December 31, 2018, a 382% increase from $222.4 million for the year ended December 31, 2017."

•      On an earnings call held on March 15, 2019, Straehla touted to investors, "2018 was a very good year for Mammoth. We saw year-over-year growth across all of our business clients but most notably in our infrastructure segment."

194.      To be sure, Mammoth's largest stream of revenue throughout the Relevant Period was derived from Cobra's ever-expanding contracts with PREPA. As stated in the Company's 2018 Form 10-K filed with the SEC on March 15, 2019: "PREPA was our largest customer for the year ended December 31, 2018 accounting for approximately 60% of our revenue and our second largest customer for the year ended December 31, 2017 accounting for approximately 29% of our revenue." Given that the First Cobra Contract was signed in late October of 2017, the 29% of total revenue derived from PREPA that year came in the fourth quarter alone. Thus, PREPA contracts accounted for 55% of Mammoth's $369 million 4Q17 revenue. Even as Cobra's work in Puerto Rico came to an end in the First quarter of 2019, PREPA accounted for nearly 33% of Mammoth's

1Q19 revenue.

## Mammoth's Transition to an Infrastructure Services Company Showed the Importance of Cobra To Mammoth

195.     Throughout the Relevant Period, Defendants emphasized and caused the Company

emphasize to investors that Mammoth planned to expand its infrastructure services, offered

through Cobra, to become a significant component in the Company's long-term operating plans.

196.     Beginning with the October 20, 2017 conference call, Straehla provided

background on Mammoth's reasons for entering the infrastructure industry and proceeded to

inform investors of the Company's plans to rapidly expand its infrastructure segment beyond the

initial work in Puerto Rico.

197.     Straehla discussed Mammoth's plans to turn Cobra's infrastructure operations into

"a core business" for the Company in a January 30, 2018 article published in *The Daily

Oklahoman*, titled "Mammoth Energy's Puerto Rico contract expanded." The article provides, in

pertinent part:

> Mammoth primarily is an oil-field services company that provides hydraulic
> fracturing and the sand and other products needed for the well completion process,
> but the company bought Cobra in 2016 and quickly expanded the utility business
> to provide services throughout much of the country. "Our focus is on rebuilding
> and working for investor-owned utilities, co-ops and county governments,"
> Straehla said. "As we go forward, we're going to be focused on building
> infrastructure services." The experience gained in Puerto Rico likely will help the
> company even after the restoration work is completed, he said. "We think the
> infrastructure spending going to continue to grow. For the U.S. as a whole, our
> infrastructure is pretty old," Straehla said. "There is a lot of modernization to do.
> That's going to be a core business for us going forward."

198.     On Mammoth's February 22, 2018 earnings call, Straehla emphasized to investors

that the Company hoped to secure additional infrastructure work in Puerto Rico for years to come,

stating, "Given our performance to date, during the restoration phase, we are hopeful that we will

participate in the rebuilding phase which will occur over the next several years, . . . "

199.    Straehla's representation that the Company's "performance to date" could lead to additional work in rebuilding the electric grid in Puerto Rico was false and misleading when made because it failed to disclose that Cobra obtained its contract with PREPA, and the contract extension, not because of the Company's "performance," but because Ellison was bribing Tribble.

200.    During the question and answer portion of the call, stock market analyst Thomas Moll from Stephens Inc., asked:

> Okay, great. And then moving on to infrastructure. Once you perform the remainder of the extended contract and get to the total $445 million in Puerto Rico, what's a reasonable timeframe for investors to get an update on what the go-forward might look like there? I know you mentioned that there's at least potential for not months or quarters, but years of work. And granted, we won't have great visibility on to what the total scope looks like, but just, when should we expect the next update from you?

Straehla responded:

> Well, Tommy. What typically happens in this type of situation is you go from restoration to reconstruction. And certainly, we have been a very big part of the restoration efforts. We have approximately 939 men on the island right now. We have a variety of equipment. Certainly, with our contacts, and what we're -- what we are actually doing, and the way our team has gone out and executed, we think we have an opportunity to be there for years. But it's a process that you go through. It's RFP process, and as those occur and certainly, there's no certainty. But we think that -- we think restoration is still going to last a while longer. As you've seen in many articles, it's not completed yet of getting the power on completely before you go to that reconstruction phase, but we anticipate being there a while, and as we get material information, we will pass it on to our investors. But I do want to tell you that one of the things that is mentioned in the call and everything previously was that we have over $500 million of backlog in total, in our infrastructure business. And we have grown our footprint significantly in north -- in the continental United States. Our team is executing at a very high level on many, many fronts.

