# EXHIBIT A

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CITY OF MONROE EMPLOYEES' RETIREMENT SYSTEM, derivatively on behalf of TWENTY-FIRST CENTURY FOX, INC., | : : : : |
|                Plaintiff, | : : |
|          v. | : C.A. No. : 2017-0833-AGB |
| RUPERT MURDOCH, LACHLAN MURDOCH, JAMES MURDOCH, CHARLES G. CAREY, DAVID F. DEVOE, RODERICK I. EDDINGTON, ROGER S. SILBERMAN, JACQUES A. NASSER, JAMES W. BREYER, JEFFREY W. UBBEN, VIET DINH, DELPHINE ARNAULT, TIDJANE THIAME, AND THE ESTATE OF ROGER AILES, | : : : : : : : : : : : |
|                Defendants, | : : |
|         and | : : |
| TWENTY-FIRST CENTURY FOX, INC., | : : |
|              Nominal Defendant. | : |

- - -

Chancery Courtroom No. 12A
Leonard L. Williams Justice Center
500 North King Street
Wilmington, Delaware
Friday, February 9, 2018
2:05 p.m.

- - -

BEFORE:  HON. ANDRE G. BOUCHARD, Chancellor
- - -

PLAINTIFF'S MOTION TO APPROVE SETTLEMENT AND FOR
ATTORNEYS' FEES AND EXPENSES AND THE COURT'S RULING

------------------------------------------------------------

CHANCERY COURT REPORTERS
Leonard L. Williams Justice Center
500 North King Street
Wilmington, Delaware 19801
(302) 255-0521

```
1   APPEARANCES:

2          STUART M. GRANT, ESQ.
           MICHAEL J. BARRY, ESQ.
3          Grant & Eisenhofer, P.A.
                   -and-
4          MAX W. BERGER, ESQ.
           MARK LEBOVITCH, ESQ.
5          DAVID L. WALES, ESQ.
           REBECCA E. BOON, ESQ.
6          of the New York Bar
           Bernstein, Litowitz, Berger & Grossmann LLP
7            for Plaintiff City of Monroe Employees'
             Retirement System
8
           NED C. WEINBERGER, ESQ.
9          Labaton Sucharow LLP
             for Plaintiff Seattle City Employees'
10           Retirement System

11         ANDREW S. DUPRE, ESQ.
           McCarter & English, LLP
12                 -and-
           AMY MILLER, ESQ.
13         of the New York Bar
           Levi & Korsinsky, LLP
14           for Plaintiffs IBEW Local 38 Pension Fund and
             Simcha Halberstam
15
           GREGORY V. VARALLO, ESQ.
16         SUSAN M. HANNIGAN, ESQ.
           SARAH A. GALETTA, ESQ.
17         Richards, Layton & Finger, P.A.
             for Defendants Rupert Murdoch, Lachlan
18           Murdoch, James Murdoch, Charles G. Carey,
             David F. DeVoe, Roderick I. Eddington,
19           Roger S. Silberman, Jacques A. Nasser,
             James W. Breyer, Jeffrey W. Ubben, Viet Dinh,
20           Delphine Arnault, Tidjane Thiame, and Nominal
             Defendant Twenty-First Century Fox, Inc.
21
           THAD J. BRACEGIRDLE, ESQ.
22         Wilks, Lukoff & Bracegirdle LLC
             for Defendant The Estate of Roger Ailes
23
                         - - -
24
```

3

1              THE COURT:  Mr. Grant.

2              MR. GRANT:  Good afternoon, Your

3    Honor.  With the Court's permission, Mark Lebovitch

4    from Bernstein Litowitz who has already been admitted

5    pro hac will present the settlement and fee petition,

6    and only to the extent Your Honor wants, an opposition

7    to Ms. Miller's motion.  But if Your Honor doesn't

8    want to hear that now, he won't do that.

9              So with Your Honor's permission, I

10   would turn this over to Mr. Lebovitch.

11             THE COURT:  That's fine.

12             MR. GRANT:  Thanks.

13             MR. LEBOVITCH:  Good afternoon, Your

14   Honor.

15             THE COURT:  Good afternoon.

16             MR. LEBOVITCH:  It's been a while.

17   It's good to be back before you.

18             I know that the Court has read the

19   papers.  And the underlying events behind this case,

20   obviously, received a lot of publicity.  So I hope to

21   really just give a concise background to it and then

22   talk about the process that led to this case and how

23   it was prosecuted and really focus on the settlement.

24             Obviously, the settlement is a

4

1    $90 million recovery, one of the largest in Delaware,

2    including one of the largest derivative case

3    recoveries ever and we think the largest in a pure

4    oversight case.

5                    THE COURT:  All covered by D&O

6    insurance.  Is that right?

7                    MR. LEBOVITCH:  Yes.  And we think

8    even more important than the monetary recovery is what

9    we think is unprecedented and really exceptional

10   governance changes, and I want to spend some time on

11   that.

12                   There have been no objections filed

13   previously, and based on a survey of the room, we

14   don't believe any objectors have shown up either on

15   the settlement or on the fee petition.

16                   I want to start with maybe just a very

17   brief big-picture comment and explain that there's a

18   lot of people here who worked hard on this case.  And

19   it's a privilege to practice here in Delaware in the

20   Chancery Court.  And if people do it long enough,

21   they'll find a case that they feel like it matters.

22   It's going to be in the *Wall Street Journal*.  It's

23   shaping the way deals are done.  But it's really

24   economic matters.  And we feel good about it but

1    that's it.  It's really rare to have a case where you

2    get involved in it and you find yourself kind of

3    involved in history and something that's about so much

4    more than just the economic issues.

5                    And here, from the origin of this

6    case, what happened, frankly, is disclosures.  You

7    know, the filing of the Gretchen Carlson complaint led

8    to a focus on Roger Ailes.

9                    And the first instinct that many

10   people would have is, well, that's not really a

11   Delaware issue.  And we touch on this in the papers,

12   that, historically, there's really no precedent in the

13   law for this.  There's one case that deals with sexual

14   harassment.  That was White versus Panic.  And what I

15   knew right up front is I believe from my own knowledge

16   that that's just a dismissal of a plaintiff who didn't

17   do a 220.  But there's no precedent for how someone

18   would pursue a derivative claim arising out of sexual

19   harassment by even one executive.

20                    This started -- and I do want to give

21   a little bit of credit up front --

22                    THE COURT:  This ultimately is a

23   Caremark-type claim.  Right?

24                    MR. LEBOVITCH:  Yes.

6

1      And what happened is, from the

2  beginning, my partner, Max Berger, who doesn't

3  normally get involved in saying, Hey, you should bring

4  this case or go investigate this or that, he, I think,

5  did see something and saw that this was more than just

6  Roger Ailes.

7      And I think his perspective is -- was

8  and I think now surely is -- that boards didn't get

9  involved in these issues, because if there's someone

10 who is acting inappropriately, it's like deviant, and

11 you can write it off as deviant and say, This is just

12 not our job.  And he said, This is something that's

13 bigger.  And there's a historical context here, and

14 kind of "The Times They Are A-Changin'."  And so we

15 started an investigation.