201.    Later in the call, stock market analyst John Daniel from Simmons & Company International asked:

> Okay. Final one for me, and this can be my dummy question for the day. I may be a little bit dumb, but you mentioned the – how you go through the RFP process in Puerto Rico. Can you speak to just what the competitive landscape is for people bidding against you down there? And then just talk about whether that process is

more complicated or less than what you do in the United States?

Straehla answered:

> Yes, it's not – it's always a competitive-type approach to do it. And it – you may've seen the Wall Street Journal article this morning where Fluor is exiting the island. Fluor worked for the Army Corps of Engineers, we work for PREPA. And we were the one that, early on, went in and started working for PREPA, and I think it's paid huge dividends for us. So you have some competitors that are exiting, you'll have other competitors that'll want to come in and take part in it. Remember that as you go from restoration to reconstruction, the reconstruction process can go on for years. And I – the point that I usually make is that super storm Sandy that occurred in 2012 timeframe, they are still doing reconstruction in New York that is FEMA backed to this day. So it could go on for 5 to 6 years. And the Puerto Rican infrastructure was in very poor shape. They had a bankrupt group that was running it, being PREPA, and they just didn't have the money to keep their infrastructure up to the common aspects and the common standards and the newer technology. So we think that it'll – it has an opportunity to go on for several years. And we think with the execution of our team, and what they've done, we will have a – and the amount of people that we have there and the amount of equipment we have there, **we will have a competitive advantage to get some of that work**.

(Emphasis added.)

202. Straehla's statements on the February 22, 2018 earnings call concerning the RFP process to secure additional work were false and misleading when made and omitted material facts necessary to make the statements not misleading in that he failed to disclose that: (1) Cobra had an unfair advantage in any RFP process due to Ellison's relationship with Tribble and his bribing her to procure and steer work to Cobra; (2) due to the wrongful conduct by Ellison and Tribble, there was a reasonable likelihood that Mammoth would not be paid for some or all of its work for PREPA, and Mammoth would be unlikely to secure additional work from PREPA in the future; and (3) due to the criminal acts committed by Ellison and Tribble, Mammoth was exposing itself to potential civil and criminal penalties and costly litigation. The omitted facts were necessary in order to make the statements made not misleading.

203. On Mammoth's May 3, 2018 earnings call, Straehla explained to investors that the Company's "[e]xpansion into infrastructure activities was targeted specifically to lessen the

impacts of the volatility seen over recent years in the commodity markets and stabilizing our earnings potential."

204.     On Mammoth's November 1, 2018 earnings call, Straehla made clear to investors that the Company planned to transition from being an oilfield services company to an industrial company through the growth of the infrastructure segment. Specifically, Straehla stated:

> Following our rapid oilfield expansion in 2017, we deliberately chose to transition our asset base from a pure oilfield service company to a diversified industrial company. We are attracted to the reduced cyclicality, stable cash flows and contracted nature into which we can effectively deploy our cash flow.
>
> This transition to an industrial company can clearly be seen in our financial results with 64% of our revenues over the past 12 months coming from our Infrastructure segment. Our M&A focus remains on the industrial side of our business, which should push the percentage of industrial revenues even higher, if we are able to find attractive opportunities.

(Emphasis added.)

205.     Later in the call, James Wicklund of Credit Suisse AG, queried Straehla about the Company's transition plans:

> You talk, Arty, about you're becoming a diversified industrial company and you're transitioning to industrial and you [] note 64% of revenues on a trailing basis this quarter were from Infrastructure. How does one actually go about changing from one type of company to another? I mean, what do you guys have to do to change your SIC code or whatever, so that you actually fall in benchmarks that industrial portfolio managers look at, rather than just, or in addition to, what oilfield services managers are benchmarking?

Straehla answered:

> Yes. That's – very, very interesting question on how we make that transition, and Don Christ has worked extremely hard – that was one of the things that we had discussed early in the second quarter and we've been working with MSCI to get that changed.
>
> Our trailing 12 months – you have to have revenues that are over 60% and attributed to that particular industry, and we've done that. And we are actively engaged in calling them. How quick that process will take, we're dependent on other people for that, so we don't know the – how expedited it will be, but we are making that attempt to change our GICS code to – our General Industrial code, to and overall

industrial company.

206.    Cobra was a critical revenue, earnings, and growth driver of Mammoth. Mammoth's stock price increased after Cobra was awarded the First Cobra contract, continued to trade a high levels during the time period in which Cobra was receiving work and payments from PREPA, and began to decline after the market learned that Cobra's work in Puerto Rico would be coming to an end.