16      We started that investigation, and it

17 was in July.  It was pretty early on.  It was

18 July 29th of 2016.  And there was about a six-month

19 stretch in that case where we were pursuing a 220.

20 Mr. Varallo was on the other side of it, and there was

21 a lot of back and forth, a lot of fighting about

22 documents and the scope of the documents and whatnot.

23      And then we had essentially a

24 breakdown at the end of 2016 where we said, Okay,

1   they're not giving us more documents.  We don't --

2   we're not happy.  We think there should be more.

3                    And then we get to early 2017, and

4   that's when this case really took a different turn.

5   It was just fortuitous.  And I touched on it in the

6   declaration.  We had gone to our client, we had a 220

7   complaint written, and we were getting a verification

8   to file a 220 complaint, and I happened to see an old

9   friend of mine from Skadden who is now a senior M&A

10  lawyer at Fox for Twenty-First Century Fox.  And I

11  just happened to see him in a restaurant and I said,

12  What are you guys doing?  And I know you're litigious,

13  but this is different.

14                   And he listened, and we had a long

15  conversation in the middle of that restaurant.  And I

16  knew that he reports to Gerson Zweifach, who is

17  general counsel.  And he listened and listened.  I

18  didn't know what was going to come of it.  And then it

19  was about a week later, as we were much closer to

20  filing what would be a very public and it was I

21  believe like a 60- or 70-page 220 complaint, I got a

22  phone call during a break in a class cert. hearing I

23  was doing in California, got a phone call from

24  Mr. Varallo, and we had a lengthy conversation.

8

1            And it's really -- it was the

2    jawboning you would expect about what kind of case

3    this would be.  And, Oh, we've given you the

4    documents.  But there was also a kind of getting-real

5    moment as well that is a credit, I think, to him.  We

6    spoke and said, Well, how would this -- if there is a

7    220, what would happen?  And then if it led to

8    litigation, what would happen?

9            And this bled over to our many

10   conversations that, you know, can't happen if people

11   are too venomous and too ideological.  And I think

12   Mr. Varallo was not shy telling us the problems we

13   would have in the case, but at the same time, I think

14   was listening and professional about why his clients

15   might have problems in the case.  And that's how the

16   praeses started.

17           We filed a 220, and we were

18   litigating, taking interviews.  So we're getting, now,

19   documents.  We didn't file a 220.  We gave it to them

20   privately.  That led to us doing some private

21   interviews and then saying, You know what?  There is a

22   case here.  And we sent them a private complaint, and

23   we said, We think we have a basis for a complaint but

24   do you want to continue this process?

1          And over time, that led to an

2   agreement to mediate.  And we retained former judge

3   Layn Phillips, who is probably one of the most

4   prominent mediators out there, and we got ready to

5   mediate this very unusual case, knowing that we were

6   doing private discovery but it would be a completely

7   different picture if everything was out in the public

8   and if we're deposing directors, you know, in the

9   spotlight, essentially.

10          And over time, our group grew.  Other

11   people had sent 220 demands to the company.  And, you

12   know, I want to just briefly commend people because

13   there's a fair amount, sometimes, of cynicism about

14   how things work amongst plaintiffs' firms, and

15   sometimes I even express some of that cynicism, but

16   this was a case, just as we started it, and we felt

17   that there is something more than just some average

18   derivative suit here.  This is important.  And really,

19   I think everyone, they bought into that.  They agreed.

20   And it was great cooperation by a dozen firms working

21   together.  Great cooperation.

22          There was a leadership, understood,

23   but people really worked together and acted as a team

24   for a very important cause.  And a lot of the firms

1  are here, represented, because people are very proud

2  of what came out of our efforts, which is this

3  settlement.

4                    And the settlement negotiations, what

5  you had was the mediation process that we lay out in

6  our papers.  You also had direct meetings, direct

7  negotiations.  We, even before having the mediation,

8  sent over a demand relating to what became the

9  Council.  And we had direct meetings to talk about

10  what's right and what's wrong and what's going to be

11  best for the company.  And I think that through a

12  process that had a lot of fights, a lot of

13  disagreements, both about the case and about the

14  settlement terms, we came to something special.

15                    Before I get to and really focus on

16  the settlement terms, I want to highlight that through

17  this unusual process, the parties entered into a

18  couple of stipulations.  And really, the stipulations

19  were because at all times, we were all experimenting

20  with this process but didn't know how it could break

21  down.  And in fact, everyone had the ability to blow

22  it up.

23                    And we entered stipulations relating

24  to discovery.  We were able to interview Gerson

11

1   Zweifach thanks to a stipulation that we put in.  And

2   that's how we learned a lot more about what happened.

3                    We put in a stipulation about demand

4   futility early in the process so that once they had a

5   complaint, all agreed, that's the date.  Because if

6   this continued for a while, we don't want the board to

7   change and have some argument --

8                    (Overlapping speakers)

9                    THE COURT:  -- board changes.

10                   MR. LEBOVITCH:  So in the end, we,

11  over the summer, had three mediation sessions.  The

12  first one was a bust, it seemed, but it was very

13  substantive.  And Your Honor has been in mediations,

14  and sometimes it's just kind of back and forth on

15  numbers.

16                   There were presentations made, and as

17  Your Honor could imagine, I'm not going to go into the

18  details, but you can imagine that questions about

19  White versus Panic and how broad that case is comes

20  up.  Questions about demand futility, even if Fox is a

21  controlled company, how would that play out.  The

22  Murdochs' role here with Ailes and Fox News.

23  Questions about proving liability of the board if you

24  go forward and proving liability of the Murdochs even

1    if a claim just went forward against the Murdochs and,

2    eventually, the Ailes estate.

3                    And then you have damages.  You have a

4    situation where there are very real damages,

5    quantifiable, there are unquantified damages, and

6    there is also harm that you couldn't know yet, you

7    couldn't know the number yet.  But we were able to

8    articulate about $200 million worth of kind of

9    reasonably pursuable damages, and --

10                   THE COURT:  How did you get to that

11   number?

12                   MR. LEBOVITCH:  Well, it was a bunch

13   of different components.  It was the payments of

14   severance to people who we contend should have been

15   removed for cause far earlier.  It was the settlements

16   that had already been paid to victims.

17                   Now, there was more litigation that

18   emerged after the Carlson complaint, but I believe the

19   number when we were negotiating was $55 million had

20   already been paid out as settlements.

21                   We had payments on keyman contracts.

22   We made the argument that the board had allowed Roger

23   Ailes to, in a way, insulate himself or sabotage Fox

24   News by putting in the contracts of key talent a

1   keyman provision tied to him, so if he left, the

2   talent at the company could leave as well and get big

3   severance payouts.  So it was a defensive parachute.