## Defendant Straehla and Layton's False Certifications

207.    The 3Q17 10-Q was signed by Straehla and Layton and included certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Straehla and Layton as exhibits, which stated in pertinent part:

    (a) I have reviewed this Quarterly Report on Form 10-Q of Mammoth Energy Services, Inc. (the "registrant"); and

    (b) Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

208.    Additionally, Straehla and Layton both signed SOX certifications, stating that "[t]he information contained in the Report fairly represents, in all material respects, the financial condition and results of operations of the Company." Similar documents executed by Defendants Straehla and Layton, substantially similar to those described in paragraphs above, were also attached to Mammoth's 2017 10-K, 1Q18 10-Q, 2Q18 10-Q, 3Q18 10-Q, 2018 10-K, and 1Q19 10-Q.

## The Individual Defendants Caused the Company to Issue a Materially False and Misleading Proxy Statements

209.    In addition to the above false and misleading statements issued and/or caused to be issued by the Defendants, the Individual Defendants also caused the Company to issue materially

false and misleading proxy statements, which sought stockholder votes for director re-election.

210.    On April 25, 2018, Defendants Heerwagen, McCarthy, Palm, Ross, Straehla, and Smith caused the Company to file a Schedule 14A (the "2018 Proxy Statement") with the SEC pursuant to Section 14(a) of the Exchange Act seeking their respective elections as directors for one-year terms. The 2018 Proxy Statement, however, contained material misstatements and omissions.

211.    The 2018 Proxy Statement contained the following statement concerning the Company's Code of Business Conduct and Ethics ("the Code of Conduct")[2]:

> We have adopted a Code of Business Conduct and Ethics designed to help directors and employees resolve ethical issues. Our Code of Business Conduct and Ethics applies to all directors and employees, including the Chief Executive Officer, the Chief Financial Officer, controller and persons performing similar functions. The Code of Business Conduct and Ethics covers various topics including, but not limited to, conflicts of interest, fair dealing, discrimination and harassment, confidentiality, compliance procedures and employee complaint procedures and is posted on our website at http://ir.mammothenergy.com/corporate-governance.cfm.

212.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as the Individual Defendants allowed false and misleading statements to be issued to the investing public and failed to comply with laws and regulations or conduct business in an honest and ethical manner.

213.    On April 26, 2019, the Individual Defendants caused the Company to file its 2019 Proxy Statement with the SEC pursuant to Section 14(a) of the Exchange Act seeking their respective elections as directors for one-year terms. The 2019 Proxy Statement, however, contained material misstatements and omissions.[3]

---

[2] *See* Mammoth's Code of Conduct:
http://ir.mammothenergy.com/static-files/d21fd66f-7ba5-4ec0-a53c-282d16900b9b

[3] Plaintiff's allegations with respect to the misleading statements in the 2018 and 2019 Proxy Statements are based solely on negligence; they are not based on any allegation of reckless or

214.    The 2019 Proxy Statement contained the following statement concerning the Company's Code of Conduct:

> We have adopted a Code of Business Conduct and Ethics designed to help directors and employees resolve ethical issues. Our Code of Business Conduct and Ethics applies to all directors and employees, including the Chief Executive Officer, the Chief Financial Officer, controller and persons performing similar functions. The Code of Business Conduct and Ethics covers various topics including, but not limited to, conflicts of interest, fair dealing, discrimination and harassment, confidentiality, compliance procedures and employee complaint procedures and is posted on our website at http://ir.mammothenergy.com/corporate-governance.cfm.

215.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as the Individual Defendants allowed false and misleading statements to be issued to the investing public and failed to comply with laws and regulations or conduct business in an honest and ethical manner.

**Fiduciary Duties**

216.    By reason of their positions as officers, directors, and/or controlling shareholders of the Company, each of the Defendants owed and continues to owe Mammoth and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his utmost ability to control and manage Mammoth in a fair, just, honest, and equitable manner. The Defendants were/are required to act in furtherance of the best interests of Mammoth and its stockholders, to benefit all stockholders equally, and not in furtherance of their personal interest or benefit.

217.    Each director of the Company owed and continues to owe Mammoth and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the

---

knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness about these allegations and related claims.

affairs of the Company and the use and preservation of its property and assets.