4                    THE COURT:  A new form of proxy put.

5   All right.

6                    MR. LEBOVITCH:  It could be.  And it

7   wasn't the scale of what we saw in the Yahoo! case

8   where every employee gets a parachute.

9                    THE COURT:  Right.

10                   MR. LEBOVITCH:  But the point if the

11  talent from a media company leaves, the dollars isn't

12  what does it but the talent has incentive to leave.

13  That's no more.  That no longer exists, thanks to the

14  settlement.

15                   And maybe that's a good segue to focus

16  on the settlement itself, unless Your Honor has

17  questions about the process.

18                   THE COURT:  I do have a couple

19  questions.

20                   150 was the number you were saying you

21  sort of pegged as your -- as the exposure here?

22                   MR. LEBOVITCH:  200.

23                   THE COURT:  I just remember in reading

24  the brief, frankly, it struck me as low that that

1   would be the range, because there would be so many

2   tentacles to the thing.

3                    Did you find in the course of

4   negotiating over the dollars that by virtue of any

5   settlements that had been entered, for example, with

6   the Ailes estate or with O'Reilly, that you were

7   precluded from going after them to get a financial

8   contribution?

9                    MR. LEBOVITCH:  No, we were not

10  precluded from going after the Ailes estate or --

11  O'Reilly, I want to be careful, because Ailes -- the

12  Ailes estate was involved in the process at the end.

13  I think that Fox -- my understanding is when Fox

14  settled with the Ailes estate, Fox preserved its

15  ability to have claims with the Ailes estate.

16                    O'Reilly we viewed as damages.  He

17  wasn't an officer so we couldn't bring a derivative

18  claim against O'Reilly other than we caused the

19  company to go after O'Reilly.  Our point really was,

20  about the board there, is they should have fired him

21  earlier.  They shouldn't have renewed his contract.

22  They should have had a contract that insulated him.

23                    Oddly enough, his first contract, part

24  of our complaint about it is they couldn't fire him

1   for cause no matter how many people sued him unless

2   there was a final nonappealable judgment against him.

3   So I don't want to prejudice the company if they want

4   to go after him --

5                   THE COURT:  He has his own protection,

6   I'm sure.

7                   MR. LEBOVITCH:  He had his own

8   protection.  And we blamed the board for allowing that

9   to happen.  And part of the settlement is that can no

10  longer happen.  A keyman provision at any dollar

11  amount is one of the specific items that's not a

12  matter of judgment for anyone.

13                  Because a lot of the settlement is

14  about the people that we put in place and the

15  structure that we put in place, which is the Council,

16  which is independent, that has phenomenal people on

17  it, and so they're going to have a lot of tools to

18  use.

19                  But to answer your question, we were

20  not precluded -- and the number, the 200 number, was

21  heavily contested, but we all realized that things

22  like the race discrimination class action is still

23  going on.  The --

24                  THE COURT:  It's just carved out.

1    Right?  This is only derivative.  The release only

2    covers derivative claims.

3                    MR. LEBOVITCH:  We're not settling

4    anyone else's claims.

5                    We were able to quantify 200.  Your

6    Honor's instinct was fair.  When we were negotiating,

7    without going into too much detail, of course, we

8    said, Yeah, you guys want to get ahead of this.  You

9    want to fix this.  By the time we're at trial, the

10   number may well be larger.

11                   That, itself, was a point of dispute,

12   because, obviously, the company thinks they're going

13   to win all their cases.  We said, Clearly, you're

14   going to have to do something about them.  You might

15   lose some.  You might settle some.  So the number

16   would go higher than the 200.

17                   But it's not like they accepted that

18   200 was even the harm that could be attributed to the

19   misconduct.  Right?  Because some of it was lost

20   advertising revenue, things like that.  We were

21   bringing in everything that we could.

22                   But then even when you go further, if

23   we had a trial in this case, the board, we would have

24   to -- let's assume we got past demand futility.  We

1    would have to prove liability of, clearly, officers.

2    And that would help us, as we had some controlling

3    people who also are officers and may have fewer

4    defenses.  But then you could have the board.

5              If we prove liability, the question of

6    damages is, Okay, well, the company has had to pay out

7    200 million or 400 million.  How much of that is

8    because the board didn't do its job versus, you know,

9    how much -- basically, what happened even if they were

10   doing their job.  And there is no automatic strict

11   liability for, you know, a breach of fiduciary duty

12   where we can say, Well, you had to pay it out and

13   that's it.  Presumably, damages would be very

14   aggressively contested on all sides.

15             But taking it all into account, and

16   knowing that we were able to articulate 200, and that

17   realistically, by the time of trial, the number would

18   be higher -- but we did a lot of diligence on those

19   pending lawsuits and whatnot.  90 million, it's

20   45 percent of the 200.  And we think that in the world

21   of shareholder derivative cases, it's, we think,

22   pretty monumental.

23             So ... okay?

24             THE COURT:  All right.  Thank you.

1               MR. LEBOVITCH:  So I just talked about

2      the 90 million.  I want to focus on the Council and

3      the governance relief.  And there's really two -- I

4      think of what does governance mean?  People use the

5      word but don't think about what that means.

6               I think that there is a corporate

7      form, and everyone knows the corporate form has sort

8      of structural kind of inefficiencies where people who

9      are controlling the money, controlling the company, at

10     times can act for their benefit per ways that aren't

11     guided for the company, that aren't intended to

12     benefit the company.

13              So governance, to me, that means two

14     things.  There's hurdles and there's tools.  Hurdles

15     is something that's going to impede someone with an

16     ill intent from getting their way at the expense of

17     the company.  And then there's tools.  And this

18     settlement, you know, kind of has a combination of

19     those.  And the tools have to be used by good people.

20     Right?  The outside directors, typically.

21              Here, we have hurdles put in place.

22     We have things that the company has agreed to put in

23     place no matter what.  Like the keyman provision, it

24     would impede someone who attains power within the

1   company from protecting themselves by giving out these

2   keyman provisions.  So that's a hurdle that we're not

3   leaving to chance.

4             When we've done this, in the Pfizer

5   case, for example, we created a regulatory committee

6   of the board in the Pfizer litigation.  We were

7   trusting the board there, but it was still under the

8   board's umbrella.  That's not a controlled company.

9   And here, without trying to impugn the controllers, we

10  definitely felt that the fix here had to be

11  sufficiently independent.

12            And so what we did is we had these

13  hurdles that we put in place.  That's part of the

14  governance.  And then we had the tools.  And the tools

15  really is the creation of the Council and the

16  empowerment of the Council.  Four of the six members

17  are independent.  We picked two and the company picked

18  two.