218.    The Defendants, because of their positions of control and authority as officers, directors, and/or controlling shareholders of Mammoth, were able to, and did, directly or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Mammoth, each of the Individual Defendants—along with the Selling Controlling Shareholders, as controlling shareholders of Mammoth—had knowledge of material, nonpublic information regarding the Company. In addition, as officers, directors, and/or controlling shareholders of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls, so that the market price of the Company's stock would be based on truthful and accurate information.

219.    To discharge their duties, the officers and directors of Mammoth were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements— including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b) conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(c) remain informed as to how Mammoth conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

      (d)  truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

## Duties Pursuant to the Company's Code of Conduct

220.    The Individual Defendants, as officers and/or directors of Mammoth, were also bound by the Company's Code of Conduct, which "embodies the commitment of Mammoth . . . to conduct [its] businesses in accordance with all applicable laws, rules and regulations and the highest ethical standards." In particular, the Code of Conduct mandates that "[a]ll of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or 'off the books' funds or other assets should not be maintained unless permitted by applicable laws, rules and regulations."

221.    The Code of Conduct also provides that "the Company's policy is that the information in its public communications, including all Securities and Exchange Commission ('SEC') filings, be full, fair, accurate, timely and understandable. All employees and directors who are involved in the disclosure process, including the Chief Financial Officer and his staff, are responsible for acting in furtherance of this policy. These individuals are required to maintain familiarity with the disclosure requirements applicable to the Company and are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the Company to others, whether within or outside the Company, including the Company's independent auditors. In addition, any employee or director who has a supervisory role in the Company's disclosure process has an obligation to discharge his or her responsibilities diligently."

222.    The Code of Conduct also requires, in part, the following:

Employees and directors should strive to identify and raise potential issues before they lead to problems, and should ask about the application of this Code whenever

in doubt. Any employee or director who becomes aware of any existing or potential violation of this Code has an obligation to promptly notify the Company's compliance officer as shall be designated from time to time.

223.    In addition to these duties, Board members who served on the Audit Committee owed specific duties to Mammoth under the Amended and Restated Audit Committee Charter (the "Audit Charter").[4] Specifically, they are mandated to:

 [O]versee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements. In that regard, the Audit Committee assists the Board in monitoring (i) the Company's accounting, auditing and financial reporting processes generally, including the qualifications, independence and performance of the independent auditor, (ii) the integrity of the Company's financial statements, (iii) the Company's systems of internal controls regarding finance and accounting and (iv) the Company's risk management and compliance with legal and regulatory requirements. In performing its duties, the Committee shall seek to maintain an open avenue of communication among the Board, the independent auditor, the internal auditors (if any) and the management of the Company.

224.    The Audit Charter further requires the Audit Committee to oversee internal controls and risk management, including:

When the Company becomes subject to the SEC filing requirement with respect to management's report on internal control over financial reporting and the independent auditor's attestation of the Company's internal control over financial reporting, review and discuss with management and the independent auditor management's report on internal control over financial reporting and the independent auditor's attestation of the Company's internal control over financial reporting prior to the filing of the Company's Form 10-K; Review and discuss with management and the independent auditor the Company's annual audited financial statements prior to the filing of the Company's Form 10-K, including disclosures made in Management's Discussion and Analysis of Financial 4 Condition and Results of Operations, and recommend to the Board whether the audited financial statements should be included in the Form 10-K; Review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of the Company's Form 10-Q, including disclosures made in Management's Discussion and Analysis of Financial Conditions and the results of the independent auditor's review of the quarterly financial statements; Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the

---

[4] *See* Audit Committee Charter at:
http://ir.mammothenergy.com/static-files/d0e35da8-6f1e-4bce-9271-7177ad3020f8

Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, and the judgments of each of management and the independent auditor as to the quality and appropriateness of the Company's accounting principles as applied in its financial reporting; Review and discuss with management and the independent auditor management's report on internal control over financial reporting and the independent auditor's attestation of the Company's internal control over financial reporting prior to the filing of the Company's Form 10-K; Review and discuss the reports required to be delivered by the independent auditor pursuant to Section 10A(k) of the Exchange Act regarding: all critical accounting policies and practices to be used; all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and o other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences; and Discuss with management and the independent auditor any published reports or correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

**Breaches of Duties**

225.    The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers, directors, and/or controlling shareholders of Mammoth, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

226.    The Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls. The Defendants also breached their duty of loyalty and good faith by allowing other Defendants to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Mammoth to incur substantial damage.

227.    The Audit Committee members had a duty to review the Company's press releases and regulatory filings. The members of the Audit Committee breached their duty of loyalty and good faith by approving the improper statements detailed herein and failing to properly oversee

Mammoth's public statements and internal control function.