19            THE COURT:  That's already happened.

20  Right?

21            MR. LEBOVITCH:  That has happened.

22  The two that we picked, one is former federal judge

23  Barbara Jones and Sylvia Hewlett.  The bios are in the

24  record.  Barbara Jones was appointed by the Secretary

1   of Defense to chair the committee that looked at

2   harassment and discrimination in the military.  And

3   Sylvia Hewlett -- and particularly, the company's

4   choices, these are stellar people.  Brande Stellings

5   and Sylvia Hewlett are really the leaders in the field

6   of working with companies on how to deal with

7   diversity and inclusion issues, is the phrase that

8   they use now.

9               And actually, technically, the Council

10  can't come into effect until Your Honor approves a

11  settlement, but I think showing the eagerness of the

12  company and the members to get started, we had a

13  meeting -- this is just referenced briefly in our

14  reply paper, but we had a meeting January 29th.  And,

15  you know, I was lucky enough to attend the initial

16  part.  Mr. Zweifach and the lawyers were there.  Viet

17  Dinh, who is on the board, was involved.  And we each

18  made initial presentations.

19              And the point I made to them that I

20  will share that really is what I was just touching on

21  is we're giving them tools and, really, they're

22  stellar people, and this is now their expertise.  And

23  they should have everything they need to make Fox News

24  go from -- and I know that they're not going to like

1  this -- from worst to first.  That's really kind of

2  the mission and objective here.

3               This is a company that had some

4  serious problems.  And we know the history since Roger

5  Ailes.  I mean, now we hear about Harvey Weinstein and

6  Steve Wynn.  So the concept of deviant men in absolute

7  power is not unique, but the solution is.  And really,

8  we hope that it's emulated by other companies that

9  find themselves facing these problems.

10              The committee excused all of us and

11  they met for a lengthy period of time, and they're

12  eager to get started.  And so that's where that

13  stands.

14              I don't know if Your Honor has other

15  specifics about the Council.  I'll highlight a couple.

16              THE COURT:  I just read through the

17  papers a little while ago to go through the section

18  that has all the components of the nonmonetary relief.

19  And the thing I would be most interested just to hear,

20  in case I didn't get it in my reading, is how

21  information gets to the board.

22              I mean, I think I read through this

23  and understand that there are certain meeting

24  reporting relationships they all seem to go through.

1    Well, I guess the Council meets with the corporate

2    governance committee periodically, but the chair,

3    which is actually a Fox person, has the more frequent

4    contact with that committee.

5                    But the written reports, if I'm

6    reading it correctly, at least for the first two

7    years, go to the entire board.  I just want to get

8    confirmation of that.

9                    MR. LEBOVITCH:  Yes.

10                   THE COURT:  And then for the last

11   three years, I think they get it twice a year.

12                   MR. LEBOVITCH:  It's the frequency

13   that changes.

14                   THE COURT:  Which is important,

15   because especially when -- I think I was reading,

16   like, the reply paper or the submission from

17   Mr. Varallo, but all the things these people didn't

18   know, I think it's important that they actually have

19   to know.

20                   MR. LEBOVITCH:  Yes.

21                   THE COURT:  So elaborate a little bit

22   on that.

23                   MR. LEBOVITCH:  That's a great

24   question, Your Honor.  It actually was a critical

1    focus.

2                   You could imagine, going into these

3    negotiations, our position is, How could you not know?

4    Of course you knew.  And there were all these signs

5    within the company that there is a broader problem.

6    But their position is, Well, we didn't know.  And in

7    the litigation, there is always a risk they'd have to

8    kind of justify that it wasn't that bad, which I am

9    sure was a driver for them.

10                  The -- I'll call it the inside-outside

11   component of the Council is really where your answer

12   starts.  This is a majority independent committee --

13                  THE COURT:  Right.

14                  MR. LEBOVITCH:  -- but we felt,

15   collectively, through our process, that the best thing

16   for this company is that the committee not be viewed

17   as internal affairs.  Right?  They're not just

18   outsiders who are investigating.  They needed the

19   legitimacy of well-meaning management.

20                  And Kevin Lord came in after all of

21   this at Fox News and Thomas Gaissmaier came in at

22   Twenty-First Century Fox.  We met with them.  We

23   understand what was important to them.  And the idea

24   was, from the outset, they not only bring legitimacy

1   of the Council to the employees, which would encourage

2   interaction, but part of their job -- and I think it's

3   paragraph 15.  I could pull it from there, but my

4   memory is 15 or 16.  I also recently re-read it.

5   There is a long paragraph that talks about the

6   requirement that the Council can get information

7   through the chair from, you know, legal and from

8   marketing and PR and whatnot.  All of these different

9   divisions within the corporate structure, they are

10  mandated to provide information to the committee so

11  the committee can do its job.

12              So they have access to do their job

13  and they can then interact.  They can create

14  information.  And that's the data gathering, which is

15  a specialty of, I think, Ms. Stellings and

16  Ms. Hewlett.  They are not just going to, you know,

17  talk about kind of highfalutin ideas.  They get in and

18  they get the data for companies.  It's what they do.

19  And they're going to get real-world information and

20  act based on that real-world information.  And they

21  then report.  Okay?

22              So they have regular access to the

23  chair of the nominating and governance committee.

24  They have, in the agreement, set meetings with the

1  governance committee.  They provide their reports.

2  And I think it's annually for a meeting with the board

3  as a whole.

4                    The report itself --

5                    THE COURT:  Who meets with the board

6  as a whole annually?

7                    MR. LEBOVITCH:  The Council.

8                    THE COURT:  I didn't see that.

9                    MR. LEBOVITCH:  I'll look it up.

10                    Written reports --

11                    THE COURT:  Oh, written reports, yes.

12                    MR. LEBOVITCH:  15(a) is the written

13  reports.

14                    THE COURT:  They go to the board.  I

15  saw that.

16                    MR. LEBOVITCH:  It is paragraph 12.  I

17  was thinking paragraph 15.  It's paragraph 12.

18  They'll meet with the chair, meet with the full

19  nominating corporate governance committee at least

20  once per year.

21                    THE COURT:  Right, that committee, but

22  not the board.

23                    MR. LEBOVITCH:  Okay.  They're going

24  to meet with the whole committee and then they'll

1    report and provide the report to the board.  And the

2    committee report is made public.

3                        THE COURT:  I saw that.

4                        MR. LEBOVITCH:  And the feature --

5                        THE COURT:  You're getting a lot of

6    help here.

7                        MR. LEBOVITCH:  Maybe they think I'm

8    struggling.

9                        The feature that's most important

10   about the reporting, Your Honor, is the minority

11   report.  Because when you think about it, okay, what's

12   to stop a controlled company or, you know, any company

13   from just thwarting a council, no matter who you put

14   on it?

15                       And we didn't know who the company

16   would put on it.  We're very happy with who the

17   company put on, but there was the prospect that there

18   would be two people in management and two people who

19   would fundamentally kind of just be loyal to someone

20   other than the Council's cause.