228.    The Defendants, because of their positions of control and authority as officers, directors, and/or controlling shareholders of Mammoth, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Defendants also failed to prevent the other Defendants from taking such illegal actions. In addition, as a result of Defendants' improper course of conduct, the Company is now the subject of the Securities Action that alleges violations of federal securities laws. As a result, Mammoth has expended, and will continue to expend, significant sums of money.

## DAMAGES TO MAMMOTH

229.    As a direct and proximate result of the Defendants' conduct, the Company has lost and expended, and will lose and expend, many millions of dollars. The wrongdoing detailed herein has exposed the Company to myriad reputation and financial damages, including but not limited to:

    (a)  Possible restatements and goodwill impairments;

    (b)  Liability arising from the Securities Action and the Indictment;

    (c)  The loss of credibility with customers and suppliers; and

    (d)  Legal and accounting costs associated with litigation, investigations, and potential restatements in connection with the Securities Action and the Indictment.

230.    Damages also include handsome compensation, bonuses, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

231.    Moreover, according to the Law360 article published on October 17, 2019, PREPA had asked the U.S. Bankruptcy Court for the District of Puerto Rico to let it hold off paying Cobra $216 million under the PREPA Contracts, pending criminal proceedings against Ellison and the implementation of a watchdog report recommending a review of the PREPA Contracts. Therefore,

as a result of criminal proceedings related to the Indictment, PREPA may potentially claw back some payments it made or would have made to Cobra under the PREPA Contracts.

## DERIVATIVE ALLEGATIONS

232.    Plaintiffs brings this action derivatively and for the benefit of Mammoth to redress injuries suffered, and to be suffered, because of the Defendants' breaches of their fiduciary duties as officers, directors, and/or controlling shareholders of Mammoth, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

233.    Mammoth is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

234.    Plaintiffs are, and have been continuously at all relevant times, stockholders of Mammoth. Plaintiffs will adequately and fairly represent the interests of Mammoth in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

235.    Plaintiffs incorporate by reference and re-allege each allegation stated above as if fully set forth herein.

236.    A pre-suit demand on the Board of Mammoth would have been futile and, therefore, is excused.  At the time of filing of this action, the Board consists of Director Defendants Straehla, McCarthy, Heerwagen, Smith, Ross, Palm, and Amron.  Plaintiffs need only allege demand futility as to a majority of Director Defendants who were on the Board at the time this action was commenced.

237.    Defendant Straehla is Wexford's affiliate and has been the Company's CEO and a member of its Board since June 3, 2016. Straehla served as CEO of the General Partner from

February 2016 until October 2016. The General Partner was controlled by Wexford. The Company concedes that Straehla is not independent under Nasdaq listing standards. As the CEO, Defendant Straehla was responsible for the fraudulent scheme to enter into the Cobra Contracts and was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing earnings calls and press releases, which he personally made statements in, and the 3Q17, 1Q18, 2Q18, 3Q18, 1Q19, and the 2017 and 2018 10-Ks, all of which he signed and for which he also signed SOX certifications. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes alleged herein. His insider sales before the fraud was exposed, which yielded $1.5 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.  Moreover, Defendant Straehla is a defendant in the Securities Action.

238.    Defendant McCarthy has served as Chairman of the Board since June 3, 2016 and served as chairman of the board of directors of the General Partner from September 2014 until October 2016. McCarthy joined Wexford in June 2008 and is currently a Partner at Wexford. Therefore, he cannot be considered independent. The Company concedes that Defendant McCarthy is not independent under Nasdaq listing standards. As Chairman of the Board and a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes alleged herein. Furthermore, Defendant McCarthy signed, and thus personally made, the false and misleading statements in the 2017 and 2018 10-Ks.

239.    Defendant Heerwagen was a director of the Company from January 2017 through November 18, 2019 (and was then replaced by Gulfport-designated Jonathan H. Yellen). Heerwagen serves as Senior Vice President of Corporate Development and Strategy for Gulfport, one of the Company's controlling stockholders. Since joining Gulfport in May 2007, Heerwagen

has served in multiple roles, including as the Director of Investor Relations and Corporate Affairs. Due to his affiliations with Gulfport he cannot be considered independent. The Company concedes that Defendant Heerwagen is not independent under Nasdaq listing standards. As a trusted Company director he conducted little, if any, oversight of the Company's engagement in the schemes alleged herein. Furthermore, Defendant Heerwagen signed, and thus personally made, the false and misleading statements in the 2017 and 2018 10-Ks.