21                       We're very happy with who they put on,

22   but we agreed upon and insisted that there be a

23   minority report.  That's even better than simply

24   publishing a report alone, because now any member who

1    doesn't like what's going on can issue a report.

2                    And I think, Your Honor, sometimes

3    setting those ground rules actually affects conduct

4    and will deter a problem from emerging.

5                    And the idea is that the prospect of

6    one of these Council members publishing, publicly, a

7    minority report on virtually any issue pretty much

8    assures that the board will have to be educated about

9    it and have to deal with it.  Because there's a lot of

10   negative consequences to, you know, whether it's

11   Barbara Jones or Brande Stellings, publishing a report

12   saying, I'm not getting cooperation from management.

13   That's bad for the company.  That's bad for

14   management.

15                   Knowing how management has been trying

16   to deal with this now, having dealt so much with

17   Mr. Varallo and Mr. Zweifach, I think it's extremely

18   unlikely that they would willy-nilly overstep and

19   invite such a minority report.

20                   And so you've got that.  And you've

21   got five years of the Council being in place.  If the

22   board wants to do away with the Council, they have to

23   explain publicly their reasoning.

24                   THE COURT:  I would like to explore

1  that provision.  Technically, tomorrow, the board

2  could terminate this, couldn't it?  They might have to

3  do it publicly, but they could terminate it.  Well,

4  help me out with paragraph 28.

5                    MR. LEBOVITCH:  The term is five

6  years.

7                    THE COURT:  Then what's it talking

8  about, a decision to modify or terminate?

9                    MR. LEBOVITCH:  I -- "... at the time

10  of the termination of this Agreement shall be made by

11  the board."  So I think at the end of five years, and

12  I hope Mr. Varallo will agree with me, but at the end

13  of five years, if they don't continue it, they have to

14  publicly state --

15                    THE COURT:  Is that how it works,

16  Mr. Varallo?

17                    MR. VARALLO:  Your Honor, this isn't a

18  gotcha.  We anticipate this being at least a

19  five-year --

20                    THE COURT:  So the termination

21  language is just talking about post five years?

22                    MR. VARALLO:  That's the way we read

23  it.

24                    THE COURT:  When I read the brief, I

1   read it the way I just articulated.  And when I went

2   back to look at the language, it seemed absurd.  It

3   would be, as a practical reality, pretty foolish to do

4   that, but I was just surprised.

5                   All right.  So you've got five years

6   for sure.  You're putting the representation on the

7   record.

8                   MR. LEBOVITCH:  We didn't get suckered

9   on that point, Your Honor, so we've got five years.

10                  So we think this is going to work.  I

11  mean, that's the key.  This is going to work.  It's

12  something that can be replicated.

13                  I already covered the risks to the

14  case.  Your Honor, I'm sure, is very well-aware of the

15  hurdles that we would face in litigating the case.

16  And all I'll say on that was in the absence of

17  precedent, I think both parties had a situation where

18  we could jawbone each other, but no one really knew

19  how this trial would play out.  We mentioned in the

20  papers we knew it would be a media circus, but beyond

21  that, we would be on unchartered grounds.

22                  So, again, with no objections, we

23  think that the settlement should be approved.

24                  I don't know if Your Honor has any

1    other questions, or I'll move on to --

2                    THE COURT:  I don't think so.  I think

3    I understand it.

4                    MR. LEBOVITCH:  We are seeking $22-1/2

5    million, which is 25 percent of just the cash, but

6    that's not the way we really have tried to articulate

7    the value and it's certainly not the way we approached

8    it.

9                    If you had just cash of $90 million,

10   there is a very significant fee that I think

11   rightfully would and could be awarded.  We believe

12   that this council, because of its importance for this

13   company and its novelty and, really, the thought and

14   tools that we provided it, so that it's not -- you

15   know, let me step back.

16                   Your Honor has seen what I'll call

17   fake governance.  Your Honor has seen things that

18   don't really mean a whole lot.  I believe -- and I

19   hope Your Honor sees that this was done by

20   professionals, and this is, we believe, as good as it

21   gets in terms of putting in place a structure.  So we

22   think that the structure itself would warrant a very

23   significant fee.

24                   We tried to articulate in the papers

1   that one way to look at it is, Okay, if I think that

2   the Council would justify alone a fee of 10 to

3   15 million, what would be awarded on the 90 million?

4   You could do it one way or the other, but it's almost

5   a relationship.  It's a sliding scale.  And we think

6   that a fair view of both elements of the settlement

7   together, you know, could actually justify a more

8   significant fee, but this is what we're seeking.

9            We think that on the governance side,

10  we cited the precedents, the Activision case, where

11  there's a discussion about the value of the governance

12  aspect of Activision.  Vice Chancellor Laster said,

13  Well, this is meaningful because you are limiting the

14  ability of controllers to control, and so that has

15  value.

16           We think that if you were to compare

17  the terms, here, we have something at least as

18  significant or, really, more significant.  We have the

19  Google case where there was, again, we think -- an

20  $8-1/2 million fee was awarded on relief that we don't

21  think really was put together the way this was.  I

22  mentioned earlier the Yahoo! case, which was attacking

23  a compensation scheme that would have created value in

24  the event of a future sale of the company.

1          But, again, we think that this is

2    really different.  This is a huge company.  There's

3    precedent for saying, Well, let's see how big the

4    company is to assess how much theoretical value there

5    is.

6          Twenty-First Century Fox is a very

7    large company, and being able to turn the page and

8    show that the board is on top of these issues, and

9    again, is taking their most important division from

10   worst to first, that has, we believe, tremendous

11   value.  It can help with ongoing transactions.

12          You know, something that's not

13   self-evident when you think about what happens if a

14   company has a corrosive culture is it's not just the

15   talent that comes and then, you know, leaves after

16   years.  It's the people who never get hired.  Because

17   you can only imagine what was going on when Roger

18   Ailes was interviewing people.  So there may be -- the

19   leading talent at the competing network may have

20   actually been happy to get the job at Fox News but

21   said, No, I'm not going to do this.  So improving the

22   culture is not just about doing the right thing.  It

23   is actually good business.  So, you know, we think

24   this will help the company in so many ways.

1      And then, you know, we talk about the

2  time and effort put in.  We -- again, a case can't

3  have, you know, too many leaders in it.  This was a

4  unique situation where we had a lot of different firms

5  getting involved, but it was under our guidance.  And

6  people came together and really cooperated.

7      And, you know, again, I don't want to

8  go down the list, but I'm tempted to identify everyone

9  who is here because people worked hard together for

10  this cause.  And, you know, we put in the numbers.