240.     Defendant Amron has been a director of the Company since January 2019. Amron is a Partner at Wexford and serves as its General Counsel. Amron also served on the board of directors of Rhino from January 2010 until the sale of Wexford's interest in Rhino to Royal Energy Resources, Inc. in March of 2016. Due to his affiliations with Wexford he cannot be considered independent. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes alleged herein. Furthermore, Defendant Amron signed, and thus personally made, the false and misleading statements in the 2018 10-K.

241.     Defendant Palm has been a director of the Company since June 2017. Palm served as a director of Gulfport from February 2006 and as CEO of Gulfport from December 2005, in each case until his retirement in February 2014. Due to his affiliations with Gulfport he cannot be considered independent. As a trusted Company director and member of all three Board committees, he conducted little, if any, oversight of the Company's engagement in the schemes alleged herein. Defendant Palm signed, and thus personally made, the false and misleading statements in the 2017 and 2018 10-Ks.

242.     Defendant Ross has been a director of the Company since November 2016. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes alleged herein. Furthermore, Defendant Ross signed, and thus personally made, the

false and misleading statements in the 2017 and 2018 10-Ks.

243.   Defendant Smith has been a director of the Company since October 2016. As Chair of the Company's Audit Committee and a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes alleged herein. Defendant Smith signed, and thus personally made, the false and misleading statements in the 2017 and 2018 10-Ks. His insider sale before the fraud was exposed, which yielded $149,100 in proceeds, demonstrates his motive in facilitating and participating in the fraud.

244.   Demand is excused here because all of the seven Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of the bribery scheme, in which they knowingly or recklessly made and/or caused the Company to make false and misleading statements and omissions of material facts, rendering the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.  Director Defendants Straehla, McCarthy, Heerwagen, Smith, Ross and Palm also solicited the false and misleading 2018 and 2019 Proxies.

245.   In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. Because of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

**Audit Committee**

246.   Demand is otherwise futile with respect to the three members of the Audit Committee (Smith, Palm, and Ross) because they face the risk of substantial liability stemming from their failure to oversee the Company's compliance with applicable accounting regulations

despite their mandate to do so under the Audit Committee Charter.

## ADDITIONAL CONSIDERATIONS

### Insider Sales

247.    As described above, two of the Director Defendants directly engaged in insider trading, in violation of federal law. Defendants Straehla and Smith collectively received proceeds of over $1.65 million as a result of insider transactions during the Relevant Period. Therefore, demand in this case is futile as to them, and thus excused.

### Affiliations with the Selling Controlling Shareholders

248.    Demand in this case is excused because the Director Defendants, all of whom are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Defendants that preclude them from acting independently and in the best interests of the Company and its shareholders. As described above, all of the Individual Defendants except for Ross and Smith have ties to the Selling Controlling Shareholders, Gulfport and/or Wexford. These relationships are as follows:

    (a)    Charles E. Davidson, who is the founder, Chairman, and CIO of Wexford, was a controlling shareholder of Gulfport until 2011, and Gulfport still conducts much of its business with companies that are controlled by Wexford. Therefore, current Gulfport employee Defendant Heerwagen is unlikely to take action against Defendants McCarthy or Amron.

    (b)    Defendant McCarthy has been a Wexford Partner since 2008. Defendant Amron has been at Wexford in some capacity since 1994.

    (c)    Defendants Palm and Heerwagen overlapped at Gulfport in senior management roles from 2005 until Palm's retirement from his tenure as Gulfport's CEO and

director in 2014. Defendant Heerwagen remains with Gulfport as a Senior Vice President, and he is Gulfport's chosen nominee to the Mammoth Energy Board.

(d) Defendant Straehla was the CEO of Diamondback Energy Services, Inc. ("Diamondback") from 2006 to 2008, when that company was still private. According to Gulfport's contemporary SEC filings,[5] Wexford indirectly controlled Diamondback, and Diamondback later disclosed that at the time it derived much of its business and revenue from agreements with Wexford-controlled entities such as Gulfport (which is no longer controlled by Wexford) and Windsor Energy Group LLC. Diamondback's 2011 IPO was later equity-sponsored by Wexford.

(e) Defendant Amron, as Wexford's General Counsel, is likely reluctant to take action against fellow Wexford Partner Defendant McCarthy.