11  There's a total lodestar.  Not including the -- our

12  submission, just so that Your Honor is clear, is up

13  until about an hour before our brief got filed, our

14  total lodestar included a portion of the Levi

15  Korsinsky time.  It was really only late on a Friday

16  that we learned that they were not participating in

17  the process.  So the $3.8 million of lodestar reflects

18  all of the firms other than Levi & Korsinsky.  So you

19  can see that the numbers, the multipliers and the

20  implied hourly rates, get adjusted accordingly if you

21  then add the additional hours.

22      THE COURT:  So there's only one

23  question I have in this regard.  I'm obviously too far

24  removed from private practice.  So this works out to a

1    little over 4,000 an hour.  Right?

2                    MR. LEBOVITCH:  It would be lower if

3    you added the Levi Korsinsky time, but at this time,

4    this is just over --

5                    THE COURT:  Help me with this

6    sentence.  "The implied hourly rate plaintiff seeks

7    here approximates or is just below the top rate

8    charged by lawyers at certain of their firms"?

9                    MR. LEBOVITCH:  I think --

10                   THE COURT:  I mean, come on.

11                   MR. LEBOVITCH:  You know what, Your

12   Honor --

13                   THE COURT:  It's preposterous.

14                   MR. LEBOVITCH:  I think there is a

15   footnote --

16                   THE COURT:  There is a footnote

17   talking about 1500 an hour, which is the rich end of

18   Wall Street.  Am I that removed from private practice?

19                   MR. LEBOVITCH:  Well, it is 12 to 1800

20   an hour.  You see that frequently.

21                   But, Your Honor, I will confess what

22   happened, actually -- and this is why we didn't list

23   the multiplier.  It's dot 5.  You can do the math.

24   But we really, in the last hour, had to -- we didn't

1   have fee affidavits for all of the time, and there was

2   a lot of changes desperately done on a Friday night

3   and a brief that a lot of people looked at a lot of

4   times.  I think in the end, the last editing -- you

5   know, so I apologize for that.  It's an oversight.

6               It's -- what we're asking for on a

7   contingency basis is, yeah, about double or a little

8   more than double the prevailing rates of many of the

9   big defense firms.

10              I will highlight, Your Honor, that,

11  look, we not only do this on a contingency but even

12  the precedents, and we touch on this in one paragraph

13  in our brief, even the precedents for historical

14  multipliers awarded and implied hourlies that are

15  awarded, I think -- I hope Your Honor agrees -- a lot

16  of those were awarded at a different time in Delaware

17  law.

18              And now, if what the Court wanted was

19  to see people litigating hard and taking real risk and

20  being willing to lose -- we don't like it, but we do.

21  And I hope Your Honor knows that our firms, we are

22  willing to take those risks.  We do.  We fought back

23  from near death in some cases in front of Your Honor.

24  But we do fight and we do take losses sometimes.

1           THE COURT:  Whose death?  Mine or

2    yours?

3           MR. LEBOVITCH:  Ours.  Ours.  That was

4    a reference to TIBCO, Your Honor.

5           THE COURT:  I'm not so sure, at times.

6           MR. LEBOVITCH:  That was our reference

7    to TIBCO.  But in any event, it's hard, and you take

8    losses.  So, yeah, if we're successful, I think that

9    hopefully the Court says, Yeah, you did a good job

10   here.  You did what we want you to do, and we're going

11   to reward you.

12           And, really, the last point that I'll

13   make is, obviously, and we support this, hopefully

14   Your Honor thinks we're good at what we do and we're

15   responsible.  Our adversary here, we touched on

16   earlier, it's hard to get anyone better than Richards

17   Layton and Mr. Varallo, but, also, Your Honor sees a

18   lot of the venom that happens in litigations, and it's

19   unfortunate.  This could not have happened, this whole

20   process could not have happened, if you didn't have

21   people who could have an argument without hitting each

22   other, have a disagreement without slamming the door

23   and, frankly, trust, because it takes a lot of candor

24   to put this together.  And I do want to commend that

1   for all parties involved.

2               So unless Your Honor has questions

3   about that ---

4               THE COURT:  I don't.

5               MR. LEBOVITCH:  Okay.  So I don't

6   know -- we discussed the issues about the L&K motion.

7   Our view is it's premature.  Our view is there is a

8   contract in place that's unambiguous, and there is a

9   process that's followed.

10              THE COURT:  There is a line in Levi &

11  Korsinsky's brief that I'd like you to address.

12  Basically, it says that their two clients are not

13  signatories to the settlement agreement.

14              Now, I did look back at the settlement

15  agreement and I didn't see a hand signature for their

16  firms, but I thought they were a party to this

17  agreement.  Am I mistaken about that?

18              MR. LEBOVITCH:  They're absolutely

19  parties to the agreement.  They saw the agreement in

20  advance.  And the whole act of signatures, there's a

21  lot of people involved, and when we were in the

22  process of getting it done, it just -- who wants to

23  get 15 more signatures?  There's already enough

24  signatures on it.  That's it.  Everyone in this room

1   who was involved in the case saw it, reviewed it,

2   approved it.  I believe we have an e-mail confirming

3   it, so there is no ambiguity there.

4                    I don't know.  There is really only

5   one point I would make on it.  I would want to quote

6   Vice Chancellor Glasscock.  I don't know if Your Honor

7   is aware but there was a prior situation where the

8   Levi & Korsinsky firm tried to get what I call a

9   preallocation from the Court, you know, in other

10  words, get an allocation before there was a

11  settlement.

12                   THE COURT:  I know what you're

13  referring to but I thought this may have been

14  discussed in the brief.  There's one of these cases

15  discussed in the brief, but maybe I'm merging them

16  together.

17                   MR. LEBOVITCH:  Duke Energy.

18                   THE COURT:  Yeah, Duke Energy.

19                   MR. LEBOVITCH:  And I just want to

20  quote the three sentences that Vice Chancellor

21  Glasscock said in deciding that the contract will

22  control and that I think it was the Prickett Jones

23  firm would do the allocation and then people could

24  come back if there was a problem.

1              This is a quote from a transcript

2   that's page 44.  We can submit it if Your Honor likes.

3   Vice Chancellor Glasscock says, and I quote, "I am

4   being asked to allocate in the first instance this fee

5   award.  I would prefer not to.  I would prefer not to

6   for two reasons.  The first, I think, like every

7   judge, I dislike litigation about litigation.  The

8   second is that however I decide this, it will have

9   incentive effects that may or may not be pernicious."

10             And we don't like litigation about

11  litigation.  I think Your Honor is aware that it's

12  rare for anything like this to happen, and in fact,

13  it's very rare for the Court to ever see a fight even

14  after a settlement is approved and a fee is awarded.

15  And it's because we kind of all have to live with each

16  other and people -- ultimately, you know, the merits

17  prevail.

18             But here, there is a contract, and I

19  will just stress that to obviate or sidestep the

20  contract would actually create I think a lot of

21  pernicious incentives.  And so, you know, I would

22  reserve if there is further argument about the issue

23  but I think that Your Honor knows the law of ripeness.