249. Five of the seven members of the Board at the time of this filing have aligned business interests through their varied associations with Wexford-controlled or affiliated companies. Aside from their intertwined backgrounds, all of the Director Defendants owe their livelihoods and/or current positions to Wexford or Gulfport (which own 49% and 21.9% of the Company's stock, respectively), and are therefore unlikely to take action against Defendant McCarthy, a Wexford Partner, or Heerwagen, a Senior Vice President at Gulfport who was specifically selected for Board membership by Gulfport. These conflicts of interest precluded the Director Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' and Selling Controlling Shareholders' conduct. Thus, any demand on the Director Defendants would be futile.

---

[5] Gulfport Energy Corp., Definitive Proxy Statement (Schedule 14A) (Apr. 30, 2007).

**Non-Compliance with the Code of Conduct**

250.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and caused the Company to issue materially false and misleading statements to the public. In violation of the Code of Conduct, the Director Defendants failed to comply with the law. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

251.    Mammoth has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Mammoth any part of the damages Mammoth suffered and will continue to suffer. Thus, any demand upon the Director Defendants would be futile. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter.  As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the stockholders of the Company. Accordingly, demand is excused as futile.

252.    The acts complained of herein constitute violations of fiduciary duties owed by the Director Defendants, and these acts are incapable of ratification.

**Insurance Considerations**

253.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors and officers liability insurance if they caused the Company to purchase it for their protection with corporate

funds. If there is a directors and officers liability insurance policy covering the wrongdoing complained of herein, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Mammoth, there would be no directors and officers insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

254.    If there is no directors and officers liability insurance, then the Director Defendants will not cause Mammoth to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

255.    Thus, for all the reasons set forth above, all of the Director Defendants, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM

**Against the Individual Defendants**
*for Violations of Section 14(a) of the Exchange Act*

256.    Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

257.    The Section 14(a) Exchange Act claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to

any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

258.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

259.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

260.    Under the direction and watch of the Individual Defendants, the 2018 and 2019 Proxy Statements failed to disclose material adverse facts about Mammoth's business, operations, and prospects. Specifically, Defendants made and or caused the Company to make false and misleading statements that failed to disclose that: (1) Mammoth's subsidiary, Cobra, improperly obtained two infrastructure contracts with PREPA that totaled over $1.8 billion and were awarded as the result of improper steering and not a competitive RFP process; and (2) as a result, the Company's and Defendants' statements about Mammoth's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

261.    The 2018 and 2019 Proxy Statements also stated that the Company's directors and employees, including its principal executive officer, principal financial officer, principal

accounting officer, and controller, or persons performing similar functions, are subject to the Company's Code of Conduct.  The 2018 and 2019 Proxy Statements was also false and misleading because, despite assertions to the contrary, Mammoth's Code of Conduct was not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

262.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 and 2019 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for stockholder determination in the 2018 and 2019 Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

263.    The false and misleading elements of the 2018 and 2019 Proxy Statements led to the re-elections of all of the Individual Defendants which allowed them to continue breaching their fiduciary duties to Mammoth.

264.    The Company was damaged as a result of the material misrepresentations and omissions in the 2018 and 2019 Proxy Statements.

265.    Plaintiffs on behalf of Mammoth have no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants**
*for Violations of Section 20(a) of the Exchange Act*

266.    Plaintiffs incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

267.    The Individual Defendants, by virtue of their positions with Mammoth and their

specific acts, were, at the time of the wrongs alleged herein, controlling persons of Mammoth and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Mammoth to engage in the illegal conduct and practices complained of herein.

268.     Plaintiffs on behalf of Mammoth have no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants**
*for Breach of Fiduciary Duties*

269.     Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

270.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Mammoth's business and affairs.

271.     Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

272.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Mammoth.

273.     In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

274.     In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

275.     Also in breach of their fiduciary duties, the Individual Defendants willfully or

recklessly made and/or caused the Company to make false and misleading statements.

276. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

277. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

278. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

279.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

280.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Mammoth has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

281.     Plaintiffs on behalf of Mammoth have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants
*for Unjust Enrichment*

282.     Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

283.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Mammoth.

284.     The Individual Defendants either benefitted financially from the improper conduct or received unjust compensation tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Mammoth that was tied to the performance or artificially inflated valuation of Mammoth, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

285.     Plaintiffs, as stockholders and representatives of Mammoth, seek restitution from the Individual Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

286.     Plaintiffs on behalf of Mammoth have no adequate remedy at law.

## FIFTH CLAIM

**Against Individual Defendants**
*for Waste of Corporate Assets*

287.    Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

288.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, engage in internal investigations, and lose financing from investors and business from future customers who no longer trust the Company and its products.