24  You know, another issue that I've litigated before

1    Your Honor.  I don't think this is a close call.  This

2    issue isn't ripe.  We should get to perform under the

3    contract.

4                   If the settlement is approved and the

5    fee is approved, we would allocate pursuant to the

6    contract.  And then if there is a dispute, we've

7    already said we would put disputed amounts in escrow

8    and we can deal with it.  But, you know, I don't

9    think -- I would hope the Court doesn't have a lot of

10   interest in enmeshing itself in those type of issues.

11                  But if Your Honor has no more

12   questions, I just want to reserve to respond if

13   there's further argument.

14                  THE COURT:  You may, and you'll have

15   that opportunity if it's necessary.

16                  Mr. Varallo?

17                  MR. VARALLO:  Good afternoon,

18   Chancellor.  Gregory Varallo for all defendants other

19   than the estate of Mr. Ailes, which is represented

20   today by Mr. Bracegirdle.

21                  Your Honor, I will say two things.

22   The $200 million damages point, I think Mr. Lebovitch

23   had it absolutely correct that there was a substantial

24   disagreement among the parties about that number.

1          THE COURT:  Right.

2          MR. VARALLO:  My client views it very

3   differently the plaintiffs did, and we made that

4   clear, and that was an important part of the

5   negotiation.  From our point of view, the $90 million

6   actually represents quite a bit more, a larger

7   percentage of the damages that could be proved.  And I

8   think from the insurer's point of view, it's probably

9   a premium to the damages that could be proved.

10          The other thing I'll say, I take a

11   moment of personal privilege to say we have in the

12   courtroom with us today Mr. Max Berger from the

13   Bernstein Litowitz firm.  And I have to say, Your

14   Honor, that without Mr. Berger's leadership and

15   Mr. Lebovitch's leadership, Mr. Grant's leadership,

16   Mr. Barry's leadership, and the hard work of all of

17   the plaintiffs in this firm -- not only in this firm

18   but in this room -- we wouldn't be here today.  And I

19   have to say as well, we would have been in a worse

20   place: a worse place for my client, a worse place for

21   society, more broadly.

22          And I know we all come here in an

23   unusual circumstance, but it's a circumstance the

24   Court should commend, because by virtue of the

1    leadership of the folks on this side of the room --

2    and I don't think I've ever used those words in the

3    same sentence before -- but by virtue of that

4    leadership and by virtue --

5                 THE COURT:  Feeling generous today,

6    Mr. Varallo?

7                 MR. VARALLO:  By virtue of the larger

8    group having collaborated so well together under that

9    leadership, we got to a result that really is a

10   special result for the company.  And so I stand up to

11   join in asking the Court to approve the settlement,

12   and I appreciate Your Honor's time.

13                THE COURT:  I do have one quick

14   question for you.  I could be off base in thinking

15   about it this way, but I looked quickly at the release

16   before I came up.  Does the release in any way impede

17   your client, the entity, the company, if it so wished,

18   from pursuing recourse from the Ailes estate?  Maybe

19   that's all wrapped up.  I don't know.  Or other people

20   that could have underlying liability associated with

21   some of these events?

22                MR. VARALLO:  I believe that the

23   language of the release would preclude the company

24   from pursuing against the Ailes estate for matters

1  pertaining -- that were covered by or could have been

2  covered by this litigation.

3                    THE COURT:  Which the D&O carriers

4  would presumably insist upon.

5                    MR. VARALLO:  Your Honor, there is a

6  long story there.  I would prefer to go off -- well, I

7  would prefer to be on the record in camera if we

8  could, if Your Honor would like to pursue it.  But in

9  candor, yes, we have given up our right to pursue the

10  Ailes estate for these matters.

11                    We have not given up our right to

12  pursue others who are not covered by that release; and

13  there could be such other persons.

14                    THE COURT:  Okay.  All right.  Thank

15  you.

16                    MR. VARALLO:  Thank you, Your Honor.

17                    THE COURT:  Mr. Bracegirdle, I don't

18  know if you had anything you wanted to add or not.

19                    MS. GULETTA:  Your Honor, Thad

20  Bracegirdle on behalf of the Ailes estate.  Nothing

21  beyond what Mr. Varallo has said to the Court.

22                    Thank you.

23                    THE COURT:  Very well.

24                    First of all, I want to know, are

1   there any objectors in the courtroom?

2                    Just for the record, there are not.

3                    Ms. Miller, were you seeking to be

4   heard?

5                    MS. MILLER:  If the Court want to hear

6   from me, I have something prepared to say.

7                    THE COURT:  Briefly.  I'll let you

8   speak briefly.

9                    MR. DUPRE:  Your Honor, I should say,

10  as Delaware counsel, Andrew Dupre, McCarter & English.

11  It's my pleasure to introduce Ms. Miller.

12                   THE COURT:  I'll just say from the

13  outset, Ms. Miller, just to orient you, I am inclined

14  to have you work through the process that is set forth

15  in the contract.  That is sort of my direction, which

16  I think makes sense.

17                   I was a little surprised to see the

18  reference to -- the nonsignatory reference in a way

19  that -- I mean, the only reason to say something like

20  that is to, like, disavow that it binds you or your

21  firm.  Are you contending that?

22                   MS. MILLER:  No, I'm not contending

23  that.  I think the point of that was just to go along

24  with the point of everything else, that if you weren't

1    Monroe's counsel, then you weren't getting the

2    opportunity to have your client sign any documents,

3    verify any complaint, or anything like that.  I think

4    that was the point of that.  That had nothing to do

5    with saying that we weren't supporting the settlement

6    or anything like that.

7            THE COURT:  I'm sorry.  Who is

8    Monroe's client?

9            MS. MILLER:  It is Bernstein Litowitz.

10           THE COURT:  Or whose firm represents

11    Monroe?

12           MS. MILLER:  Grant & Eisenhofer and

13    Bernstein Litowitz.

14           THE COURT:  They both do.

15           MS. MILLER:  Yes.

16           THE COURT:  Like I said, I think you

17    sort of know what my inclination is, but if you want

18    to speak briefly, I will give you the opportunity.

19           MS. MILLER:  Okay.  I will be very,

20    very brief, then.

21           I, of course, think that the contract

22    doesn't apply in this situation because it doesn't

23    cover this situation because I do not believe that the

24    co-lead counsel can decide Levi & Korsinsky's fee in

1    good faith.

2              But I do want to focus on one thing

3    that's been represented to the Court.  When we asked

4    for our $1.5 million fee request, we did the math, and

5    that comes out to $625 per hour of an implied hourly

6    rate.  And if you were to award that fee to us, then

7    you would know exactly what Levi & Korsinsky is going

8    to get paid on an hourly basis.