289.    Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

290.    Plaintiffs on behalf of Mammoth have no adequate remedy at law.

## SIXTH CLAIM

**Against Defendants Gulfport and Wexford**
*for Breach of Fiduciary Duty in Their Capacity as Mammoth's Controlling Stockholders*

291.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

292.    As detailed herein, Wexford and Gulfport were and still are Mammoth's controlling stockholders. As controlling stockholders, Wexford and Gulfport owed the Company the fiduciary duties of due care, good faith, and loyalty.

293.    For their own benefit and in breach of their fiduciary duties, Wexford and Gulfport caused the Company to engage in the misconduct described herein. Also in breach of their fiduciary duties, the Defendants Wexford and Gulfport willfully or recklessly made and/or caused the Company to make false and misleading statements.

294.    As a direct and proximate result of these breaches of fiduciary duties, Mammoth

has been damaged and will continue to be damaged.

295.    Plaintiffs on behalf of Mammoth have no adequate remedy at law.

### SEVENTH CLAIM

**Against Defendants Wexford and Gulfport**
*for Breach of Fiduciary Duty and Misappropriation of Information under* Brophy

296.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth

above, as though fully set forth herein.

297.    When Defendants Wexford and Gulfport sold over $165 million worth of

Mammoth shares under the Underwritten Secondary Offering, they were in possession of material,

adverse, non-public information regarding the Company's involvement in the misconduct

described herein. The revelation of this impairment and the full truth concerning Mammoth's

procurement of the Cobra Contracts would destroy more than $300 million in market capitalization

when revealed to the market.

298.    The foregoing information was proprietary, material, adverse, and nonpublic

information regarding the Company's operations known only by Mammoth insiders. The

information which formed the Selling Controlling Shareholders' basis for their June, 2018 sale of

stock was the type of information which the Selling Controlling Shareholders were specifically

barred from trading upon. This information was a proprietary asset belonging to Mammoth which

was usurped for the benefit of the Selling Controlling Shareholders and to the detriment of the

Company.

299.    By selling Mammoth shares based on material, adverse, nonpublic information, the

Selling Controlling Shareholders breached the duty of loyalty which they owe to the Company and

its minority stockholders.

300.    Plaintiffs, derivatively on behalf of the Company, seek restitution from the Selling

Controlling Shareholders, as well as entry of an order of this Court disgorging all profits realized by the Selling Controlling Shareholders as a result of their breaches of the duty of loyalty and imposing a constructive trust for the benefit of the Company.

301.    Plaintiffs on behalf of Mammoth have no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Defendants as follows:

a.    Declaring that Plaintiffs may maintain this action on behalf of Mammoth, and that Plaintiffs are adequate representatives of the Company;

b.    Declaring that each of the Defendants have breached or aided and abetted the breach of their fiduciary duties to Mammoth;

c.    Determining and awarding to Mammoth the damages sustained by it because of the violations set forth above from each of the Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

d.    Directing Mammoth and the Defendants to take all necessary actions to reform and improve Mammoth's corporate governance and internal procedures to comply with applicable laws and protect Mammoth and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1)    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

2)    a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations.

    e.        Awarding Mammoth restitution from Defendants, and each of them;

    f.        Awarding Plaintiffs the costs and disbursements of this action, including reasonable

attorneys' and experts' fees, costs, and expenses; and

    g.        Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.


Dated: January 17, 2020                Respectfully submitted,

                                          **FARNAN LLP**

OF COUNSEL:

                                          /s/  Brian E. Farnan

**THE ROSEN LAW FIRM, P.A.**          Brian E. Farnan (#4089)

Phillip Kim                              Michael J. Farnan (#5165)

275 Madison Avenue, 40th Floor        919 N. Market Street, 12th Floor

New York, New York 10016             Wilmington, Delaware 19801

(212) 686-1060                        (302) 777-0300

pkim@rosenlegal.com                  bfarnan@farnanlaw.com

                                          mfarnan@farnanlaw.com

**THE BROWN LAW FIRM, P.C.**

Timothy Brown                          *Liaison Counsel for Plaintiffs*

240 Townsend Square

Oyster Bay, New York 11771

(516) 922-5427

tbrown@thebrownlawfirm.net

**LEVI & KORSINSKY, LLP**

Gregory M. Nespole

Samir Shukurov

55 Broadway, 10th Floor

New York, New York 10006

(212) 363-7500

gnespole@zlk.com

sshukurov@zlk.com


*Co-Lead Counsel for Plaintiffs*