9              You just heard co-lead counsel stand

10   up here and say that basically they're seeking a fee

11   of about $4,000 per hour if they get paid on what

12   they're seeking.  But to us, we don't believe that's a

13   fair representation of what is actually going to get

14   paid, unless all of the hours are going to be treated

15   accordingly, meaning that everyone is going to get

16   paid that $4,000 per hour for all of their hours.

17             If that's not the way that it's going

18   to work, then co-lead counsel should tell you, We're

19   actually going to take whatever, $20,000 an hour, and

20   these people are going to get paid $500 an hour.  We

21   think that that would be an accurate way to represent

22   the lodestar if that's what it really is.

23             And that's what we want to say, is

24   that we are happy if the co-lead counsel are going to

1   stand by their representation and say everyone is

2   entitled to the same hourly rate.  We put in more

3   hours, so we get more of the hourly rate.

4                    THE COURT:  Are you suggesting they

5   made such a representation?

6                    MS. MILLER:  I think their brief does.

7   I think their brief tells you that this is the hourly

8   rate that everyone is going to get paid.  And that --

9   you know, if that's not what they're doling out, then

10  that isn't accurate.

11                   THE COURT:  I'm pretty confident

12  that's not what that part of the brief says.

13                   MS. MILLER:  Okay.  Well, we thought

14  that that was an important distinction.

15                   And if you have any questions about

16  anything, then I'm happy to answer them.

17  Otherwise ...

18                   THE COURT:  I don't.

19                   MS. MILLER:  Okay.  Thank you for your

20  time.

21                   THE COURT:  All right.

22                   Anything else from your side?

23                   MR. GRANT:  Nothing else, Your Honor.

24                   THE COURT:  Okay.  So let me talk for

1   a few minutes about this.  Fortunately, I don't have

2   to do the stuff I often have to do at settlement,

3   which is go through all the class elements.  Because

4   this is a derivative case, it simplifies things.

5                I will commend everyone in the room on

6   what happened here.  It's pretty unusual, not entirely

7   unprecedented, the prepackaged settlement.  But there

8   definitely were sensitivities here that make it, from

9   everything I can see, a really sensible, practical way

10  to resolve a pretty sticky situation.  And so for

11  that, I commend you for doing it and bringing it to

12  the Court the way you did.

13               I obviously wasn't there along the

14  way, so I take everyone's word who spoke sort of

15  glowingly -- recognizing, I'm sure, there were lots of

16  intramural fights along the way -- about the level of

17  cooperation that was exhibited on both sides to get to

18  the point of actually getting this done.  So on that,

19  I commend you.

20               I think the settlement is an excellent

21  settlement.  I looked through the therapeutic

22  benefits.  Obviously, I misread the termination

23  provision but, otherwise, I think I have the thrust of

24  the settlement.  And there's real meaning to the

49

1    Council, and, of course, there is always the cash.  On

2    the other side of the ledger, the claims are

3    ultimately Caremark claims, which are very hard to

4    prove.

5              It's very hard to quantify these types

6    of benefits.  I thought about asking for some

7    affidavit or something that would give me some notion

8    on that.  I know when that's been done in the past,

9    sometimes they've been less helpful than more helpful.

10   And it is difficult to do it.  But I think the fee

11   award in the aggregate is fair.

12             I'm not going to parse it finely.  It

13   doesn't fit in the natural framework of our ranges,

14   depending on where the case is, because everything was

15   done prefiling.  There was some level of deposition

16   activity and certainly a lot of interviews and other

17   things that were going on here.

18             So I think the amount is appropriate;

19   the settlement, I think, is an excellent settlement;

20   and I'm going to approve both.

21             With respect to the Levi & Korsinsky

22   matter, I am going to give you a few points of

23   guidance, but I think the right way to handle it is to

24   go through the process of the good-faith discussion

1    that needs to occur under the provision of the

2    settlement agreement.  But good faith means good

3    faith.

4                    And a couple things:  I will want you

5    to escrow a million and a half of the settlement

6    amount pending the outcome of that.

7                    I truly do want a dialogue.  I think

8    what people need to recognize -- I'll sort of make two

9    comments to hopefully inform the discussion when it

10   occurs.

11                   I think, Ms. Miller, your firm -- you

12   know, I'm probably one of the few judges, maybe the

13   only one, that's been in the secret sweat lodge of

14   some of this in my days in private practice.  I think

15   you would be naive to think there's going to be

16   equivalence between the people that took the

17   leadership role and the manner of compensation.  It's

18   not some pro rata exercise, and I think you'd be naive

19   to think that.

20                   But I also want the plaintiffs, the

21   lead folks, to truly exercise good faith and to

22   recognize that if this comes back to me, which I hope

23   it never does, I'm going to need sunlight on where

24   every dollar went in the settlement, who got paid

1   what, what the multipliers were for every firm, and

2   what the justification is of the treatment down the

3   road.

4                    I never want to see it, frankly.  And

5   I wouldn't rule out assigning this to some sort of

6   Master to deal with the situation.  I don't know.  I

7   haven't thought about it that deeply.  I really hope

8   that it can be resolved and would strongly encourage

9   you to resolve it.

10                   So I think I probably need to do a

11  modification of the form of order that reflects the

12  last part of what I said.

13                   The order should be on the system.

14  Right?  The final order?  I imagine it is.

15                   MR. GRANT:  Yes, Your Honor.

16                   THE COURT:  And if it's not, somebody

17  from my chambers will call you soon to let you know

18  that, but I'm pretty sure it is.  And I'll enter it,

19  and I'll put a modification in reflecting what I just

20  said about how we're going to handle the Levi &

21  Korsinsky matter.

22                   Does anybody have any questions for

23  me?

24                   MR. GRANT:  No, Your Honor.

1                    MR. LEBOVITCH:  No.

2                    THE COURT:  Thank you for your

3       presentations, and to all of you, have a good day.

4                    MR. VARALLO:  Thank you, Your Honor.

5                    VARIOUS COUNSEL:  Thank you, Your

6       Honor.

7                    (Court adjourned at 3:00 p.m.)

8                              – – –

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

53

                              CERTIFICATE

1

2

3              I, JEANNE CAHILL, RDR, CRR, Official

4    Court Reporter for the Court of Chancery of the State

5    of Delaware, do hereby certify that the foregoing

6    pages numbered 3 through 52 contain a true and correct

7    transcription of the proceedings as stenographically

8    reported by me at the hearing in the above cause

9    before the Chancellor of the State of Delaware, on the

10   date therein indicated.

11                   IN WITNESS WHEREOF I have hereunto set

12   my hand at Wilmington, Delaware, this 13th day of

13   February, 2018.

14

15

16                  /s/ Jeanne Cahill
                    ----------------------------
17                  Jeanne Cahill, RDR, CRR
                    Official Chancery Court Reporter
18                  Registered Diplomate Reporter
                    Certified Realtime Reporter
19

20

21

22

23

24

                      CHANCERY COURT REPORTERS